## UNITED STATES DISTRICT COURT
### For The DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOHN GARD,<br>  5045 Rushlight Path<br>  Columbia, Maryland 21004-1295,<br><br>           Plaintiff<br>     v.<br><br>UNITED STATES DEPARTMENT<br>  of EDUCATION<br><br>            Defendant<br>      and<br><br>MARGARET SPELLING, SECRETARY,<br>UNITED STATES DEPARTMENT<br>    OF EDUCATION<br>  400 Maryland Avenue, S.W.<br>  Washington, D.C. 20202<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No.  07-2303 (RMC)**<br><br>**NOTARIZED REVISED<br>    AMENDED COMPLAINT** |

## NOTARIZED REVISED AMENDED COMPLAINT

### I. NATURE OF ACTION

1.   This is a Notarized Revised Amended Complaint action by John Gard, Plaintiff, Pro se,

(hereafter Plaintiff), to **redress actions** taken by Margaret Spelling in her official capacity as

Secretary, United States Department of Education, Defendant, and the United States

Department of Education, Defendant, (hereafter jointly Defendants or Agency), **based on**

intentional and unintentional direct and indirect theories and proof[1] of discrimination,

accommodation and reprisal violations and acts, and intentional Privacy Act violations and

---

[1] To include, but not be limited to, the Douglas factors.

**RECEIVED**

APR **1 8** 2008

**NANCY MAYER WHITTINGTON, CLERK**
U.S. DISTRICT COURT

Page 1 of 230

Gard v Department of Education, Civil Action No. 07-2303 (RMC) (April 18, 2008)

# **INDEX**

I.      Nature of Action, paragraphs 1 - 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     Jurisdiction and Venue, paragraphs 4 - 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

III.    Exhaustion of Administrative Remedies, paragraphs 9 - 82 . . . . . . . . . . . . . . . . . . .  6

IV.     Plaintiff, paragraphs 83 - 91 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

V.      Defendants, paragraphs 92 - 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

VI.     Claims, paragraphs 95 - 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

            ED-2005-28-00, paragraph 97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

            ED-2006-11-00, paragraph 98 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

            ED-2007-15-00, paragraph 99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

            Medical Reprisal, paragraph 100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

            Retirement Reprisal, paragraph 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

            Adjudication Reprisal, paragraph 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

VII.    Defendants' Admissions and Judicially Decided Facts, paragraphs 103 - 149 . . . . . . . .  29

VIII.   Statement of Facts, paragraphs 150 - 814 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

            Quick Summary, paragraphs 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

            Chronic Pain from Gun Shot Injury, paragraph 195 . . . . . . . . . . . . . . . . . . . . .  48

            Hearing Loss, paragraphs 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

            Narcolepsy, paragraphs 246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59

            Post-Traumatic Stress Disorder, paragraphs 321 . . . . . . . . . . . . . . . . . . . . . . .  74

            Historical and Current Related Facts, paragraph 388 . . . . . . . . . . . . . . . . . . . .  84

Count I   refusal to continue reasonable accommodation ............................ 190

Count II   refusal to accommodate ............................................... 192

Count III   retaliatory acts ..................................................... 194

Count IV   refusal to acknowledge existence of reasonable accommodation records ....... 195

Count V   unlawful maintenance of medical records ............................... 197

Count VI   unlawful removal of medical records ................................. 198

Count VII   unlawful destruction of medical records ............................. 199

Count VIII   unlawful refusal to restore medical records ......................... 201

Count IX   unlawful maintenance of retirement records ........................... 202

Count X   unlawful removal of retirement records ................................ 203

Count XI   unlawful destruction of retirement records ........................... 204

Count XII   unlawful refusal to restore retirement records ....................... 205

Count XIII   PA security, safeguarding, maintenance and record-keeping ............. 207

Count XIV   PA security, safeguarding, maintenance and record-keeping for Rehab. Act  .. 208

Count XV   refusal to answer discovery request for ED-2005-28-00 .................. 209

Count XVI   refusal to forward ROI for ED-205-28-00 to EEOC ..................... 210

Count XVII   refusal to forward ROI for ED-2006-11-00 to EEOC ................... 211
Count XVIII   tampering with witness ........................................... 212

Count XIX   Defendants witness perjury ......................................... 213
Count XX   refusal to file Board appeal answer .................................. 215

Count XXI   PA record maintenance ............................................ 216
Count XXII   PA record maintenance ........................................... 217

Relief ...................................................................... 217
            File Ref:    2008-04-16 Index for RAC 01.wpd

reprisal acts, **pursuant to** the Defendants violations of:   1) the Rehabilitation Act of 1973 (Rehab. Act), as amended[2]; 2) the Civil Rights Acts of 1964 and 1991 (CRA), as amended[3]; 3) the Privacy Act of 1974 (PA), as amended[4]; 4)  Equal Employment Opportunity Commission (EEOC) regulations, as amended[5];  and 5) Plaintiff's Constitutional, handicap, Title VII, and EEOC due process, discovery, hearing and adjudication rights.  The following Federal statutes and regulations support the before-identified statutes, regulations and rights:  a) the Americans with Disabilities Act of 1990 (ADA), as amended[6]; b) Office of Personnel Management (OPM) regulations, as amended[7]; c) the Federal Records Act of 1950 (FRA), as amended[8]; and d)

---

[2]  e.g., a) Sections 501 through 505, 508, and 510 of the Rehabilitation Act of 1973 (Rehab. Act), as amended; and b) the Rehabilitation Act Amendments of 1992.

[3]  e.g., a) Title VII; b) Civil Rights Act of 1964, as amended, e.g., Sections 704, 706(f) through 706(k) and 717; c) 42 U.S.C. § 2000e-3, § 2000e-5(f) through (k) and § 2000e-16;   d) Civil Rights Act of 1991, as amended, e.g., Section 102; e) Title VII reprisal sections; f) the additional protections, compensatory and punitive damages provided by said statutes; and g) reprisal and compliance regulations.

[4]  e.g., a) 5 UCC §552a; b) security, safeguard, maintenance, correct, restore, and non-destruction regulations applicable to Federal records; and c) compliance regulations.

[5]  e.g., a) 29 C.F.R. § 1630.14(b)(1), requires all medical or disability-related information be kept in separate files and treated as confidential medical records in accordance with EEOC regulations;  b) 29 C.F.R. § Part 1600, §1630.2(o);  c) EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, No. 915-002 (October 17, 2002);  d) security, safeguard, maintenance, and non-destruction regulations applicable to Federal records; and e) reprisal and compliance regulations.

[6]  e.g., Titles I and V, and Section 512, as the ADA references and incorporates the Rehab. Act and visa versa.

[7]  e.g., a) security, safeguard, maintenance, record-keeping, restore, and non-destruction regulations applicable to Federal records; and b) compliance regulations.

[8]  e.g., Title 44, Chapter 31 §3101 - §3107, especially §3106,  as the FRA is applicable to the Rehab. Act, Title VII, EEO, and PA claims pertaining to the security, safeguard,

National Archives and Records Administration (NARA) regulations, as amended[9].

2.  This complaint includes all direct and indirect theories and proof of: a) intentional and unintentional discriminatory handicap and non-handicap, e.g., Title VII and EEOC, discrimination, accommodation and reprisal acts and violations; and b) intentional Privacy Act violations and reprisal acts, to include, but not be limited to, the following: 1) handicap discrimination, 2) refusal to continue reasonable accommodation, 3) refusal to accommodate, 4) illegally requesting/demanding Plaintiff release <u>ALL</u> of Plaintiff's medical records to the Defendants, 5) illegally requesting/demanding Plaintiff update Plaintiff's medical records on file with the Defendants when the Defendants did not have a valid legal reason for making said request, 6) hostile work environment, 7) harassing conduct, 8) retaliatory conduct, 9) disparate treatment, 10) failure to comply with Defendants' rules and regulations, 11) failure to comply with the rules and regulations of the statutes and regulations identified in paragraph # 1, 12) manufacturing pretext reasons to justify Defendants' actions, 13) taking retaliatory actions against Plaintiff for filing a handicap refusal to continue reasonable accommodation discrimination claim against the Defendants,  14) taking retaliatory actions against Plaintiff for filing a handicap failure to accommodate discrimination claim against the Defendants, 15) taking retaliatory actions against Plaintiff for filing a discrimination claim against the Defendants, 16) taking retaliatory actions against Plaintiff for filing reprisal claims against the Defendants, 17) failure to secure official Federal records, 18) failure to maintain official Federal

---

maintenance, restore, and non-destruction requirements of Federal records, and includes criminal and penalty clauses for the Defendants' a) failure to comply with the requirements of said statutes and regulations and b) destruction of Federal records.

[9] e.g., as the NARA regulations are applicable to the FRA.

records, 19) failure to restore official Federal records, 20) destruction of official Federal records, 21) criminal and civil violations and conduct, 22) destruction of evidence, 23) criminal acts, 24) Defendants' perjury, and 25) Defendants tampering with a witness. The Complaint's actual individual, joint and intertwined claims are set forth in Section VI, Claims.

3.  Defendants' acts as identified in paragraph # 2 and Section VI, Claims, have had, and continue to have, materially adverse affects on: a) Plaintiff, his wife and their children; b) the control of Plaintiff's handicaps/impairments[10], which impairments substantially limits Plaintiff's major life activities of living, driving, eating, sleeping, being awake, being alert, and working; c) Plaintiff's daily, weekly and monthly work and personal schedule; d) Plaintiff's daily, weekly and monthly work and personal planned and unplanned activities; e) Plaintiff's daily, weekly and monthly planned sleep schedule; f) Plaintiff's daily unknown and unplanned narcoleptic sleep interruption awake events[11] are unknown and unplanned because his narcolepsy **controls** all of his daily, weekly, monthly and yearly life activities;[12] g) the compensation, terms, conditions, and privileges of Plaintiff's Federal employment to include, but not be limited to, Plaintiff's work situation, work productivity, assigned position and position title, assigned duties, and access to Defendants' computer systems, records and co-workers required to complete assigned work assignment(s); and h) Plaintiff's marriage.

---

[10] When EEO counseling was requested, my physical disabilities, in alphabetical order, were: a) chronic pain from a gun shot injury, b) hearing loss, c) narcolepsy, and d) post-traumatic stress disorder (PTSD), which are discussed in the Complaint's FACTS section.

[11] See the Complaint's FACTS section for further information concerning narcolepsy, Plaintiff's narcolepsy, and the other handicaps/impairments.

[12] Plaintiff's narcolepsy decides what Plaintiff will do every minute of the day and when he will be allowed to do it.

## II. JURISDICTION AND VENUE

4.  Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

5.  This Court has jurisdiction of the discrimination and reprisal causes of this action under the Rehab. Act, Title VII, CRA, and EEOC regulations, e.g., § 706(f)(3) of Title VII, 42 U.S.C. §2000e-5(f).

6.  This Court has jurisdiction of the Privacy Act causes of this action under the PA, e.g., 28 U.S.C. §1331 and 5 U.S.C. §552a.

7.  This Court has jurisdiction to award Plaintiff full make-whole relief to include, but not be limited to, reasonable accommodation, correction of Defendants' unlawful employment practices and acts, equitable relief, injunctive relief, monetary damages, emotional damages, declaratory relief, compensatory damages, marital damages, termination of Defendants' employees, referral of Defendants' employees to disciplinary boards/bodies, and all reasonable attorney fees, costs and consequential damages pursuant to 42 U.S.C.A. §2000e-5(g)(k), 29 U.S.C.A. §626(b)(c)(1)(2), and 28 U.S.C.A. §1346b(1), and the previously identified statutes.

8.  Venue is appropriate in this District Court pursuant to the venue statute as set forth under 42 U.S.C. § 2000e (5) (f) (3), Fed.R.Civ.P., and the local rules of this court as the:

    A.  Defendants' handicap, Title VII and EEOC discrimination violations and unlawful employment acts and practices occurred in the District of Columbia,

    B.  Defendants' Privacy Act violations and unlawful and reprisal acts occurred in the District of Columbia,

C.  Defendants' reasonable accommodation violations and unlawful employment acts and practices occurred in the District of Columbia,

D.  Defendants' Constitutional violations and unlawful and reprisal acts occurred in the District of Columbia.

E.  In case some of the above are incorrect or insufficient, the District Court has jurisdiction and venue under the Rehab. Act, CRA, PA, and Plaintiff's Constitutional, handicap, Title VII, CRA and EEOC due process, discovery, hearing and adjudication rights.

## III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.  Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

10.  All of the necessary administrative prerequisites for filing the discrimination, accommodation, reprisal and rights violations, unlawful employment practices and acts claims identified in paragraph 2 and Section VI, Claims, have been met.

11.  All of the necessary administrative prerequisites for filing the Rehab. Act, Title VII and EEOC handicap, discrimination, accommodation, reprisal and rights violations, unlawful employment practices and acts claims identified in paragraph 2 and Section VI, Claims, have been met.

12.  All of the necessary administrative prerequisites for filing the security, safeguard, maintenance, record-keeping, restore, and non-destruction record and reprisal violations, unlawful employment practices and acts claims identified in paragraph 2 and Section VI, Claims, have been met.

13.  All of the necessary administrative prerequisites for filing the Rehab. Act, PA, and OPM and

EEOC regulations security, safeguard, maintenance, record-keeping, restore, and non-destruction record and reprisal violations, unlawful employment practices and acts claims identified in paragraph 2 and Section VI, Claims, have been met.

14. All of the necessary administrative prerequisites for filing the Constitutional reprisal violations, unlawful employment practices and acts claims have been met.

15. Plaintiff has continuously worked for the Defendants since April 24, 1989 and is currently assigned to work for the Director, Post Audit Group, Financial Improvement and Post Audit Operations, Office of the Chief Financial Officer, Defendants.

16. The Plaintiff is a GS-14, systems accountant.

17. At all times relevant to this complaint, Plaintiff is and has been an active Federal civilian employee employed by the Defendants.

18. November 22, 2004, is the date of the alleged discriminatory action for ED-2005-28-00. Defendants' Report of Investigation (ROI-1) report, i.e., ROI-1 @ p. 2 and Tab B2.

19. On January 3, 2005, Plaintiff timely requested EEO counseling from the Defendants for ED-2005-28-00. ROI-1 @ p. 7 and Tab B2.

20. On March 2, 2005, the EEO counselor issued the notice to file a formal complaint of discrimination for ED-2005-28-00. ROI-1 @ p. 7 and Tab A.

21. On March 14, 2005, Defendants acknowledged Plaintiff's timely filing of a Formal Complaint of Discrimination against the U.S. Department of Education for ED-2005-28-00. ROI-1 @ p. 7 and Tabs A and C1.

22. Plaintiff complied with and promptly answered all of the EEO investigator's interrogatories and produced all documents requested during the investigation of ED-2005-28-00.

23. On January 10, 2006, the Defendants issued the Report of Investigation for ED-2005-28-00.

24. Defendants Report of Investigation for ED-2005-28-00 excluded documents Plaintiff submitted to the EEO investigator.

25. The documents excluded from the Defendants' Report of Investigation for ED-2005-28-00 were relevant to the adjudication of ED-2005-28-00 as said documents proved that Plaintiff had submitted requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, to the Defendants.

26. The Report of Investigation for ED-2005-28-00 does not include the claims of ED-2006-11-00.

27. On February 9, 2006, Plaintiff timely submitted to the EEOC his request for a hearing for ED-2005-28-00.

28. Per the EEOC, the Defendants did not forward the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC from March through April 2006.

29. On May 11, 2006, Plaintiff forwarded[13] to the EEOC a copy of the Report of Investigation for ED-2005-28-00.

30. On June 13, 2006, the EEOC issued the Acknowledgment and Order and assigned EEOC No. 570-2006-00125X to the Defendants' ED-2005-28-00 complaint number.

31. In early July 2006, Defendants timely served discovery requests on the Plaintiff for ED-2005-28-00, i.e., EEOC No. 570-2006-00125X.

32. Plaintiff's discovery requests for ED-2005-28-00 were timely served upon the Defendants in July 2006 in accordance with EEOC regulations.

---

[13] EEOC informed Plaintiff that only Federal agencies, e.g., the Defendants, can forward the Defendants' Report of Investigation to the EEOC.

33. In early August 2006, Plaintiff timely answered the Defendants' discovery requests for ED-2005-28-00, i.e., EEOC No. 570-2006-00125X.

34. In early August 2006, Defendants requested to discuss settlement prior to the due date for answering Plaintiff's discovery requests for ED-2005-28-00, i.e., EEOC No. 570-2006-00125X.

35. In early August 2006, Defendants stated they would answer Plaintiff's EEOC discovery requests for ED-2005-28-00, i.e., EEOC No. 570-2006-00125X, if settlement negotiations failed.

36. The EEOC dismissed Plaintiff's request for hearing for ED-2005-28-00 so the parties could discuss settlement per the Defendants' August 2006: a) request to discuss settlement, and b) agreement to answer Plaintiff's discovery requests if settlement negotiations failed.

37. Settlement negotiations failed in June 2007.

38. Plaintiff timely re-filed his request for hearing for ED-2005-28-00 in July 2007 with the EEOC.

39. Defendants have not answered Plaintiff's EEOC discovery requests for ED-2005-28-00.

40. In July 2007 the EEOC ordered the Defendants to forward the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC.

41. Per the EEOC, since July 2007, the Defendants have not forwarded the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC.

42. As of January 31, 2008, the EEOC had not held the requested hearing for ED-2005-28-00.

43. As of January 31, 2008, the EEOC had not issued an EEOC decision for ED-2005-28-00.

44. On January 31, 2008, Plaintiff requested the EEOC return ED-2005-28-00 to the Defendants.

45. On Jan. 31, 2008, Plaintiff requested the Defendants issue a final decision for ED-2005-28-00.

46. As of April 14, 2008, the Defendants have not issued a final decision for ED-2005-28-00.

47. EEOC regulations requires the Defendants to issue a final decision for ED-2005-28-00.

48. The Revised Amended Complaint Plaintiff filed on or before April 18, 2008, includes the claims of ED-2005-28-00.

49. On August 4, 2005, Plaintiff sent Defendants an email requesting Defendants' officials cease and desist handicap and EEO discriminatory and reprisal actions. ED-2006-11-00. Exhibit 1.

50. On August 30, 2005, Plaintiff timely requested EEO counseling from the Defendants for ED-2006-11-00.

51. On August 30, 2005, Plaintiff notified Defendants' officials that he had requested EEO counseling.

52. On September 15, 2005, Plaintiff sent an official request to Mr. White, EEO Director, requesting to amend/combine the like and related issues and claims of ED-2006-11-00 with ED-2005-28-00.

53. On November 16, 2005, Mr. David Wortham, Defendants' EEO counselor, notified Plaintiff that the Defendants would not combine the claims set forth in ED-2006-11-00 with the claim set forth in ED-2005-28-00.

54. On September 22, 2005, Plaintiff sent a letter to Mr. James R. White, Director, EEOG, and copied the Secretary, Defendants, ten of the Defendants' officials/employees and the EEO counselor. The letter states that: "In addition, I am again specifically requesting that all agency official officials and employees be instructed to immediately stop, cease and desist all retaliatory actions, i.e., whistleblower reprisal and EEO, agency officials and employees have taken and/or are taking against me." Exhibit 5 @ p. 2.

55. On September 29, 2005, Plaintiff requested the Notice to File a Formal Complaint of

Discrimination for ED-2006-11-00 be issued. Exhibit 6.

56. On November 28, 2005, Plaintiff timely filed[14] the Notice to File a Formal Complaint of Discrimination for ED-2006-11-00 with the Defendants. Exhibit 7.

57. On December 8, 2005, Defendants acknowledged the filing of the Plaintiff's Notice to File a Formal Complaint of Discrimination for ED-2006-11-00. Exhibit 8.

58. The due date for the Defendants to issue the Defendants' Report of Investigation for ED-2006-11-00 was on or about June 7, 2006.

59. Defendants did NOT investigate ED-2006-11-00.

60. As of April 14, 2008, the Defendants have not issued the Report of Investigation for ED-2006-11-00.

61. On Jan. 31, 2008, Plaintiff requested the Defendants issue a final decision for ED-2006-11-00.

62. As of April 14, 2008, the Defendants have not issued a final decision for ED-2006-11-00.

63. EEOC regulations require the Defendants to issue a final decision for ED-2006-11-00.

64. The Revised Amended Complaint that Plaintiff filed on or before April 18, 2008, includes the claims of ED-2006-11-00.

65. November 24, 2006, is the date of the alleged discriminatory action for ED-2007-15-00.

66. On December 11, 2006, Plaintiff timely requested EEO counseling from the Defendants for ED-2007-15-00.

67. On February 9, 2007, Plaintiff received the EEO Notice to File a Formal Complaint of Discrimination for ED-2007-15-00 for ED-2007-15-00.

---

[14]   Plaintiff received the notice on November 22, 2005.

68. On February 13, 2007, Plaintiff timely filed a Formal Complaint of Discrimination for ED-2007-15-00 with the Director, Equal Employment Opportunity Group, Defendants.

69. Defendants did NOT investigate ED-2007-15-00.

70. Defendants did NOT issue a Report of Investigation for ED-2007-15-00.

71. Plaintiff received the Defendants' September 20, 2007, DECISION to DISMISS the complaint identified as ED-2007-15-00 on September 22, 2007.

72. Plaintiff informed the Defendants by fax dated October 29, 2007, of his decision to file an action for ED-2007-15-00 in this Court.

73. The complaint Plaintiff filed on December 21, 2007, included the claims of ED-2007-15-00.

74. On December 21, 2007, Plaintiff timely filed a handicap refusal to accommodate discrimination, PA and reprisal complaint with this Court in the appropriate United States District Court within the 90-day statutory period from the receipt of the Defendants' final decision, which final decision pertains to ED-2007-15-00.

75. The Revised Amended Complaint Plaintiff filed on or before April 18, 2008, includes the claims of ED-2007-15-00.

76. Pursuant to the Court's ORDER dated April 2, 2008, Plaintiff has timely filed a handicap refusal to accommodate discrimination, PA and reprisal Revised Amended Complaint with this Court in the appropriate United States District Court within the time period the Court authorized for filing the Revised Amended Complaint, which complaint now includes the claims of ED-2005-28-00, ED-2006-11-00 and ED-2007-15-00.

77. Plaintiff's discrimination and reprisal complaints, i.e., ED-2005-28-00, ED-2006-11-00, and ED-2007-15-00, are each based on separate and different facts, dates and time-period actions

the Defendants have taken against the Plaintiff.

78. Plaintiff's PA complaint, i.e., Civil Action No. 00-1096 (PLF), was filed against the Defendants on or about May 16, 2000, which complaint is pending in the United States District Court for the District of Columbia.

79. Plaintiff's PA complaint, i.e., Civil Action No. 00-1096 (PLF), and this PA complaint, i.e., Civil Action No. 07-2303 (RMC), are each based on separate and different facts, dates and time-period acts the Defendants have taken against the Plaintiff.

80. Plaintiff has exhausted the administrative remedies applicable to the claims set forth in this Revised Amended Complaint.

81. The Court has jurisdiction to adjudicate the claims of this Revised Amended Complaint.

82. The Court has venue to adjudicate the claims of this Revised Amended Complaint.

## IV. PLAINTIFF

83. Plaintiff is a Caucasian American male born November 18, 1945.

84. Plaintiff is a U.S. born, legal citizen of the United States of America.

85. Plaintiff is a citizen and resident of Howard County located in the State of Maryland, where he has resided during all times relevant to this action.

86. Plaintiff's address is 5045 Rushlight Path, Columbia, Maryland 21044-1295.

87. Plaintiff is entitled to all of the rights and privileges the United States Constitution and the Bill of Rights authorizes and guarantees a U.S. born, legal citizen of the USA.

88. Plaintiff was a United States Marine Corps Officer during the Viet Nam conflict.[15]

---

[15] Plaintiff is a Viet Nam Era and NOT a Viet Nam combat veteran because President Nixon ordered all Marines out of Viet Nam as Plaintiff's flight approached Okinawa.

89. Plaintiff was Honorably discharged upon the completion of his military service.

90. Plaintiff does NOT have a criminal record.

91. During the 62 years Plaintiff has been on this earth, Plaintiff has NOT done anything to result in a bona fide criminal allegation, investigation, accusation, charge, conviction, and/or record.

## V.  Defendants

92. The United States Department of Education is named as the Defendants for that part of this action applicable to the Privacy Act (PA) violations and reprisal claims, allegations, and clauses of this action.

93. Margaret Spelling, Secretary, United States Department of Education is named as the Defendants in her official capacity as the head of the United States Department of Education for that part of this action applicable to the handicap discrimination and accommodation and handicap, Title VII, and EEOC reprisal violations and claims, allegations, and clauses of this action.

94. The Defendants are an Executive Agency/Department of the United States of America.

## VI.  CLAIMS

95. Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

96. Plaintiff brings this action to correct unlawful employment practices on the basis of the individual, joint and intertwined claims identified in paragraph # 2 and set forth with specifics in paragraph numbers 97 through 102. Claims presented to the EEO counselor are identified with the applicable Defendants' EEO complaint number, i.e., ED-2005-28-00, ED-2006-11-00,

and ED-2007-15-00. Reprisal claims not presented to the EEO counselor are identified as "Reprisal claim."[16] Claims restated for clarity are identified by the Defendants' EEO complaint number and "restated claim."[17] Claims the EEO counselor summarized are identified as "Counselor's claim summarized."

97. **Plaintiff's First Handicap Refusal to Continue Reasonable Accommodation Discrimination Claim,** was assigned Defendants' EEO complaint number ED-2005-28-00.

   A. ED-2005-28-00 **primary** claim Defendants accepted for investigation was: "Whether the Complainant was discriminated against on November 22, 2004, based on his physical disability, when he was not allowed to continue working at home – a previously granted reasonable accommodation." Or, alternative claim,

   B. ED-2005-28-00 **alternative** restated claim. **IF the Defendants continue to deny** that in 1990 through 1992 the Defendants: 1) determined Plaintiff was an otherwise handicapped employee entitled to reasonable accommodation and the protections of the Rehab. Act, and 2) authorized and provided Plaintiff with the requested reasonable accommodation from approximately 1990 through November 18, 2004, the Court will really be adjudicating the Defendants' intentional failure to comply with Defendants' regulations and timely deny,[18]

---

[16] The law allows reprisal claims occurring during the adjudication of a pending EEOC complaint to be included and adjudicated in the pending complaint without having the issue presented to an EEO counselor. Plaintiff has chosen to have the reprisal claims occurring during the adjudication of his pending EEO complaints adjudicated herein.

[17] Plaintiff understands that it is legally permissible to restate a claim as long as the restated claim reflects the actual claim presented for counseling. Plaintiff believes all restated claims accurately reflect the claim presented for counseling.

[18] The Defendants did NOT deny Plaintiff's requests for reasonable accommodation.

in writing, Plaintiff's written requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, as the Defendants' denial, which commenced after November 18, 2004, is an admission of intentional handicap refusal to accommodate discrimination. Plaintiff submitted, in accordance with the Rehabilitation Act from 1990 through 1992, the medical documentation the Defendants requested. Plaintiff would have filed a handicap refusal to accommodate discrimination complaint against the Defendants in 1992/1993 if the Defendants had not authorized and provided Plaintiff with the requested reasonable accommodation. Actions speak louder than words and the Defendants' actions authorized and provided Plaintiff with the requested reasonable accommodation from approximately 1990 through November 18, 2004. ED-2005-28-00 alternative restated claim.

C.   The actual claim presented to the EEO counselor was "Working at home as a reasonable accommodation had previously been given to the complainant. The agency has refused to continue to allow the complainant to do this."

D.   Agency officials identified as taking or being involved in the taking, implementing and/or authorizing the taking of the On or about November 22, 2004, discriminatory act or who had the authority, responsibility and/or capability to stop the discriminatory act from being taken, which they did not do, are as follows: a) Mr. Ted Mueller, Acting Director, Financial Improvement and Post Audit Operations (FIPAO), Office of the Chief Financial Officer (OCFO), and b) "OGC personnel," Defendants. ED-2005-28-00.

98. **Plaintiff's Second Handicap Refusal to Accommodate Discrimination, and Handicap and Reprisal Claims,** was assigned Defendants' EEO complaint number ED-2006-11-00.

    A.   The EEO counselor's claims summarization are:

        (1). Assignment of duties,

        (2). Duty hours (Flexi place),

        (3). Harassment (General),

        (4). Reasonable accommodation,

        (5). Reassignment directed,

        (6). Discipline (Other), and

        (7). Terms and conditions of employment. Counselor's claim summarization.

    B.   The actual claims submitted to the EEO counselor in ED-2006-11-00 are:

        (1). Denying Mr. Gard is and was handicapped.

        (2). Denying Mr. Gard is and was an otherwise qualified handicapped employee.

        (3). Denying the agency had previously authorized Mr. Gard reasonable accommodation.

        (4). Refusing to acknowledge and/or admit that Mr. Gard's physical disabilities are and were handicaps.

        (5). Refusing to acknowledge and/or admit that Mr. Gard submitted medical documentation to the agency pre-1998.

        (6). Informing Mr. Gard that he has to submit a written request for reasonable accommodation. On October 24, 2005, Ms. Stracke stated a verbal reasonable accommodation is valid, but the approval of a reasonable accommodation request must be in writing. Agency officials continue to refuse to acknowledge and/or admit that

the verbal approval of a reasonable accommodation request is valid and must be recognized by the agency according to EEOC regulations and court decisions.

(7). Informing Mr. Gard that he has to submit a written request for reasonable accommodation. On October 24, 2005, Ms. Stracke specifically requested Mr. Gard to submit updated medical information so it could be evaluated and a determination made as to whether the condition qualifies or continues to require reasonable accommodation. Mr. Miller stated reasonable accommodation approvals are supposed to be reevaluated every five years. I stated I have never read anything in the law or EEO regulations that states or implies reasonable accommodation approvals are to be reevaluated every five years. He may be right but I have not seen anything that would prove him right. I do know that the law and EEO regulations specifically state the agency can not request additional medical information after adequate medical information has been submitted and reasonable accommodation authorized.

(8). Refusal to continue on August 7, 2005, the reasonable accommodation Mr. Harris had authorized Mr. Gard in December 2004 [typo, correct date is 1998] when Mr. Gard was returned to the agency's facilities and workforce.

(9). In August 2005, the refusal to continue the credit hour reasonable accommodation Mr. Maestri had authorized Mr. Gard in February 2000. Refusal to allow Mr. Gard to continue to earn credit hours. On October 24, 2005, Ms. Stracke instructed Mr. Gard to submit a new request for credit hour reasonable accommodation along with the required medical information. Mr. Gard informed Ms. Stracke and Mr. Miller that requesting Mr. Gard to submit a new request for credit hour reasonable

accommodation along with the required medical information is illegal. The request was made, medical information had previously been submitted and the agency had authorized credit hour reasonable accommodation.

(10).    Numerous reprisal actions for filing an EEO handicap discrimination complaint against the Agency, e.g.:

a.    Requiring Mr. Gard to sign a receipt for a work assignment on April 5, 2005.

b.    Assigning Mr. Gard a work assignment known to be a "hoax."

c.    Refusing to authorize Mr. Gard access to the audit finding data the work assignment required him to analyze.[19]

d.    Refusing to provide Mr. Gard access to the audit finding data the work assignment required him to analyze. ED-2006-11-00 restated claim. The actual claim presented to the EEO counselor was, "Refusing to provide Mr. Gard with the audit finding data the work assignment required him to analyze from April 5 through the beginning of August 2005. The audit finding data that Mr. Miller has provided Mr. Gard commencing in August 2005 has been, in some instances, incomplete, missing data, and/or invalid. As of October 25, 2005, only part of the data that Mr. Gard was to analyze has been provided and some of that data continues to be incomplete, missing data, and/or invalid."

e.    Requiring Mr. Gard to analyze data known to be incorrect and invalid with some of it missing.

---

[19] Words were left out of the next sentence of this claim, i.e., Mr. Miller continues to authorize Mr. Gard access to the audit finding data. That sentence is incorrect.

    f.    Requiring Mr. Gard to analyze "ghost" data.

    g.    Refusing to assign valid bona fide work to Mr. Gard.

    h.    Refusing to authorize Mr. Gard office supplies.

    i.    Creating a hostile work environment. ED-2006-11-00.

C.    Agency officials identified as taking or being involved in the taking, implementing and/or authorizing the taking of the alleged discriminatory acts, or who had the authority, responsibility and/or capability to stop the alleged discriminatory acts from being taken, which they did not do, are as follows: a) Mr. Chuck Miller, Supervisor, Post Audit Group (PAG), FIPAO, OCFO; b) Ms. Linda Stracke, Director, FIPAO, OCFO; c) Mr. Jack Martin, Chief Financial Officer (CFO), OCFO; d) Mr. Danny Harris, Deputy CFO, OCFO; and e) Ms. Joanna Dailey, Esq., Office of General Counsel (OGC), Defendants.  ED-2006-11-00.

99. **Plaintiff's Third Handicap Refusal to Accommodate Discrimination, and Handicap and Reprisal Claims,** was assigned Defendants' EEO complaint number ED-2007-15-00.

    A.    The EEO counselor's claims[20] summarization are:

---

  [20] Plaintiff's document titled "EEO 5 12-11-2006.doc," was attached to Plaintiff's December 11, 2006, email request for EEO counseling, and stated "I am hereby officially requesting EEO counseling for the following as set forth below:". Exhibit # 450.

    Plaintiff's February 13, 2007, EEO Formal Complaint of Discrimination letter filed with the Defendants, stated that Plaintiff's attachment to his December 11, 2006, email to the OM IDR Center disagrees with the IDR's statement of two (2) allegations of discrimination. Plaintiff's December 11, 2006, email attachment set forth ten (10) allegations of discrimination; however, the actual number of allegations of discrimination submitted to the OM IDR Center was twelve (12), i.e., two plus 10, per the attachment.

    Plaintiff found emails dated January 17 and February 6, 2007, when drafting this Revised

(1). Terms and conditions of employment. Counselor's claims summarization.

(2). Reasonable accommodation. Counselor's claims summarization.

B.  The actual claims[21] submitted to the EEO counselor are:

(1). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials'   November 24, 2006, failure/refusal to acknowledge that Mr. Gard submitted requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, to agency officials as required by and in accordance with the Rehabilitation Act. Exhibit # 451, Item # 1. ED-2007-15-00.

(2). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that Mr. Gard timely submitted to agency officials the medical information and documentation agency officials had requested Mr. Gard submit pursuant to Mr. Gard's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, as required by and in accordance with the Rehabilitation Act. Exhibit # 451, Item # 2. ED-2007-15-00.

(3). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that agency officials timely approved Mr. Gard's

---

Amended Complaint, which added two EDPAS claims to the 12 claims. Therefore, the actual number of claims submitted for counseling was 14. ED-2007-15-00.

[21] See footnote # 20.

requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, in accordance with the Rehabilitation Act. Exhibit # 451, Item # 3. ED-2007-15-00.

(4). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that Mr. Gard requested reasonable accommodation from agency officials during the October through December 21, 1998, medical and return-to-work discussions as required by and in accordance with the Rehabilitation Act. Exhibit # 451, Item # 4. ED-2007-15-00.

(5). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that agency officials had all of the medical information and documentation they needed from Mr. Gard to make a reasonable accommodation determination concerning Mr. Gard's reasonable accommodation requests made during the October through December 21, 1998, medical and return-to-work discussions due to the medical information and documentation agency officials had on file because they had previously requested Mr. Gard submit the same, which he did submit, pursuant to Mr. Gard's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992. Exhibit # 451, Item # 5. ED-2007-15-00.

(6). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006,

failure/refusal to acknowledge that agency officials timely approved Mr. Gard's requests for reasonable accommodation made during the October through December 21, 1998, medical and return-to-work discussions in accordance with the Rehabilitation Act. Exhibit # 451, Item # 6. ED-2007-15-00.

(7). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that Mr. Gard requested reasonable accommodation from agency officials in February 2000 as required by and in accordance with the Rehabilitation Act. Exhibit # 451, Item # 7. ED-2007-15-00.

(8). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that agency officials had all of the medical information and documentation they needed from Mr. Gard to make a reasonable accommodation determination concerning Mr. Gard's reasonable accommodation requests made during February 2000 due to the medical information and documentation agency officials had on file because they had previously requested Mr. Gard submit the same, which he did submit, pursuant to Mr. Gard's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992. Exhibit # 451, Item # 8. ED-2007-15-00.

(9). EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to acknowledge that agency officials timely approved Mr. Gard's

request for reasonable accommodation made during February 2000 in accordance with the Rehabilitation Act. Exhibit # 451, Item # 9. ED-2007-15-00.

(10).    EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to correctly file, maintain, and safeguard Mr. Gard's medical information and documentation on file with the agency because agency officials had previously requested Mr. Gard submit the same, which he did submit, pursuant to Mr. Gard's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, as required by and in accordance with the Rehabilitation Act and the Privacy Act. Exhibit # 451, Item # 10. ED-2007-15-00.

(11).    EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to accommodate. Exhibit # 451, Item # 11. ED-2007-15-00.

(12).    EEO and Handicap Discrimination Reprisal, and Handicap Discrimination for the Agency, Ms. Linda Stracke, and other unknown agency officials' November 24, 2006, failure/refusal to continue reasonable accommodation. Exhibit # 451, Item # 12. ED-2007-15-00.

(13).    Mr. David Wortham, EEO Counselor, confirmed "ok" on January 17, 2007, to Plaintiff's request to add an EDPAS performance agreement claim based on Plaintiff's last EDPAS to the claims presented for counseling. ED-2007-15-00.

(14).    Mr. David Wortham, EEO Counselor, confirmed "ok" on January 17, 2007, to

Plaintiff's request to add an EDPAS performance standard claim based on the new performance standards to the claims presented for counseling. ED-2007-15-00.

C.  Defendants' officials identified as taking or being involved in the taking, implementing and/or authorizing the taking of the alleged discriminatory acts, or who had the authority, responsibility and/or capability to stop the alleged discriminatory acts from being taken, which they did not do, are as follows: a) Ms. Linda Stracke, Director, FIPAO, OCFO; b) Mr. Chuck Miller, Supervisor, PAG, FIPAO, OCFO; c) Mr. Richard Mueller, Supervisor, Indirect Cost Group, FIPAO, OCFO; d) Mr. Danny Harris, Deputy CFO, OCFO; and e) Ms. Joanna Dailey, Esq., Office of General Counsel (OGC), Defendants.

100.  **Medical Reprisal Claims**.  The Medical Reprisal Claims are due to the Defendants' intentional and illegal actions of refusing/failing to secure, safeguard, maintain and not destroy official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records",[22] filed in the Defendants' Employee Medical Folder pertaining to Plaintiff[23], which Defendants' actions were intentionally implemented, even though said actions violated the security, safeguard, maintenance and non-destruction requirements of the Rehab. Act, PA and FRA statutes, and EEOC, OPM and NARA regulations, against the Plaintiff in response to Plaintiff's July and August 2004 disclosures and Plaintiff's

---

[22] i.e., a)  Plaintiff's requests for reasonable accommodation records dated October 19, 1990, December 16, 1991, and March 4, 1992; and b) the medical documentation Plaintiff and Plaintiff's physicians submitted to the Defendants from 1990 through 1992 and prior to 1998.

[23] The Rehab. Act, PA and FRA statutes, and EEOC, OPM and NARA regulations require the Defendants to secure, safeguard and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff for the benefit and on behalf of the Defendants and Plaintiff.

filing of a handicap discrimination claim against the Defendants as proven by the dates and time-frame of Defendants' actions and statements to: 1) **DENY** Plaintiff the reasonable accommodation Defendants had authorized and provided Plaintiff prior to November 19, 2004; 2) **DENY** Plaintiff the reasonable accommodation Plaintiff was and is entitled to as a handicapped otherwise qualified employee of the Defendants; and 3) **PUNISH** the Plaintiff for: a) disclosing grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, Office of Inspector General (OIG), in July 2004; and b) filing a handicap discrimination claim against the Defendants.  Reprisal claim.

A.  Defendants intentional and illegal refusal/failure to **SECURE, SAFEGUARD AND MAINTAIN** Plaintiff's reasonable accommodation and medical documentation records filed in the Defendants' Employee Medical Folder pertaining to Plaintiff commencing on or about November 19, 2004.  Reprisal claim.

B.  Defendants' intentional and illegal **REMOVAL** of Plaintiff's reasonable accommodation and medical documentation records from the Defendants' Employee Medical Folder pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

C.  Defendants' intentional and illegal **DESTRUCTION** of "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee Medical Folder pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

D.  Defendants' intentional and illegal **REFUSAL TO RESTORE** "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee

Medical Folder pertaining to Plaintiff commencing on or about November 19, 2004.
Reprisal claim.

101.    **Retirement Records Reprisal Claims**. The Retirement Records Reprisal Claims are due
to the Defendants' intentional and illegal actions of refusing/failing to secure, safeguard
and maintain, and not destroy official Federal records, i.e., "Plaintiff's military retirement
records",[24] filed in the Defendants' Official Personnel File pertaining to Plaintiff[25], which
Defendants's actions were intentionally implemented, even though said actions violated
the security, safeguard, maintenance and non-destruction mandatory requirements of the
PA and FRA statutes and OPM and NARA regulations, against the Plaintiff in response
to Plaintiff's July and August 2004 disclosures and Plaintiff's filing of a handicap
discrimination claim against the Defendants as proven by the dates and time-frame of
Defendants' actions and statements to:  a) **DENY** Plaintiff the Federal Employees
Retirement System (FERS) benefits Plaintiff would be entitled to receive upon retirement
if the Defendants had continued to secure, safeguard and maintain, and not destroy the
official Federal records, i.e., "Plaintiff's military retirement records", filed in the
Defendants' Official Personnel File pertaining to Plaintiff; and b)  **PUNISH**  Plaintiff:
1) for disclosing grantee fraud and potential Defendants' employee fraud to the

---

[24]    i.e., 1) military service-time records, 2) proof of military service-time and calculation
records, and 3) proof of military service-time deposit records, required for FERS retirement
benefits.

[25] The PA and FRA statutes and OPM and NARA regulations require the Defendants to
secure, safeguard and maintain the Defendants' Official Personnel File pertaining to Plaintiff for
the benefit and on behalf of the Defendants and Plaintiff.

Defendants' Inspector General, OIG, in July 2004; and 2) for filing a handicap discrimination claim against the Defendants. Reprisal claim.

A.  Defendants intentional and illegal refusal/failure to **SECURE, SAFEGUARD AND MAINTAIN** Plaintiff's military retirement records filed in Defendants' Official Personnel File pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

B.  Defendants' intentional and illegal **REMOVAL** of Plaintiff's military retirement records from the Defendants' Official Personnel File pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

C.  Defendants' intentional and illegal **DESTRUCTION** of Plaintiff's military retirement records filed in the Defendants' Official Personnel File pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

D.  Defendants' intentional and illegal **REFUSAL TO RESTORE** Plaintiff's military retirement records to the Defendants' Official Personnel File pertaining to Plaintiff commencing on or about November 19, 2004. Reprisal claim.

102.  **Adjudication Rights Reprisal Claims.**  The following Adjudication Rights Reprisal Claims are due to the Defendants' violation of Plaintiff's Constitutional, handicap, Title VII and CRA statutes, and OPM, EEOC and Merit Systems Protection Board (MSPB or Board) due process, discovery, hearing, and adjudication rights.

A.  Defendants did not combine ED-2006-11-00 with ED-2005-28-00.  Commencing in September 2005, Plaintiff requested the Defendants combine the claims of Plaintiff's second handicap discrimination and reprisal complaint, i.e., ED-2006-11-00, with the claim

Page 28 of 230

of Plaintiff's first handicap discrimination complaint, i.e., ED-2005-28-00. On November 16, 2005, Mr. David Wortham, IRD Center, sent Plaintiff an email stating "Defendants would not combine the claims of Plaintiff's second handicap discrimination and reprisal complaint with the claim of Plaintiff's first handicap discrimination complaint." ED-2006-11-00 restated reprisal claim.

B.  Defendants did not answer the discovery requests for ED-2005-28-00 Plaintiff timely served upon the Defendants in July 2006.

C.  Defendants did not forward the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC as ordered by the EEOC since Plaintiff timely re-filed his request for a hearing with the EEOC in July 2007.

D.  Defendants did not issue a Report of Investigation for ED-2006-11-00.

E.  Defendants did not issue a final EEO decision for ED-2005-28-00.

F.  Defendants did not issue a final EEO decision for ED-2006-11-00.

G.  Defendants' tampering with a witness prior to and during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing.

H.  Defendants' perjury during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing.

# VII.  DEFENDANTS' ADMISSIONS and JUDICIALLY DECIDED FACTS

103.  Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

104.    The following Defendants' admissions are proven non-disputable facts.

105.    The following Judicially decided facts are proven non-disputable facts.

106.    Defendants admitted that "During 1997 and 1998, Plaintiff was employed as a Staff Accountant, Systems Accountant and Team Leader for Special Support Projects in the Office of the Chief Financial and Chief Information Officer of Defendant Department of Education." *Defendants' ANSWER, Privacy Act complaint*, Civil No. 00-1096 (July 17, 2000), @ Paragraph # 5.

107.    Defendants admitted that "Among Plaintiff's assigned duties was work on the transition of the Department's existing computer system to a new computer system which would be used by Defendant for disbursing, accounting for, reporting and tracking the many billions of dollars of grant and contract monies Defendant dispenses annually to public and private entities." *See id.* At # 5.

108.    Defendants admitted that "Plaintiff's supervisor, Betty Hepak, asked Plaintiff to look for and report instances of waste, mismanagement and fraud in his review of both systems." *See id.* At # 5.

109.    Defendants admitted that "in late 1997 and early 1998, Ms. Hepak and Plaintiff raised some concerns to management officials about security inadequacies in the new computer system being developed by Defendant." *See id.* At # 7.

110.    Defendants admitted that "Ms. Betty Hepak was Plaintiff's immediate supervisor in December 1997 and that she recommended Plaintiff for placement in the Government's Executive Potential Program." *See id.* At #6.

111.    Defendants admitted that "Ms. Steinbrueck became Plaintiff's immediate supervisor

subsequent to Ms. Hepak." *See id.* At # 10.

112. Defendants admitted that "on June 2, 1998 Plaintiff filed a Whistleblower Disclosure Complaint with the United States Office of Special Counsel (OSC)." *See id.* At # 8.

113. Defendants admitted that "Plaintiff alleged in the OSC Complaint that Defendant had engaged in waste, mismanagement and possible fraud." *See id.* At # 8.

114. Defendants admitted that "Plaintiff claimed that he suffered reprisals for engaging in whistleblower activity." *See id.* At # 8.

115. Defendants admitted that "Plaintiff provided a copy of the OSC Complaint to an official in the Office of Inspector General and notified by e-mail dated June 2, 1998, the Secretary, Richard W. Riley, and the former Deputy Secretary, Marshall S. Smith, that he had filed an OSC Complaint." *See id.* At # 8.

116. Defendants admitted that "Plaintiff's Complaint named a number of officials and co-employees who he alleged were responsible for the problems he disclosed." *See id.* At # 10.

117. Defendants admitted that "Among those officials whom Plaintiff listed as responsible were Donald Rappaport, Chief Financial and Chief Information Officer of Defendant and Janice Steinbrueck, Group Supervisor, Grants Program and Department Reporting Group." *See id.* At # 10.

118. Defendants admitted that "a notice dated June 19, 1999, labeled 'Security Alert' was placed at Defendant's entrance security guard posts, directing the guards that, effective immediately, Plaintiff was banned from all of Defendant's buildings." *See id.* At # 15.

119. Defendants admitted that "it distributed the notice described above in paragraph 16

[defendant meant to type Privacy Act Admission Item 15] of this Answer to its security guards and that the notice was posted so as to be visible to the security guards stationed at the entrance desks to Defendant's buildings." *See id.* At # 16.

120.    Defendants admitted that "At no time, either before or after June 19, 1998, was Plaintiff ever asked by Defendant or any official of Defendant to provide any information related to the basis for the promulgation of the June 19, 1998 letter or the actions taken against him on June 22, 1998." *See id.* At # 22.

121.    Defendants admitted that "Plaintiff learned about records maintained by Defendant as a result of Freedom of Information Act (FOIA) requests that he made after June 22, 1998, and that these records include unsworn statements made by his co-workers." *See id.* At # 23.

122.    Defendants admitted that "both before and after June 19, 1998, Defendant obtained information concerning Plaintiff from its employees and medical consultant." *See id.* At # 25.

123.    Defendants admitted that "it disseminated records about Plaintiff that were obtained from its employees to its medical consultant." *See id.* At # 26.

124.    Defendants admitted that "Defendant never informed Plaintiff about the statements from other employees and third parties regarding him, maintained by Defendant in its records, either before or after June 19, 1998, prior to their FOIA disclosure." *See id.* At # 27.

125.    Defendants admitted that "Defendant never, either before or after June 19, 1998, asked Plaintiff to comment on the accuracy, relevance, timeliness or completeness of these statements or gave him the opportunity to defend himself or respond to them before taking

action against him on June 19 and 22, 1998, or at any time thereafter." *See id.* At # 27.

126.    Defendants admitted that "On Monday, June 22, 1998, while Plaintiff was attending a meeting with members of the staff of the Office of Inspector General regarding his allegations, his first line supervisor, Janice Steinbrueck, together other Department officials and uniformed armed Federal Protective Service police officers interrupted the meeting and refused to allow it to continue." *See id.* At # 12.

127.    Defendants admitted that "Ms. Steinbrueck presented Plaintiff with a document that she requested Plaintiff to read." *See id.* At # 12.

128.    Defendants admitted that "The document was a memorandum directed to Plaintiff dated Friday, June 19, 1998, signed by Donald Rappaport, Defendant's Chief Financial Officer." *See id.* At # 12.

129.    Defendants admitted that "The letter stated that Plaintiff was being placed on Administrative Leave for an indefinite period." Privacy Act Admission Item # 12.

130.    Defendants admitted that "the reason given for the action taken was that it was 'due to your recent behavior which has been disruptive to the effective and efficient work of the office'." *See id.* At # 12.

131.    Defendants admitted that "There was no explanation as to what "behavior" of Plaintiff the Defendant was referring." *See id.* At # 12.

132.    Defendants admitted that "Plaintiff was ordered to turn in his keys and government identification card and told that during the period of enforced involuntary leave he was not to enter any Department of Education facility." *See id.* At # 12.

133.    Defendants admitted that "He was directed to call into Ms. Steinbrueck every work day

at 9:00 a.m." *See id.* At # 12.

134.   Defendants admitted that "Federal Protective Service officers escorted Plaintiff from the Defendant's premises on June 22, 1998." *See id.* At # 13.

135.   Defendants admitted that "the Federal Protective Service's incident report no. NC0403262F8 incorrectly states that the Plaintiff's employment 'was being terminated'." *See id.* At # 29. The Agency's admission set forth in Privacy Act Admission Item # 29 is not based on the stated facts of the incident report. The Agency has not put forth any evidence that supports the Agency's admission or disproves the statement written on the incident report. The incident report speaks for itself. Appellant does not accept this admission.

136.   Defendants admitted that "At no time did Defendant or any official of Defendant ever attempt to collect information from Plaintiff as to whether he had been terminated on or before June 22, 1998, or as to whether he had received notice that he had been barred from Defendant Department of Education's buildings before he entered Defendant's premises on the morning of June 22, 1998." *See id.* At # 30.

137.   Defendants admitted that "effective December 21, 1998, Defendant rescinded the June 19, 1998, directive that had placed Plaintiff on administrative leave with pay and instructed Plaintiff to return to work in the Office of the Chief Financial Officer." *See id.* At # 17.

138.   Defendants admitted that "Plaintiff was on administrative leave with pay from June 22, 1998, until December 21, 1998." *See id.* At # 14.

139.   Defendants admitted that "it denied Plaintiff's request to be placed in the same position he had been in before he was placed on administrative leave with pay and further admits that

Defendant placed Plaintiff in a different operational area, despite Plaintiff's request." *See id.* At # 18.

140.    Defendants admitted that "Plaintiff was placed in a different operational area than he had been in before he was placed on paid administrative leave." *See id.* At # 18.

141.    The Defendants have admitted through the accepted and signed terms of the Gard v Department of Education settlement agreement dated May 6, 2002, negotiated to settle Plaintiff's MSPB appeal assigned MSPB Docket No. DC-1221-02-0128-W-1 that "the parties reached a tentative settlement that provided for the withdrawal of this appeal; that action will result in the appeal being dismissed by the Board. The Appellant represented himself, and Joanna Dailey represented the Agency. They subsequently provided me [MSPB Administrative Judge] with a written, signed copy of their settlement agreement. Appeal File (AF), Tab 31." *Settlement Conference Summary*, and *INITIAL DECISION*, MSPB Washington Regional Office, Administrative Judge Manning (May 6 and 20, 2002), @ p. 1 and 2.

142.    "I [MSPB Administrative Judge] have determined that the parties understand the terms of their settlement, and that they agreed it is to be entered into the record for enforcement purposes. I have further determined that the parties agreement is lawful on its face and that it was freely entered into by both parties." *See id.* At p. 1.

143.    "Based on the Board's record, to include the parties' written settlement agreement filed on May 2, 2002, I [MSPB Administrative Judge] have determined that the record establishes by preponderant evidence that the appellant engaged in whistleblowing activity by making disclosures protected under the whistleblower statute; that the agency took or failed to take,

or threatened to take or fail to take, personnel actions as defined in statute; and that the appellant raised these matters before the Office of Special (OSC) and proceedings before the OSC were exhausted. AF, Tabs 1, 16 - 18. The protected disclosures and personnel actions upon which these findings are based are specifically limited to those detailed in the Board's March 30, 2002 Order and Notice as the subject of Board review at a hearing scheduled to convene on May 24, 2002." *See id.* At p. 1 and 2.

144.    The *Gard v Department of Education Settlement Agreement dated May 6, 2002, (Settlement Agreement dtd May 6, 2002)* negotiated pursuant to and to settle Plaintiff's MSPB appeal assigned MSPB Docket No. DC-1221-02-0128-W-1 is attached hereto and incorporated herein by reference. Exhibit no. xxxxxxxxxxxx.

145.    The Agency [Defendant] shall:

A.    "1. Allow Appellant [Plaintiff] to remain in his current position of record (i.e., Systems Accountant, GS-0510-14, Financial Improvement and Post-Audit Operations, Office of the Chief Financial Officer); and

B.    "2. Forbear, prior to January 1, 2003, from directing Appellant's [Plaintiff] reassignment to a position other than the position referenced in Paragraph V(A)(1) above, absent Appellant's [Plaintiff] written agreement to such a reassignment;" *See id.* At V(A)(1) and (2) @ p. 2.

C.    Per the Defendants' interpretation of the *Settlement Agreement dtd May 6, 2002,* the settlement clauses V(A)(1) and (2) nullify, as they contradict, the terms of the *Parties' Return-to-Work Agreement dated December 14, 1998 (Return-to-Work Agreement dtd Dec. 14, 1998),* signed by Mr. Danny Harris, Acting Director, Financial Management

Operations, who accepted for the Defendants on the advice and consent of the Defendants' legal counsel. Exhibit 39.

D.  The terms of the *Settlement Agreement dtd May 6, 2002,* did NOT nullify the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

E.  There is nothing in the *Settlement Agreement dtd May 6, 2002,* that can be construed as stating the *Settlement Agreement dtd May 6, 2002,* nullified the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

F.  There is nothing in the *Settlement Agreement dtd May 6, 2002,* that can be construed as implying the *Settlement Agreement dtd May 6, 2002,* nullified the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

G.  There were no discussions during settlement negotiations concerning the nullification of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

H.  There were no discussions during settlement negotiations concerning the recision of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

I.  The *Settlement Agreement dtd May 6, 2002,* did NOT nullify the reasonable accommodation the Defendants had authorized and were providing the Plaintiff.

J.  Plaintiff would never agree to a settlement agreement that nullified the reasonable accommodation the Defendants had authorized and were providing the Plaintiff.

146.  The Agency [Defendant] shall: "Forbear from proposing or implementing an adverse or disciplinary action against Appellant [Plaintiff] for any incident or circumstance of his employment now known to the Agency and arising on or before the effective date of this Agreement;" *See id.* At V(A)(4) @ p. 3.

Page 37 of 230

147.    The Agency [Defendant] shall: "Contemporaneously with its execution of this Agreement, transmit to Appellant [Plaintiff] the letter appended hereto." *See id.* At V(A)(6) @ p. 3.

148.    "The Agency's [Defendants] action to place you [Plaintiff] on paid administrative leave in June, 1998, and related actions, were not taken for disciplinary reasons and do not constitute adverse actions in your personnel records. In fact, placement on administrative leave is not a personnel action memorialized by a Standard Form 50 in an employee's official personnel folder (OPF). Thus, your [Plaintiff's] OPF contains no documents concerning your placement on administrative leave." *See id.* At *Contemporaneous Letter Appended Hereto.*

149.    "You [Plaintiff] were restored to duty status effective December 20, 1998. The Agency [Defendant] made no determination at the time, or at any time since, that a disciplinary action was warranted for the factual circumstances giving rise to your [Plaintiff] placement on administrative leave, and will not take any such action." *See id.*

## VIII. STATEMENT OF FACTS

150.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

151.    Plaintiff's disabilities/impairments, in alphabetical order, are: a) chronic pain from a gun shot injury, paragraph # 197, page 48; b) hearing loss, paragraph # 232, page 57; c) narcolepsy, paragraph # 248, page 60; and d) post-traumatic stress disorder (PTSD), paragraph # 323, page 74, which are discussed in the before-identified paragraphs; however, said proof is not limited to those paragraphs.

152.    The condition and control of Plaintiff's pain from the gun shot injury, narcolepsy and post-traumatic stress disorder are interrelated and what happens in one disability/impairment affects the condition and control of the other disabilities/impairments.

# QUICK SUMMARY

153.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

154.    From April 24, 1989, through June 2, 1998, Plaintiff was a qualified, reasonably accommodated employee of the Defendants.

155.    On June 2, 1998, Plaintiff filed a whistleblower disclosure complaint against the Defendants alleging gross mismanagement and internal employee fraud.

156.    On June 19, 1998, Defendants issued[26] Plaintiff a letter, that immediately placed Plaintiff on paid administrative leave and barred Plaintiff from entering any facility of the Defendants.

157.    Defendants alleged in their June 19, 1998, letter that Plaintiff was a threat.

158.    The Defendants' June 19, 1998, threat allegation pertained to the fact that Plaintiff was a threat to the **continuation** of the Defendants' gross mismanagement and internal employee fraud activities due to:

   A.   Plaintiff's June 2, 1998, **exposure** of the Defendants' gross mismanagement and internal employee fraud activities to the Office of Special Counsel and the legal authorities;

---

[26] Said letter was received at home by Plaintiff's wife the morning of June 22, 1998.

Page 39 of 230

B.  Plaintiff's refusal to condone the Defendants' gross mismanagement and internal employee fraud activities; and

C.  Plaintiff's refusal to participate in the Defendants' gross mismanagement and internal employee fraud activities.

159.  Plaintiff was not a threat to co-workers in 1998.

160.  Plaintiff is not a threat to co-workers.

161.  Plaintiff was not a threat to the public in 1998.

162.  Plaintiff is not a threat to the public.

163.  Plaintiff was not a threat to himself in 1998.

164.  Plaintiff is not a threat to himself.

165.  The United States Office of Special Counsel (OSC) validated the validity of Plaintiff's June 2, 1998, gross mismanagement whistleblower disclosure.

166.  The OSC sent a letter to the President, United States of America, notifying the President of the OSC's finding of Defendants' gross mismanagement.  The OSC sent copies of this letter to the appropriate House and Senate oversight committees, offices and personnel. The OSC held a press conference concerning the OSC's finding of Defendants' gross mismanagement and released a copy of the letter the OSC sent to the President to the public.

167.  Criminal pleas and juries validated the validity of Plaintiff's June 2, 1998, whistleblower disclosure involving Defendants' employee fraud.  Approximately sixteen employees, relatives and contractors were convicted of fraud by various courts of The United States District Court for the District of Columbia.

168.    The Defendants demanded full unrestricted access to all of Plaintiff's medical records after the Defendants had armed Federal police officers physically remove Plaintiff from the Defendants' facilities on June 22, 1998. Plaintiff's legal counsel informed the Defendants to file the appropriate action/motion in District Court to obtain the same. Defendants have refused to file an action/motion in District Court because the Defendants cannot justify their actions and their medical record demand is illegal.

169.    From September through November 1998, the Defendants demanded Plaintiff sign a blanket, unrestricted, medical release form, which form, if signed, would have authorized the Defendants full unlimited access to ALL of Plaintiff's medical records.

170.    From September through November 1998, Plaintiff did not sign the Defendants' blanket, unrestricted, medical release form as:

   A.   Plaintiff and Plaintiff's physicians had provided the Defendants with all of the medical information they had requested and were entitled to pursuant to Plaintiff's requests for reasonable accommodation and the Rehab. Act from 1990 through 1992 and prior to 1998,

   B.   Said form would have authorized the Defendants full unlimited access to ALL of Plaintiff's medical records; and

   C.   Said form violated the Rehab. Act, EEOC regulations, and Plaintiff's rights.

171.    Defendants held return-to-work discussions with the Plaintiff from October through early December 1998.

172.    The October through early December 1998 return-to-work discussions resulted in a written and verbal *Return-to-Work Agreement dtd Dec. 14, 1998*, based on the parties' discussions held thereto.  Exhibit 39.

173.    The *Return-to-Work Agreement dtd Dec. 14, 1998,* rescinded, without restriction and <u>without obtaining Plaintiff's medical records,</u> the Defendants' June 19, 1998, letter, which had a) placed Plaintiff on paid administrative leave, b) barred Plaintiff from entering any facility of the Defendants, and c) alleged Plaintiff was a threat.

174.    The Defendants' June 19, 1998, allegation that Plaintiff was a threat is a fabrication as the Defendants would not have rescinded the Defendants' June 19, 1998, letter and returned Plaintiff to the Defendants' workplace and facilities without obtaining Plaintiff's medical records and a medical return-to-work evaluation if the Defendants' threat allegation had validity, which it doesn't.

175.    The Defendants' June 19, 1998, allegation that Plaintiff was a threat is a fabrication as the Defendants could not legally allow Plaintiff to return to the Defendants' workplace and facilities without obtaining Plaintiff's medical records and a medical return-to-work evaluation if the Defendants' threat allegation had validity, which it doesn't.

176.    The written *Return-to-Work Agreement dtd Dec. 14, 1998,* states "you [Plaintiff] are to report for work on Monday, December 21, 1998." Exhibit 39.

177.    The written *Return-to-Work Agreement dtd Dec. 14, 1998,* states "You will be allowed to enter the building and I will return your Department ID to you." Exhibit 39.

178.    The written *Return-to-Work Agreement dtd Dec. 14, 1998,* states "As agreed to in our last meeting, you will report to Mr. Phil Maestri, the Director for Financial Improvement and Debt Management, who will be your immediate supervisor." Exhibit 39.

179.    The written *Return-to-Work Agreement dtd Dec. 14, 1998,* states "Your work schedule will be determined after discussions with Mr. Maestri." Exhibit 39.

180.    Defendants agreed[27] to the following facts through the written and verbal *Return-to-Work Agreement dtd Dec. 14, 1998,* and the parties return-to-work discussions held thereto:

A.    Plaintiff was returned to the Defendants' facilities and active duty;

B.    Plaintiff was returned to being a full-time active-duty no-restriction employee;

C.    Plaintiff was allowed to be in any Agency facility without escort at any time;

D.    Defendants requested and did not order Plaintiff to maintain a low profile while in an Agency facility;

E.    Defendants requested and did not order Plaintiff to not seek action against any of the Agency employees who were involved in having Plaintiff placed on administrative leave and barred from the Agency's facilities, including the Agency employees who had made statements against Plaintiff;

F.    Defendants requested and did not order Plaintiff to try and do his best to diffuse, not inflame, the tense and hostile work situation and environment that would exist in the OCFO upon his return to active duty;

G.    Defendants requested and did not order Plaintiff to walk away from and not respond to a confrontation if he was confronted by any Agency employee and to report the confrontation to his supervisor;

H.    The Defendants would reasonably accommodate Plaintiff and would do whatever they could reasonably do to reduce the stress he would experience upon returning to the

---

[27] The Defendants' denial of the reasonable accommodation facts set forth in this paragraph's subparagraphs is an admission of intentional handicap refusal to accommodation discrimination due to the October through December 1998 documentation.

Agency's facilities, when working in his assigned office and the potential for a confrontation while he was in an Agency facility;

I.  Defendants reasonably accommodated Plaintiff by allowing him to work at home as much as possible and expressed their preference for him to work at home for his, not the Agency's, security and personal safety reasons;

J.  Defendants would provide Plaintiff with reasonable, not absolute, protection while the Plaintiff was in an Agency facility as absolute protection could not be guaranteed;

K.  Defendants would reasonably accommodate Plaintiff by creating a special position for Plaintiff in the office of the Financial Improvement and Post Audit Operations (FIPAO), Office of the Chief Financial Officer (OCFO), Agency, that would report to the Director, FIPAO;

L.  Defendants would assign Plaintiff to the special position created for him in the Financial Improvement and Post Audit Operations (FIPAO), Office of the Chief Financial Officer (OCFO), Agency;

M.  Defendants would reasonably accommodate Plaintiff through the assignment of special work assignments that would not require Plaintiff to have any contact with any of the Agency employees who were involved in having Plaintiff placed on administrative leave and barred from the Agency's facilities and/or who had made statements against the Plaintiff;

N.  Defendants would reasonably accommodate Plaintiff through the assignment of special work assignments that would not require Plaintiff to interact with any of the Agency employees who were involved in having Plaintiff placed on administrative leave and barred

from the Agency's facilities and/or who had made statements against Plaintiff;

O. Defendants would reasonably accommodate Plaintiff through the assignment of special work assignments that would limit the Plaintiff's contact with other Agency employees;

P. Defendants would reasonably accommodate Plaintiff through the assignment of special work assignments that would require Plaintiff to have direct contact with only very few Agency employees, i.e., mainly his supervisor;

Q. Defendants would reasonably accommodate Plaintiff by requesting and would not order Plaintiff to attend group, all-staff meetings;

R. Defendants would reasonably accommodate Plaintiff through an office location assignment that would allow Plaintiff to have a GS-14/15 office with a door that locked which the Plaintiff was to keep locked at all times for his own personal protection even when he was in the office;

S. Defendants would reasonably accommodate and protect Plaintiff in that Plaintiff would not be required to have any interaction with any of the Agency employees who were involved in having Plaintiff placed on administrative leave and barred from the Agency's facilities and/or who had made statements against Plaintiff;

T. Defendants would reasonably accommodate Plaintiff in that Plaintiff's supervisor would be the Director, FIPAO, OCFO;

U. Defendants specified Plaintiff's job title would be "Special Assistant to the Director, FIPAO, OCFO";

V. The parties' written and verbal agreement did not include the resolution of any litigation that Plaintiff would file against the Agency;

W. Defendants agreed the parties' written and verbal agreement did not rescind the prior handicap reasonable accommodation former Agency officials had authorized the Plaintiff pre-1998; and

X. Parties' agreement would only partially be reduced to writing, you will have to trust us.

181. From December 21, 1998, through November 18, 2004, the Defendants continued the reasonable accommodation the Defendants had provided the Plaintiff prior to June 19, 1998.

182. From December 21, 1998, through November 18, 2004, the Defendants provided Plaintiff with additional reasonable accommodation.

183. From December 21, 1998, through November 18, 2004, Plaintiff was a qualified, reasonably accommodated employee of the Defendants.

184. In July 2004, Plaintiff disclosed external grantee and Defendants' internal employee fraud to Mr. Jack Martin, Chief Financial Officer, and Mr. John Higgins, Inspector General, Defendants.

185. In August 2004, Plaintiff disclosed additional Defendants' internal employee's actions of approving her own work to Mr. Jack Martin, Chief Financial Officer, Defendants.

186. Plaintiff continues to be a threat to the continuation of the Defendants' gross mismanagement and internal employee-fraud activities.

187. On or about November 22, 2004, the Defendants discontinued all of Plaintiff's reasonable accommodation.

188. Per the Defendants, Plaintiff was no longer a qualified handicap employee of the Defendants commencing on or about November 19, 2004.

189.    Defendants did not have a bona fide reason to discontinue Plaintiff's reasonable accommodation on or about November 19, 2004.

190.    Defendants did not have a business reason to discontinue Plaintiff's reasonable accommodation on or about November 19, 2004.

191.    Defendants did not have a legal reason to discontinue Plaintiff's reasonable accommodation on or about November 19, 2004.

192.    Defendants should have continued Plaintiff's reasonable accommodation from on or about November 22, 2004, through current.

193.    Defendants want the Court to reward the Defendants for their gross mismanagement and internal employee-fraud activities by terminating Plaintiff's employment with no front pay damages and no FERS retirement or medical insurance benefits based on the Defendants' June 19, 1998, known false "threat" allegation, which the Defendants intentionally made against Plaintiff due to Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

194.    Plaintiff wants the Court to punish the Defendants for their gross mismanagement and internal employee fraud activities by enforcing Article I, Section 9, of the United States Constitution, and the Federal appropriation, disbursement and accountability laws enacted thereto, and ordering the Defendants to terminate the employment of Defendants corrupt employees and those employees involved in taking illegal employment actions against the Plaintiff; however, Plaintiff's relief is not limited to the relief stated herein.

## CHRONIC PAIN FROM GUN SHOT INJURY

195.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

196.    Plaintiff's chronic pain from the gun shot injury is a for-life disability/impairment due to: 1) the chronic nature, duration and intensity of the pain; 2) no control over a pain flare-up; 3) no control over the timing, when and where, of a pain flare-up; 4) no control over the duration of the pain flare-up; 5) no control over the intensity of a pain flare-up; 6) no control over the debilitating effect of a pain flare-up; and 7) no advance warning a pain flare-up is imminent.

197.    Plaintiff does not have control over the pain Plaintiff experiences from the gun shot injury.

198.    The pain controls Plaintiff's activities and life 24 hours per day.

199.    Plaintiff was shot December 21, 1985.

200.    Physicians originally told Plaintiff that he would be partially paralyzed, that he had lost the use of his right arm and hand, and that there was nothing they could do about it except give him pain killers; which interfered with Plaintiff's narcoleptic medication. Through intense and painful Swedish deep-tissue massage therapy Plaintiff regained the "limited use" of his right arm and hand. [Note:"limited use."]

201.    The bullet's location has reduced the grip and strength of Plaintiff's right arm and shoulder. Rifle shooting makes Plaintiff 's shoulder hurt so Plaintiff hardly shoots anymore. It was 15 years after the injury before Plaintiff attempted to shoot. Plaintiff will have pain when

he shoots and pre-schedules massage treatments. But the level of pain and number of massage treatments it will take to reduce the pain is unknown.

202.    Plaintiff's pain from the gun shot injury continues to be a disability/impairment through today and probably will be life-long even though the "chronic" part of it has changed/decreased since 1991 as it now usually does not cause intense daily pain [Note "usually" and "intense."] which means it can, it has and it will continue to do so into the foreseeable future. The only thing that has really changed since 1991 is I now usually have more days of non-intense chronic pain whereas I used to have more days of chronic-intense pain but there is no guarantee.

203.    When the gun-shot injury pain flares up: 1) it will do so without warning and the pain will be intense and **debilitating**; 2) it can/will cause pain from the neck muscles all way down the entire right arm, often causing numbness in the right hand; and 3) essentially putting the Plaintiff out of commission until the pain is relieved. Swedish deep-tissue massage therapy treatments usually reduce the pain. Plaintiff has been able to reduce them from one to three massage per week to one to four per month, possibly longer, depending on the pain. There is no guarantee as to the number of treatments and weeks will be needed before the pain will subside. Also, there is no guarantee of further improvement.

204.    The actuality of Plaintiff ever again being pain-free from the gun-shot injury is unknown and probably unlikely.

    A.    Plaintiff was driving to Sioux City, Iowa, to pick up Plaintiff's mother to take her to the Mayo Clinic for treatment. Plaintiff touched his neck while driving and instantly raised up and off the seat causing the seat belts to engage due to the intensity of the pain. The

intensity of the pain was such that Plaintiff had to: a) find a massage therapist who was qualified in Swedish deep-tissue massage therapy, b) convince the massage therapist Plaintiff was on the "up-and-up" because Plaintiff was from out-of-town, and c) work in a massage appointment as regular clients come first. Plaintiff had two massage treatments prior to driving Plaintiff's mother to the Mayo Clinic; one or two massage treatments while Plaintiff was in Rochester, MN; and another one or two massage treatments in Sioux City after returning from the Mayo Clinic. Plaintiff had approximately 6 emergency massage treatments in a span of 10 to 12 days and another 2 to 4 after returning home. The reason why this flare-up was so intense and the duration so long lasting are unknown.

B.  The driving-home pain is an example of the type of pain Plaintiff has and can experience without warning. However, Plaintiff can get the same type of pain from everyday, normal office work.

C.  Plaintiff cringes every time there is a requirement to shake hands. A light handshake is usually okay from the perspective of Plaintiff 's injury, but the corporate world, private business, government, office, and even personal relationships, require a firm handshake. Depending on Plaintiff 's pain status prior to a light hand-shake, a light hand-shake is usually okay. A firm hand-shake is a "no, no"; and a hard, firm hand-shake will instantly send a shooting pain up Plaintiff's arm and into Plaintiff's neck, shoulder and back.

D.  In January 1997, a driver turned left in front of Plaintiff. The accident caused Plaintiff's head to hit the top of the car, which caused his neck to be shoved downwards, which injured Plaintiff's neck and shoulder muscles, which caused the gun shot injury pain to flare up. The re-injury of the gun shot wound caused an immediate and significant increase

in the intensity and duration of the pain from Plaintiff's gun shot injury.

E.  One minute Plaintiff is fine. The next second Plaintiff is feeling intense pain. That is what Plaintiff is talking about. Plaintiff has no control over when the pain will flare up or the intensity or duration of said pain. The pain from the gun shot injury controls.

205.  The actuality is that Plaintiff will have pain from the gun-shot injury for the rest of his life, and probably will never regain arm/hand strength and body stamina to do the physical things Plaintiff did prior to being shot.

206.  Initially, Plaintiff's right arm and hand were partially paralyzed and unusable, and Plaintiff's pain-free days after the gun-shot injury were zero and stayed that way for years. Plaintiff gradually regained "limited usability" of his right arm and hand, and then relatively pain-free days that increased to a few hours and then to a few days thanks to the Swedish deep-tissue massage therapy. At present, relatively pain-free days are usually (maybe) a week and possibly a few weeks to maybe a few months but "relatively pain-free" and "usually" are hard to define. Plaintiff stopped tracking the pain duration and intensity a few years ago because it is easier to manage the pain by trying to ignore it until its intensity is such that it cannot be ignored.

207.  "Relatively pain-free" means Plaintiff mentally blocks the pain until the pain's intensity won't let him block it. There are no guarantees as to how long Plaintiff can mentally block the pain. The only guarantee is that the pain will flare up in the future. The unknowns are the pain's duration and intensity level, and when the pain will again decide to flare up.

208.  "Pain-free" is an illusion but is improving because Plaintiff is now better able to mentally block and ignore the pain; however, not always. If the location of the bullet decides to

make Plaintiff's right arm and hand hurt it will and there is nothing Plaintiff nor the physicians can do about that. If the location of the bullet decides to make Plaintiff's right hand go numb it will and there is nothing Plaintiff or the physicians can do about that. Yes, Plaintiff can: 1) take Tylenol, which helps some/sometimes; and 2) hope and pray massage therapy continues to help, which it has so far. However, Tylenol and massage therapy are neither a cure or a guarantee because there is no cure and the only guarantee is that Plaintiff will continue to experience pain from the gun shot injury for the rest of his life. The unknowns are the nature, duration and intensity of said pain.

209.    The type, duration and level of pain from the gun-shot injury and the limitations thereof Plaintiff has and will continue to experience for the rest of his life equate to a major life activity for Plaintiff. It is not the same type, duration and level of pain experienced by most people during their lives.

210.    The ability to obtain medical diagnoses and treatment is a major life activity. Plaintiff's audiologist ordered a type of magnetic head scan[28]. The radiologist refused to authorize or allow Plaintiff to take the scan[29] due to the: 1) bullet's location, 2) possibility of the bullet moving, and 3) potential for and risk of permanent nerve damage and paralysis. So, the bullet[30] is now affecting Plaintiff's ability to obtain medical diagnoses and treatment

---

[28]  Approximately February 2008.

[29]  Plaintiff offered to sign a full medical liability waiver but the physician still refused to authorize the scan as the risk of permanent paralysis was too great.

[30]  Physicians have continuously recommended that the bullet not be removed as removal: a) will not decrease the pain or b) might increase the pain and c) the potential for and risk of permanent nerve damage and paralysis is too great. That is, total and permanent paralysis of the right arm and hand and maybe the neck and shoulder is a very strong possibility.

unrelated to the pain caused by the gun shot injury.

211.    Unknown and unplanned pain from the gun shot injury is obviously unknown and unplanned by definition, otherwise the pain from the gun shot injury would be a known event if Plaintiff knew or had control over when and where the event would occur and the level of its frequency, duration, intensity and severity.

212.    The pain from the gun shot injury controls Plaintiff's activities and life 24 hours per day.

213.    The unknown and unplanned pain from the gun shot injury has an adverse affect on Plaintiff because said pain adversely affects Plaintiff's sleep, which adversely affects Plaintiff's narcolepsy, which adversely affects Plaintiff's alertness, which adversely affects Plaintiff's concentration, which adversely affects Plaintiff's ability to drive, which affects Plaintiff's ability to commute to the office, which affects Plaintiff's productivity, which adversely affects Plaintiff's work, which adversely affects Plaintiff's ability to square dance[31], which adversely affects Plaintiff's right arm range-of-motion, which can adversely increase Plaintiff's gun-shot injury pain, and the cycle starts over.

214.    The pain from the gun shot injury also affects Plaintiff's neck and back muscles, causing them to tighten up and cause pain in both the neck and back. Plaintiff rolls his right shoulder and twists and stretches his shoulder, neck and back throughout the day, every day, to reduce the pain and keep his neck, back and right shoulder and hand operational. Plaintiff's actions are audible, obvious and visible to anyone in the vicinity, but do reduce the likelihood for Plaintiff's right shoulder to freeze up.

---

[31] Square dancing forces the upper body muscles to move, which is required to decrease pain and maintain the Plaintiff's range of arm motion.

215.    Sometimes the intensity of the pain has been so intense that it has caused tears to run down Plaintiff's face. Plaintiff's pain was that intense a couple of months ago. Plaintiff was square dancing and during the dance the pain flared up, which caused Plaintiff to miss calls. Missing calls causes the square to break down, which causes other square dancers to prefer to dance with other qualified square dancers. Plaintiff is a qualified square dancer except when the pain flares up.

216.    Driving is a major life activity. Plaintiff has had to drive with his left hand when his right arm and hand were hurting and his right hand was going numb! Plaintiff has driven under those conditions because Plaintiff had no choice, e.g., during work commutes and the Iowa/Mayo Clinic trip. Driving under such conditions is dangerous as one's concentration is on the pain and numbness of one's right arm and hand, and not on the driving or the traffic and road conditions.

217.    Concentrating is a major life activity. Concentrating and trying to accomplish something when Plaintiff's painful right arm and hand and a right hand is going numb is difficult but not totally impossible. However, it substantially decreases productivity.

218.    Eating is a major life activity. Plaintiff has had to eat when his right arm and hand are hurting and his right hand is going numb. Plaintiff is right handed. Although the non-dominant hand can be used, it is difficult. Plaintiff missed his mouth and hit his nose. This should not be done in public as the children, not the parents, think this is funny.

219.    Preparing food is a major life activity. Plaintiff has attempted to cut meat into bite-size pieces to eat when his right arm and hand couldn't stand the pressure or movement required to cut a piece of meat! Plaintiff's daughter cut Plaintiff's meat because Plaintiff

could not do it.

220.    Being able to dress oneself is a major life activity. Plaintiff has had to put on his clothes,

pull up his pants and dress himself one-handed because his right arm and hand are hurting

and are more useless than useful.

221.    Personal hygiene is a major life activity. Plaintiff has had to use a restroom and wash one-

handed because his right arm and hand were hurting and were more useless than useful.

222.    Using a computer keyboard is a major life activity. Plaintiff has had to use a computer

keyboard one-handed because his right arm and hand were hurting and were more useless

than useful. The fingers on his right hand may or may not press the correct key but this is

getting much better with time; however, if the pain kicks in then pressing the correct key

may or may not happen and I am back to being one-handed if my right hand is numb or is

going numb. Plaintiff has been one-handed many times. It still comes and goes.

223.    Working is a major life activity. When Plaintiff's right hand is numb or going numb, it is

nearly impossible to work because your fingers will strike an incorrect key because you are

having problems concentrating because of the pain you are experiencing. The same thing

applies to taking notes during a meeting or class.

224.    Finalizing a court document by a due date is a major life activity. Finalizing a court

document with a drop-dead due date when Plaintiff's concentration and typing are lousy

because his right arm and hand are hunting and right hand is or is going numb because of

the amount of typing that had to be accomplished is very difficult. The pain controls and

the right arm and hand informs Plaintiff through pain when he has overused it.

225.    Living is a major life activity. Staying awake at the appropriate times during the day is a

major life activity. Staying alert at the appropriate times during the day is a major life activity. Sleeping is a major life activity. Try sleeping, living or doing anything during any time period when: a) your right arm and hand are hurting; b) your right hand is going numb; c) the pain intensity has caused tears to roll down your checks; d) your mind keeps telling you that you could lose the use of your right arm and hand if your shoulder freezes up; e) you have been unable to break the pain cycle, thus the risk your shoulder might freeze up is increasing; f) you don't feel like moving, stretching, rotating or exercising your right arm and hand; g) you know you must move, stretch, rotate and exercise your right arm and hand to keep your shoulder from freezing up; and h) then your body and left leg start twitching/jerking[32] because your narcolepsy kicked in and says "sleep" but the pain intensity says "no sleep." This has happened to Plaintiff many, many times and will continue to happen. The pain from the gun shot injury interferes with sleeping, which in turn interferes with the control of Plaintiff's narcolepsy. Plaintiff has had many nights of inadequate sleep because of the pain Plaintiff was experiencing from the gun shot injury.

226.    Then there is "compensating pain," which is not detailed herein. Pain and muscle-tightness from the right side of Plaintiff's body can, will and has radiated to the left side of his body.

227.    The frequency, duration, intensity and severity of the pain Plaintiff experiences from the gun shot injury and the life-long limitations caused thereof, which Plaintiff has and will continue to experience for the rest of his life, due to his gun shot injury equates to a major life activity for Plaintiff. The un-controllability and the intensity of Plaintiff's gun shot

---

[32] I constantly monitor the twitching/jerking of my left leg as it has been a narcoleptic signal for me.

injury pain is not the same as the pain experienced by most people during their lives.

228.    Plaintiff's pain is really only partially controlled as best as it can be as it will flare up without warning. Plaintiff's chronic, lifelong pain condition qualifies as a Rehab. Act handicap/impairment condition entitled to reasonable accommodation.

229.    Plaintiff's intense and un-predictable lifelong pain from the gun shot injury qualifies as a Rehab. Act handicap/impairment condition entitled to reasonable accommodation.

## HEARING LOSS

230.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

231.    Plaintiff would sit in the front row center or slightly left of center in college to improve Plaintiff's ability to hear, sometimes by reading lips. Plaintiff had a hard time hearing the professor in those classes where he was unable to sit in the front row.

232.    Plaintiff had a terrible time hearing in the United States Marine Corps training and schools because of the rigid control.

233.    During the college and military time-period it was difficult to diagnose Plaintiff's hearing loss.

234.    Plaintiff's hearing loss was diagnosed in 1987 and is documented in the Defendant's Official Personnel File for Plaintiff.

235.    Plaintiff tried different hearing assistance devices over the years to overcome his hearing loss.

236.    Defendants' officials raised havoc with one hearing device, which worked in meetings. Their reactions were comical but also sad because this device actually did assist the Plaintiff in hearing and frequency-controlled hearing aids had not been invented. This device was about the size of a cigaret package.

237.    Defendants' officials would get upset when Plaintiff placed the hearing assistance device on the table in front of him. Plaintiff would explain that it was a hearing assistance device. Defendants officials' would not believe Plaintiff; they thought it was a tape recorder. Plaintiff would be falsely accused of tape recording the meeting. Plaintiff stopped using this device due to the workplace problems it was causing.

238.    This hearing assistance device was actually beneficial to the Defendants. It reduced the amount of time wasted in meetings. Defendants' officials would often promptly adjourn a meeting upon seeing the device.

239.    Plaintiff's hearing loss was a disability/impairment from 1989 through 2005, because prior to January 1, 2006, Plaintiff's type of hearing loss could not be corrected. Although Plaintiff could hear sounds and noises from 1989 through 2005, what was heard depended on factors: a) location of the speaker, i.e., in front, behind or to the side of Plaintiff; b) speaker's enunciation of a word, consonant or vowel; c) speaker's rate of speech; and d) background noise.

240.    Hearing is a major life activity.

241.    Plaintiff's use of a telephone without the head phone increased the chronic pain from the gun shot injury Plaintiff experienced because of the neck muscles involved and the location of the bullet.    The Defendants authorized Plaintiff reasonable accommodation and

provided Plaintiff with a telephone headphone. Plaintiff now has the use of a speaker-phone at both home and office.

242.  With the development of computers and microchips, the hearing aid industry developed frequency-controlled hearing aids.

243.  Plaintiff purchased two frequency-controlled hearing aids on October 31, 2005.

244.  While Plaintiff's hearing loss was a disability/impairment from 1989 through 2005, it is probably not a disability/impairment today due to the invention of the frequency-controlled hearing aids Plaintiff now uses even though Plaintiff continues to have a problem hearing in certain locations due to background noise, e.g., a) the 11th floor conference room of the UCP building where Plaintiff works and staff meetings are held due to the ventilation system and fan noise, which was not a problem in the FOB6 facility, and b) restaurants, which is why Plaintiff doesn't like getting together with friends and partying, i.e., it was usually impossible for Plaintiff to hear and carry on a conversation with anyone and it still is today. Plaintiff's hearing is better but not perfect.

245.  Plaintiff's hearing loss qualifies as a Rehab. Act handicap/impairment condition entitled to reasonable accommodation.

## NARCOLEPSY

246.  Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

247.  Plaintiff's narcolepsy has control over when and where a narcoleptic sleep interruption

awake event, i.e., the ugly head of narcolepsy, will occur.

248.    A person who is drunk has more control over what they can and cannot do when drunk than an "adequately controlled" narcoleptic does when the ugly head of narcolepsy decides to raise it ugly head and override medication control.

249.    Unknown and unplanned narcoleptic sleep interruption awake events are obviously unknown and unplanned by definition, otherwise the sleep interruption awake event would be a known event if Plaintiff knew or had control over when and where the event would occur and the level of its frequency, duration, intensity and severity.

250.    The ugly head of narcolepsy controls Plaintiff's activities and life 24 hours per day even though he has so called "adequately controlled" narcolepsy.

251.    Plaintiff usually has daily sleep interruption awake events.

252.    The medication taken to control narcoleptic sleep interruption awake events is designed to reduce the frequency, duration, intensity and severity of the unknown and unplanned sleep interruption awake events, thereby allowing the narcoleptic to: a) perform, usually through workplace reasonable accommodation, non-life threatening work; and b) have a more similar, with restrictions and definitely not equal, work and personal life.

253.    The medication Plaintiff takes to control his narcoleptic sleep interruption awake events reduces, but does NOT eliminate, the frequency, duration, intensity and severity of Plaintiff's daily unknown and unplanned sleep interruption awake events.

254.    The medication Plaintiff takes to control his narcoleptic sleep interruption awake events allows Plaintiff to have a more similar, with restrictions and definitely not equal, work and personal life.

255.   The medication Plaintiff takes to control his narcoleptic sleep interruption awake events allows Plaintiff to perform, through workplace reasonable accommodation, Defendants non-life threatening work.

256.   Medication taken to control narcoleptic sleep interruption awake events is not designed to, and usually will not, eliminate all daily sleep interruption awake events, which is why narcoleptics are precluded from working in certain jobs and professions for public and workplace safety reasons. Narcoleptics will not be issued a pilot's license (I tried.), long-haul over-the-road commercial truck or tour bus driver's license, or heavy equipment operator's license to name a few of the narcoleptic-restricted jobs and professions as the medication usually does not eliminate all sleep interruption awake events.

257.   Plaintiff's narcolepsy is a chronic, lifelong permanent disability/impairment due to: 1) the lifelong guaranteed nature of his narcolepsy; 2) no control over the when and where of a narcoleptic event; 3) no control over the frequency of a narcoleptic event; 4) no control over the duration of a narcoleptic event; 5) no control over the intensity of a narcoleptic event: 6) no control over the severity of a narcoleptic event; and 6) no control over the debilitating affect of a narcoleptic event even though his narcolepsy is medically controlled because medicine reduces, but does not eliminate, narcoleptic events.

258.   Plaintiff is fortunate in that he has 10 to 60 minutes advance warning a narcoleptic event is imminent, which is why he is allowed to drive.

259.   Plaintiff was diagnosed with narcolepsy in 1983 by the Mayo Clinic.

260.   Plaintiff's chronic narcoleptic condition will be a disability/impairment for the rest of Plaintiff's life even though the frequency of Plaintiff's daily sleep interruption awake

events has been reduced through medication because said events cannot be eliminated through medication.

261. Plaintiff's narcolepsy is a disability/impairment through today and probably will be through the rest of Plaintiff's life because at present there is <u>no cure</u>.

262. Medicine does not cure narcolepsy.

263. Plaintiff is "out of commission" when his narcolepsy decides Plaintiff will experience a sleep interruption awake event.

   A. The ugly head of narcolepsy decides when and where Plaintiff will have a sleep interruption awake event.

   B. Plaintiff does NOT decide when or where they will have a sleep interruption awake event.

   C. The ugly head of narcolepsy decides the frequency, duration, intensity and severity of a sleep interruption awake event.

   D. Plaintiff does NOT decide the frequency, duration, intensity or severity of a sleep interruption awake event.

264. Medication can assist the narcoleptic person in improving the frequency, duration, intensity and severity of an event; however, the actual frequency, duration, intensity and severity of an event is decided by the ugly head of narcolepsy; not the medication.

265. Narcolepsy is not a partner-friendship-enhancing condition. I learned when dating it was better to inform a potential partner when we met that I had narcolepsy. Some would ask questions and evaluate narcolepsy; some would excuse themselves and run.

266. The actuality of being a narcoleptic is that your life has permanently adversely changed.

267. The actuality of ever having a normal life again is permanently over for a narcoleptic

person.

268.   The actuality of ever again being normal since my diagnosis of narcolepsy is **NEVER** unless some magic cure were to be found.

   A.   Narcolepsy is not like a broken bone, which physicians can set and the body heal.

   B.   Narcolepsy is not like an organ, which physicians can remove, cure or replace with other body parts that can take over the functions of the removed or diseased part.

   C.   Narcolepsy is not like a heart problem, which can be fixed through bypass surgery and actually controlled through the implant of a pacemaker and medication.

   D.   Narcolepsy is something that can't be surgically removed or healed through an implant or actually controlled through medication.  Narcolepsy can be kind of, sometimes, partially but not always controlled through medication.

269.   The actuality is that Plaintiff will have narcolepsy for the rest of his life, which is something Plaintiff prefers not to think about.

270.   "Adequately controlled" means it is the best control the physician and narcoleptic person can obtain from the medication.

271.   "Adequately controlled" does not mean cured.

272.   "Adequately controlled" does not mean the narcoleptic person is now, suddenly, event-free; that they will not have any more uncontrolled events.

273.   "Adequately controlled" does not equate to 100 percent.  Uncontrolled narcoleptic events will happen with or without medication.

274.   There are no guarantees as to whether Plaintiff will or will not be event-free today or tomorrow.  The only guarantee is that the ugly head of narcolepsy can and will raise its

ugly head when it decides to override the medication. The unknowns are the ugly head's when and where, and frequency, duration, intensity and severity levels.

275.    The sleeping condition caused by the ugly head of narcolepsy will be intense, **debilitating** and non-stoppable when it decides to raise its ugly head.

276.    Narcoleptic medication is not a "pop" a pill this minute and you will be fine the next minute. Narcoleptic medication does not work that way.

277.    Narcoleptic medication is taken on a prescribed schedule. It takes time to start working, and more time for it to reach its full effect. How long the medication's effectiveness will last depends on the "ugly head" and events, e.g., workplace stress, that the narcoleptic has no control over. All the medication can do is assist the narcoleptic person in shortening the frequency, duration, intensity and severity of an event; the actual frequency, duration, intensity and severity of an event is decided by the ugly head of narcolepsy; not the medication.

278.    If the effectiveness of an "adequately controlled" heart pacemaker was 99% per 24 hours, then the heart pacemaker was not effective during that 24 hour time-period for 14.4 minutes, which, I expect, would equate to an "adequately controlled" dead patient.

279.    If the medicine's effectiveness for an "adequately controlled" narcoleptic was 80% per 16 hours[33], then the medication was not effective during that 16 hour time-period for 3.2 hours, or 12 minutes per hour, which, I expect, would equate to an "adequately controlled" narcoleptic per the manufacturer but, in reality, would more correctly relate to a "partially

---

[33] 24 hours less 8 hours for sleep.

controlled" narcoleptic, which phrase no business would use to describe their product. The respective "adequately controlled" effectiveness percent and times for 90 and 95 percent are: 90% effective equals 1.6 hours, or 6 minutes per hour, 0.1 per second; and 95% effective equals 0.8 hours, or 3 minutes per hour, or 0.05 per second.

280.   The ability to perform acceptable work at the 90 percent and above, and possibly the 80%, adequately controlled effective rate would depend on various factors, e.g., timing, spacing, type of work, alertness factor, and reasonable accommodation, if any was being provided.

281.   The ability to drive at the 95 percent and above, and possibly the 90%, adequately controlled effective rate would depend on various factors, e.g., timing, spacing, driving conditions, and alertness factor, which is why the medication is monitored and narcoleptics don't drive when the "ugly head" has risen.

282.   The effectiveness of the medication a narcoleptic takes is specific to that person, that day.

283.   There is no illusion with narcolepsy. The ugly head of narcolepsy is, has or has not risen; is or is not causing immediate sleep; is allowing Plaintiff to be awake or is causing sleep; and if awake is allowing full or partial alertness.

284.   If the ugly head of narcolepsy decides to raise its head, then it will, and neither I nor the physicians can do anything about that except possibly adjust medication dosage, but that depends on various factors.

285.   Defendants are fully aware of Plaintiff's narcolepsy and the problems his narcolepsy caused in the office. Plaintiff has had full-blown "ugly head" events in the Defendants' workplace while being medically "adequately controlled." The co-workers were scared because Plaintiff was on the floor.

286.    Although Defendants' supervisory personnel in the vicinity of Plaintiff's work area had been advised of Plaintiff's narcoleptic condition and what to do and not do and the medical procedures to take if Plaintiff should have a narcoleptic event while in the office, Plaintiff's co-workers had not been informed prior to the event. The comments Plaintiff heard while having a narcoleptic event in the office convinced Plaintiff that it would be better for co-workers to have knowledge of Plaintiff's narcolepsy.[34]

287.    Having a narcoleptic event in the workplace or in public can be embarrassing for the narcoleptic because there can be a loss of inappropriate body fluids during an event due to the lack of control over body functions regardless of medication or so called "adequate control."

288.    Communicating is a major life activity. A narcoleptic is usually unable to communicate during a narcoleptic event.

289.    Being able to drive is a major life activity. Being able to safely drive is a major life activity. Being legally authorized to drive is a major life activity. Driving is a major life activity. Plaintiff cannot drive when his "adequately controlled" narcolepsy decides it is time for a sleep interruption awake event. A narcoleptic can't: a) sleep and drive, b) sleep and work, or c) sleep and do anything except sleep. If driving, the narcoleptic has no choice but to immediately move the vehicle to a safe location, shut it off and go to sleep; hopefully, in that order!  To do otherwise would: a) endanger the public and the narcoleptic, and b) most likely cause the narcoleptic to lose their driver's license. Plaintiff

---

[34] Narcoleptics are usually able to continue hearing during a narcoleptic event.

has had to immediately move his vehicle to a safe location, shut it off and go to sleep because the ugly head of Plaintiff's "adequately controlled" narcolepsy decided it was time for a sleep interruption awake event.

290. An appointment schedule is a major life activity. If the ugly head of Plaintiff's narcolepsy decides to raise its ugly head it doesn't care if Plaintiff's narcolepsy is adequately controlled or if Plaintiff has a mandatory appointment, e.g., like a court hearing or trial. The ugly head of narcolepsy decides whether Plaintiff will sleep or be on time and it doesn't care if Plaintiff is or is not on time or even there.

291. The ugly head of Plaintiff's narcolepsy has raised its ugly head when Plaintiff was at a restaurant, out with friends, and at a movie. In actuality, narcolepsy is worse than a spoiled, misbehaving two-year-old. You have hope with a misbehaving child.

292. Working is a major life activity. Fighting the ugly head of narcolepsy instead of allowing it to run its course prolongs the event's duration. Allowing the ugly head to run its course requires employer-authorized workplace reasonable accommodation. Ms. Stracke sat behind Plaintiff in class a few years ago. For some reason, the ugly head raised its ugly head about mid-morning, and Plaintiff fought it all day because the Defendants had discontinued reasonable accommodation.

293. Defendants have stated Plaintiff's narcolepsy is not "visible." Well, Plaintiff's narcolepsy was "visible" that class day to any observant person and it would have been totally "visible" to all class participants if the lack of reasonable accommodation caused by Defendants actions had triggered a full-blown ugly head event, which means Plaintiff would have been flat on the floor with all of the resulting consequences. Was Plaintiff

awake during class? Yes. Was Plaintiff alert during class? No. Was Plaintiff productive during class? No. And, all Plaintiff needed was permission through reasonable accommodation to take a 10- to 15-minute nap.[35]

294.    Plaintiff's narcolepsy is a "visible" handicap disability/impairment when the ugly head has risen.

295.    If a narcoleptic has an event on a plane and no one on the plane knows the narcoleptic, it could be catastrophic for the narcoleptic. The plane's crew wouldn't know what was happening because the narcoleptic is usually unable to communicate. If lucky, the crew would only divert the plane to the nearest airport for a medical emergency landing. If unlucky, the crew would think the person was having a heart attack and implement life-saving heart attack medical procedures, which procedures could kill or severely injure/disable the narcoleptic. This is one reason Plaintiff's doesn't like flying. Another reason is that flying across time-zones creates unnecessary sleep and medication control problems. Driving across time zones is okay as it allows for daily adjustments.

296.    Plaintiff had a narcoleptic event on the return flight from Nevada. Luckily, Ms. Feeney was sitting next to Plaintiff or an unlucky passenger would most likely have panicked, which would have caused the crew to panic, which most likely would have resulted in an in-flight medical emergency and a medical emergency landing.

297.    Plaintiff has experienced an increase in the frequency and severity of his daily sleep interruption awake events since the Defendants discontinuance of the reasonable

---

[35] Prior to November 19, 2004, Defendants had authorized Plaintiff reasonable accommodation. Work time was made up through the use of credit hours and sick leave.

accommodation Defendants had authorized and were providing Plaintiff prior to November 19, 2004. For example:

A.  The use of credit hours reduced the number of Plaintiff's daily sleep interruption awake events.

B.  The use of credit hours allowed Plaintiff to be productive.

C.  The use of credit hours allowed Plaintiff to reduce the amount of sick leave being used.

D.  Plaintiff's alternate work schedule reduced the number of Plaintiff's daily sleep interruption awake events.

E.  Plaintiff's alternate work schedule allowed Plaintiff to be productive.

F.  Plaintiff' alternate work schedule reduced the amount of sick leave Plaintiff used.

G.  And the above are examples of the reasonable accommodation the Defendants authorized Plaintiff.

298.  Concentrating is a major life activity. Trying to concentrate and accomplish something, anything, when Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" is impossible.

299.  Eating is a major life activity. Plaintiff cannot eat when his "adequately controlled" narcolepsy kicks in and says "sleep." Hopefully, Plaintiff will not be in a restaurant when this happens. Restaurant owners get upset.

300.  Preparing food is a major life activity. Preparing food when Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" is not possible. Was the stove on or off?

301.  Being able to dress oneself is a major life activity. Putting on Plaintiff's clothes, pulling up his trousers and dressing himself when Plaintiff's "adequately controlled" narcolepsy

kicks in and says "sleep" is not possible. It is wise after an event to check how you are dressed, or if you are dressed, before going downstairs where relatives, neighbors, friends or children are congregated or before stepping outside your home.

302.    Personal hygiene is a major life activity.  When Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" it is not possible to use a restroom and wash.

303.    Using a computer keyboard is a major life activity.  When Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" it is not possible to concentrate or correctly type or use a computer keyboard.

304.    Working is a major life activity. When Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" it is not possible to work because your fingers fail to strike the correct key because you are having problems concentrating because your "adequately controlled" narcolepsy has kicked in and says "sleep." The same thing applies to taking notes during a meeting or class.  Working when the ugly head of your narcolepsy decides it is time for a sleep interruption awake event can be done with, and usually can not be done without, reasonable accommodation.

305.    Meeting work productivity quotas is a major life activity.  When Plaintiff's "adequately controlled" narcolepsy kicks in and says "sleep" it is not possible to be productive because your fingers fail to strike the correct key because you are having problems concentrating because your "adequately controlled" narcolepsy has kicked in and says "sleep." Meeting work productivity quotas when the ugly head of your narcolepsy decides it is time for a sleep interruption awake event can be done with, and usually can not be done without,

reasonable accommodation.[36]

306.    Finalizing a court document by a due date is a major life activity.[37]  Finalizing a court document with a drop-dead due date when Plaintiff's concentration and typing are lousy because his "adequately controlled" narcolepsy has kicked in and says "sleep" is not possible. The ugly head of narcolepsy is in control!

307.    Being awake and alert during trial and litigation proceedings is a major life activity. Uncontrolled narcoleptic events could happen during a status conference, a hearing, or the trial, and there is not one thing Plaintiff, the defendants and/or the Court can do about it except accept it if it happens and resume the proceedings when Plaintiff's narcolepsy decides to bury its ugly head.

308.    Living is a major life activity. Staying awake at the appropriate times during the day is a major life activity. Staying alert at the appropriate times during the day is a major life activity. Living or doing anything during any time period when Plaintiff's body and left leg start twitching/jerking because the ugly head of his narcolepsy is starting to raise its ugly head and it says "sleep" is not possible.[38]

309.    Sleeping at the appropriate time is a major life activity. Plaintiff will go to sleep regardless of where he is or what he is doing or if it is the appropriate place or time to sleep when the ugly head of Plaintiff's narcolepsy says "sleep."

---

[36] This assumes the Defendants have established realistic work productivity goals.  Not doing so is one of their latest reprisal acts.

[37] The Defendants' answer and the Court's response to this will be very interesting.

[38] I constantly monitor the twitching/jerking of my left leg because it has been an "ugly head" narcoleptic signal for me.

310.    Romance is a major life activity. The ugly head of Plaintiff's narcolepsy adversely affected Plaintiff's ability to romance partners when dating, which adversely affected his dating relationships, which adversely affected his romantic relationships, which adversely affected his self-esteem; which adversely affected his life because the ugly head of his narcolepsy said "sleep" and the partner wanted romance. Going to sleep because the ugly head of your narcolepsy said sleep instead of romance does not enhance a relationship especially when the partner wanted and was prepared for romance.

311.    Sexual performance is a major life activity. A side effect of the medication Plaintiff takes to control his narcolepsy is that it adversely affects Plaintiff's ability to maintain an erection, which adversely affects Plaintiff's sexual performance. It is difficult to have sex when a side effect of the medication taken to control your narcolepsy interferes with erections. Plaintiff's ability to maintain an erection and sexual performance has steadily decreased since November 2004.

312.    Sexual adequacy is a major life activity. It is not possible for Plaintiff to have sex when the ugly head of his "adequately controlled" narcolepsy kicks in and says "sleep."

313.    A side effect of the medication Plaintiff takes to control his narcolepsy is that it adversely affects blood pressure and heart functions. Plaintiff now has moderate-to-high blood pressure despite the Gard family medical history of low blood pressure and few heart problems or disease. Plaintiff had low blood pressure in 1998. Plaintiff did not have a blood pressure or heart problem prior to 2004. Plaintiff's blood pressure has steadily risen since November 2004, due to the Defendants' intentional increase in stress and discontinuance of the reasonable accommodation Defendants had provided the Plaintiff

prior to November 19, 2004.

314.    Sleeping is a major life activity.

315.    Being able to stay awake during the day is a major life activity.

316.    Plaintiff has seen an increase in his daily sleep interruption awake events since Defendants discontinued the reasonable accommodation Defendants had authorized and were providing Plaintiff prior to November 19, 2004.

317.    Unknown and unplanned narcoleptic events have an adverse affect on Plaintiff because said narcoleptic events adversely affects Plaintiff's sleep pattern and the medical control of his narcolepsy, which adversely affect Plaintiff's alertness level, which adversely affects Plaintiff's concentration, which adversely affects Plaintiff's ability to drive, which affects Plaintiff's ability to commute to the office, which affects Plaintiff's productivity, which adversely affects Plaintiff's work, which adversely affects Plaintiff's ability to square dance, [as noted earlier], which adversely increases Plaintiff's pain from the gun shot injury, which adversely affects Plaintiff's marital life, which adversely affects Plaintiff's sleep, and the cycle starts over.

318.    The frequency, duration, intensity and severity of the ugly head of narcolepsy and the life-long limitations caused thereof, which Plaintiff has and will continue to experience due to his narcoleptic condition equates to a major life activity for Plaintiff. The unpredictability and uncontrollable urge to sleep caused by narcolepsy is not the same as the lack of sleep experienced by most people during their lives.

319.    Plaintiff's so-called "adequately controlled," which is really partially controlled as best as it can be, chronic, lifelong    narcoleptic condition qualifies as a Rehab. Act

handicap/impairment condition entitled to reasonable accommodation.

320.  Plaintiff's narcolepsy qualifies as a Rehab. Act handicap/impairment condition entitled to reasonable accommodation.

# POST-TRAUMATIC STRESS DISORDER

321.  Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

322.  Post-Traumatic Stress Disorder (PTSD) is a mental illness that some people develop after experiencing traumatic or life-threatening events. *Post-Traumatic Stress Disorder*, Microsoft® Encarta® Online Encyclopedia 2007.

323.  People with PTSD relive the traumatic event again and again through nightmares and disturbing memories during the day. They sometimes have flashbacks, in which they suddenly lose touch with reality and relive images, sounds, and other sensations from the trauma. Because of their extreme anxiety and distress about the event, they try to avoid anything that reminds them of it. They may seem emotionally numb, detached, irritable, and easily startled. They may feel guilty about surviving a traumatic event that killed other people. Other symptoms include trouble concentrating and sleep difficulties. *See id.*

324.  Post-traumatic stress disorder can severely disrupt one's life.  People with this disorder may have unpredictable, angry outbursts at family members. At other times, they may seem to have no affection for their loved ones.

325.  Post-traumatic stress disorder is an extreme reaction to extreme stress. In moments of crisis,

people respond in ways that allow them to endure and survive the trauma. Afterward, those responses, such as emotional numbing, may persist even though they are no longer necessary.

326.    Treatment of post-traumatic stress disorder may involve psychotherapy, psychoactive drugs, or both. Psychotherapists help individuals confront the traumatic experience and work through their strong negative emotions.

327.    Plaintiff obtained PTSD treatment from the Vet Center located in Sioux City, Iowa, and the VA hospital located in Sioux Falls, South Dakota, starting in approximately 1980.

328.    Plaintiff obtained PTSD treatment from the Vet Centers located in Denver and Colorado Springs, Colorado, from approximately 1984 through 1989.

329.    Plaintiff obtained PTSD treatment from the Vet Centers located in Springfield, Virginia, and Washington, D.C., from approximately 1989 through 1996, and 2000/2001.

330.    Plaintiff obtained further PTSD counseling and treatment from the Vet Center located in Washington, D.C., around 1992/1994 due to non-work-related problems. This was a very difficult time-period for Plaintiff.  Vet Center personnel referred Plaintiff to the U.S. Department of Veterans Affairs (VA) hospital located in Washington, D.C., for treatment due to the severity of Plaintiff's PTSD.

331.    The VA PTSD physician prescribed medication to treat Plaintiff's PTSD but had to discontinue said medication due to Plaintiff's narcolepsy.

332.    Medication used to treat PTSD interferes with the medication used to treat narcolepsy.

333.    Plaintiff does not take PTSD medication.

334.    The VA provided Plaintiff with 18 months of intense PTSD counseling treatment.

335.   Defendants' officials ensured that Plaintiff's work assignments and schedule allowed Plaintiff the time required to attend the VA's PTSD counseling sessions.[39]

336.   Prior to 1998, the Defendants received the VA's certification that Plaintiff was not a threat to himself, the public or co-workers.

337.   Prior to 1998, the VA provided the Defendants with all of the medical information the Defendants are entitled to have knowledge of concerning Plaintiff's PTSD.

338.   Prior to 1998, the VA provided the Defendants with all of the medical information the Defendants needed to provide Plaintiff with reasonable accommodation.

339.   The Defendants are not entitled to any additional information concerning Plaintiff's PTSD.

340.   The Defendants do not need any additional information concerning Plaintiff's PTSD to provide Plaintiff with PTSD reasonable accommodation.

341.   Prior to 1998, the VA directed the Defendants to provide Plaintiff with PTSD reasonable accommodation.

342.   Prior to 1998, the VA directed the Defendants to not harass Plaintiff.

343.   Prior to 1998, the VA directed the Defendants to provide Plaintiff with a non-threatening work environment.

344.   Prior to 1998, the VA directed the Defendants to leave Plaintiff alone and allow him to work.

345.   Prior to 1998, the VA directed the Defendants to not take action against the Plaintiff without first notifying the VA.

---

[39] Defendants had authorized Plaintiff reasonable accommodation. Work time was made up through the use of credit hours and sick leave.

346.    Prior to 1998, the VA directed the Defendants to not take action against/detrimental to the Plaintiff without first obtaining the VA's permission to take said action.

347.    VA personnel instructed the Defendants to: a) provide Plaintiff with the reasonable accommodation he requested, b) ensure no retaliatory actions were taken against the Plaintiff, and c) not take any disciplinary action against the Plaintiff without first notifying the VA and obtaining the VA's approval.

348.    Prior to 1998, the VA instructed Plaintiff to not abuse the reasonable accommodation the VA had instructed the Defendants to provide Plaintiff.

349.    Plaintiff has not abused the reasonable accommodation the VA instructed the Defendants to provide Plaintiff.

350.    Defendants complied with the VA's reasonable accommodation instructions prior to Plaintiff's June 2, 1998, whistleblower disclosures.

351.    Defendants did not comply with the VA's reasonable accommodation instructions concerning Plaintiff on June 19, 1998, when the Defendants sent Plaintiff written notification that Plaintiff had been placed on paid administrative leave and barred him from entering any Defendants' facilities, effective immediately, because the Defendants had not notified the VA of said action prior to implementing said action nor had the Defendants obtained the VA's permission to take said action.

352.    The Defendants did not comply with the VA's reasonable accommodation instructions concerning Plaintiff on June 22, 1998, when the Defendants directed armed Federal police officers to physically remove Plaintiff from the Defendants' facilities because the Defendants: a) had not notified the VA of said action prior to implementing said action, 2)

had not obtained the VA's permission to take said action, and 3) the Defendants did not deliver Plaintiff to the VA hospital for further evaluation.

353.    The Defendants were under strict VA instructions that the Defendants' implementation of action against Plaintiff required the Defendants to notify the VA prior to the implementation of said action.

354.    The Defendants did not notify the VA prior to the Defendants' implementation of the June 19 and 22, 1998, action(s) against Plaintiff.

355.    The Defendants did not notify the VA after the Defendants' implementation of the June 19 and 22, 1998, action(s) against Plaintiff.

356.    The Defendants were under strict VA instructions that the Defendants' use of armed Federal police officers involving Plaintiff required the Defendants to directly and immediately have Plaintiff delivered to the VA hospital for further evaluation.

357.    The Defendants **directed** armed Federal police officers to physically remove Plaintiff from the Defendants' facilities on June 22, 1998; however, the Defendants did not:

    A.   Notify the VA, or

    B.   Direct the armed Federal police officers to deliver Plaintiff to the VA hospital for further evaluation.

358.    Plaintiff saw the VA PTSD physician on July 6, 1998, due to the Defendants' June 19 and 22, 1998, actions.  The VA physician wanted to know why Plaintiff had made an appointment to see them when they had not received a report from the Defendants that there was a problem.  The VA physician "went ballistic" when Plaintiff told him the Defendants had armed Federal police officers physically remove Plaintiff from the

Defendants' facility on June 22, 1998. The VA physician's response was emphatic! If the Defendants' officials found it justified/necessary to have you physically removed from the Defendants' facility by armed Federal police officers then they should have had you immediately delivered to the emergency room of the VA hospital for evaluation; they knew that; you should not have been released! The VA physician and Plaintiff then discussed: a) the events surrounding the Defendants' physical removal of Plaintiff from the Defendants' facility by armed Federal police officers on June 22, 1998, and b) how Plaintiff was holding up and feeling. The VA physician concluded that the Defendants had not called them for permission to have Plaintiff removed from the Defendants' facilities prior to having Plaintiff physically removed by armed Federal police officers on June 22, 1998, because the Defendants' removal of Plaintiff from the Defendants facilities was "bull-crap," the VA would not have authorized the Defendants removal of Plaintiff, and the VA would have ordered the Defendants to immediately cease said actions.

359.    Defendants attempted to correct their June 19 and 22, 1998, failure to comply with the VA's reasonable accommodation and discipline directive on August 20, 1998, or approximately 45 days after Plaintiff had seen the VA's PTSD physicians.

360.    Defendants attempted to correct their June 19 and 22, 1998, failure to comply with the VA's reasonable accommodation and discipline directive on August 20, 1998, by informing Plaintiff that he was authorized to enter Defendants' facilities on the pretext of assisting employees from the Office of Inspector General in locating and securing files. Defendants assured Plaintiff's legal counsel that permission for Plaintiff to enter the Defendants' facilities was granted and Defendants' personnel had been so informed.

Plaintiff entered the Defendants' facilities as instructed and came within a hair's breadth of being arrested by the Defendants' armed security guards for violating the Defendants' June 19, 1998, letter, which had banned Plaintiff from entering the Defendants' facilities. Defendants had informed Defendants' security guards that Plaintiff was not authorized to enter the Defendants' facility. Plaintiff's entry onto Defendants' property on August 20, 1998, was a setup to have Plaintiff arrested, delivered to the VA hospital and terminate his employment.

361. In 2000/2001, the VA's physicians and staff provided Plaintiff with further private and group PTSD counseling and treatment and then had Plaintiff take a sixteen-week PTSD anger management course. Plaintiff successfully completed the course. Defendants received a copy of the VA's certificate that Plaintiff had successfully completed the course.

362. In 2000/2001, Defendants' officials ensured that Plaintiff's work assignments and schedule allowed Plaintiff the time required to attend the VA's weekly PTSD counseling sessions.[40]

363. After Plaintiff's 2004 fraud disclosures and Plaintiff's filing of a handicap discrimination claim against the Defendants, the Defendants became **"unable to locate"** the Defendants' Employee Medical Folder pertaining to Plaintiff because said folder contained the medical information the Defendants had received from the VA and what the VA had and had not directed the Defendants could and could not do concerning Plaintiff.

364. The Defendants did not need, do not need and are not entitled to receive updated VA medical information concerning Plaintiff's PTSD and/or certification that Plaintiff is not

---

[40] Defendants had authorized Plaintiff reasonable accommodation. Work time was made up through the use of credit hours and sick leave.

a threat to himself, the public or co-workers because the *Return-to-Work Agreement dtd Dec. 14, 1998,* rescinded, without restriction and <u>without obtaining Plaintiff's medical records</u>, the Defendants' June 19, 1998, letter, which had a) placed Plaintiff on paid administrative leave, b) barred Plaintiff from entering any facility of the Defendants, and c) alleged Plaintiff was a threat.

365. The Defendants did not need, do not need and are not entitled to receive updated VA medical information concerning Plaintiff's PTSD and/or certification that Plaintiff is not a threat to himself, the public or co-workers because: a) Defendants rescinded the Defendants June 19, 1998, letter; b) Defendants' actions prove that it is not needed; c) Plaintiff's actions prove that it is not needed; and d) Defendants' request is not legal.

366. There has been no incident[41] since April 24, 1989, that would justify the Defendants request and/or repeated requests for updated VA medical information concerning Plaintiff's PTSD and/or certification that Plaintiff is not a threat to himself, the public or co-workers.

367. Plaintiff's PTSD was controlled through the reasonable accommodation the VA had directed the Defendants to provide Plaintiff, counseling and Plaintiff's self-discipline.

368. Although United States Marine Corps training and service resulted in some of Plaintiff's PTSD problems, the discipline Plaintiff obtained from that same training and service is what has allowed Plaintiff to: a) manage his PTSD through Defendants' reasonable accommodation and VA's assistance, b) keep his freedom, and c) remain a non-threatening

---

[41] Plaintiff's gross mismanagement and fraud disclosures are not qualifying incidents.

employee of the Defendants, especially when the Defendants illegally discontinued Plaintiff's reasonable accommodation and have repeatedly attempted since Plaintiff's June 2, 1998, whistleblower disclosures to **provoke** Plaintiff into a physical confrontation, which the Defendants could use to terminate his employment.

369.    Mental health is a major life activity.

370.    Physical health is a major life activity.

371.    Mental health includes PTSD.

372.    Physical health includes Plaintiff's chronic pain from the gun shot injury.

373.    Physical health includes Plaintiff's chronic narcolepsy.

374.    Plaintiff's PTSD is a chronic, life-long, mental health condition.

375.    The condition of Plaintiff's PTSD mental health affects the control of the pain felt from Plaintiff's gun shot injury.

376.    The condition of Plaintiff's PTSD mental health affects the amount of pain felt from Plaintiff's gun shot injury.

377.    The condition of Plaintiff's PTSD mental health affects the control of Plaintiff's narcolepsy.

378.    The condition of Plaintiff's PTSD affects every aspect of Plaintiff's life.

379.    Concentrating is a major life activity. Concentrating and accomplishing something, anything, when Plaintiff's PTSD is active is impossible.

380.    Eating is a major life activity. Plaintiff has laid on the floor day and night for two to three days at a time because of his PTSD. The only person who would come near Plaintiff was his daughter because she knew Plaintiff would not hurt her.

381.    Personal hygiene is a major life activity. When Plaintiff's PTSD is active personal hygiene goes bye, bye.

382.    Working is a major life activity. It is extremely difficult, sometimes impossible, to work Plaintiff's PTSD is active.

383.    Living is a major life activity. It is very difficult to have a life when Plaintiff's PTSD is active. Living or doing anything constructive during any time period when Plaintiff's PTSD is active is not quite impossible, but close to it.

384.    Sleeping is a major life activity. Plaintiff's active PTSD has an extreme adverse effect on the control of Plaintiff's narcolepsy.

385.    Friends, relationships and marriage are major life activities. Plaintiff's active PTSD has an extreme adverse effect on friends, relationships and marriage. One marriage was destroyed. The second marriage is close to being destroyed because of the Defendants' discontinuance of reasonable accommodation.

386.    The frequency, duration, intensity and severity of Plaintiff's PTSD and the life-long limitations caused thereof, which Plaintiff has and will continue to experience equates to a major life activity for Plaintiff. Plaintiff's PTSD is not experienced by most people during their lives.

387.    Plaintiff's PTSD qualifies as a Rehab. Act handicap/impairment condition entitled to reasonable accommodation.

# HISTORICAL and CURRENT RELATED FACTS

388.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs and all of the Statement of Facts paragraphs, as they are intertwined and related to each other, as if the same were set forth in full herein.

389.    Historical facts included herein are related to the Defendants' current illegal acts and facts.

390.    The substance of the historical facts included herein proves that the historical facts themselves are related to the Defendants' current illegal acts and reprisal motives.

391.    Plaintiff farmed from 1973 through January 14, 1984.

392.    On June 20, 1983, Plaintiff filed a civil action in the United States District Court for the Northern District of Iowa, Western Division, Civil No. C83-4106, against the Farmers Home Administration (FmHA), U.S. Department of Agriculture (USDA), for: a) failure to accurately maintain Plaintiff's loan records, and b) unjustly and falsely accusing Plaintiff of committing federal crimes and refusing to back up those accusations with a federal warrant.

393.    In January 2005, Ms. Joanna Dailey, Esq., OGC, Defendants, also falsely accused Plaintiff of criminally violating Federal statutes and Defendants' regulations, which time-period is during the processing of ED-2005-28-00. Defendants, just like the FmHA, refused to back up their criminal accusation(s) with a warrant. Ms. Dailey's false accusation is another attempt by Defendants to provoke Plaintiff into a physical confrontation, which the Defendants could use to terminate Plaintiff's employment.

394.    Plaintiff is intentionally not setting forth the specifics of the events, actions and reactions,

that occurred during the Gard v FmHA, USDA civil action other than to state that: a) Plaintiff's actions were legal, and b) said events, actions and reactions caused and required Plaintiff to obtain post-traumatic stress disorder (PTSD) counseling from the Vet Centers funded by the U.S. Department of Veterans Affairs, which Vet Centers were initially established to treat military personnel of the Viet Nam time-period.

395.    The parties to the Gard v FmHA, USDA civil action, through the Assistant U.S. Attorney, negotiated and finalized the terms of a settlement agreement on or about November 14, 1983. This settlement agreement reads as though Plaintiff lost; however, an "informed person" reading this settlement agreement would know that is not true.

396.    Plaintiff held a public auction and voluntarily shut down his farming operation on January 14, 1984, due to his health – a) Plaintiff had been diagnosed with narcolepsy in 1983 by the Mayo Clinic; b) Plaintiff was suffering from PTSD; and c) the combined stress of being diagnosed with narcolepsy, suffering from PTSD, and farming was killing him.

397.    The Personal Qualifications Statement – SF 171 Plaintiff filed with the Federal government on or about October 24, 1983, and updated on or about January 22, 1987, specifically stated Plaintiff would not accept employment in the Washington, D.C., Metropolitan area.

398.    On April 1, 1984, the National Credit Union Administration (NCUA) hired Plaintiff to work as a credit union examiner. This position was located in Cheyenne, Wyoming.

399.    Plaintiff and his family lived on a farm located near Sioux City, Iowa, when hired by the NCUA.

400.    Plaintiff and Plaintiff's family moved to Colorado Springs, Colorado, instead of Cheyenne, Wyoming, during the summer of 1984 per NCUA instructions because the credit union

examiner position located in Cheyenne, WY, was an <u>"illegal, sham, non-existent position."</u>

401.    The NCUA terminated Plaintiff's employment on December 21, 1984.

402.    Plaintiff was a probationary federal employee, i.e., had not completed one year of continuous federal service, when NCUA terminated his employment.

403.    Plaintiff filed a handicap refusal to accommodate discrimination complaint against the NCUA.

404.    Plaintiff is intentionally not setting forth the specifics of the events, actions and reactions, that occurred during the Gard v NCUA civil action other than to state that:

   A.   Plaintiff's actions were legal;

   B.   Said events, actions and reactions caused and required Plaintiff to obtain further PTSD counseling from the Vet Centers;

   C.   Plaintiff was shot in the back on December 21, 1985, i.e., 24 hours after informing the Assistant United States Attorney of the NCUA's illegal hiring activities;

   D.   The parties were unable to finalize a settlement agreement because the NCUA refused to pay Plaintiff back pay and interest;

   E.   The Gard v NCUA civil action proceeded to trial due to the back pay and interest issue even though Plaintiff was aware when he walked through the court-room doors on the first day of trial that the Court would: 1) rule for the NCUA if Plaintiff had a Federal job, 2) rule for the NCUA if Plaintiff had turned down a Federal job offer, and 3) rule for the Plaintiff if Plaintiff had NOT been offered a Federal job;

   F.   Plaintiff received a telephone call from the Personnel Department, Defendants, U.S. Department of Education, approximately two weeks prior to the trial's start date;

G. Defendants' personnel officer offered Plaintiff Federal employment located <u>in the Washington, D.C., Metropolitan area</u> (compare to paragraph # 399);

H. Defendants' personnel officer, U.S. Department of Education, dropped the phone when Plaintiff stated he would accept their employment offer;

I. Upon regaining composure, Defendants' personnel officer stated your application states you will not accept Federal employment in the Washington, D.C., Metropolitan area;

J. Plaintiff stated that he had changed his mind and would accept Federal employment in the Washington, D.C., area;

K. Plaintiff received written confirmation of the Defendants,' U.S. Department of Education, job offer prior to the commencement of trial;

L. The above is why and how Plaintiff became an employee of the Defendants, U.S. Department of Education, and moved to the Washington, D.C., area in April 1989;

M. The Defendants were fully aware of the above in April 1989 because they were involved in the resolution of the Gard v NCUA civil action;

N. The Defendants were aware of the above from 1989 through November 19, 2004; and

O. The Gard v NCUA civil action was to be "buried" per the U.S. Department of Justice and the Court due to certain events, actions and reactions undisclosed herein that occurred during the proceedings of the Gard v NCUA civil action.

405.   The U.S. Assistant Attorney, who represented the National Credit Union Administration in the 1989 Gard v NCUA court proceedings, informed Plaintiff upon the conclusion of the proceedings that the government would wait 10 years before taking further action against Plaintiff.

406.  The Defendants did not wait 10 years.  Defendants commenced retaliatory actions against the Plaintiff in 1998, which is 9 years after the Gard v NCUA 1989 civil action.

407.  Why did the Defendants bring the decision the court issued in the Gard v NCUA civil action into Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing and make an issue out of it by misstating facts known to them when the Defendants knew: a) the court's decision in Gard v NCUA was to be buried; b) what really happened in the Gard v NCUA proceedings because the Defendants were involved in its resolution; and c) the real reason why the Defendants hired the Plaintiff?  The Defendants now owe and can pay Plaintiff the NCUA back pay plus interest Plaintiff was denied due to the Defendants' intentional misstatement of facts made by Defendants' legal counsel during the MSPB hearing and failure to leave this decision buried.

408.  The Defendants' employment offer was for Plaintiff to start work on or about April 10, 1989.

409.  The start date for the Gard v NCUA scheduled trial was on or about April 17, 1989.

410.  Upon receipt of the Defendants' job offer, Plaintiff notified the Defendants that: a) the Defendants' employment offer for him to work in the Washington, D.C., area was accepted; b) he had filed a handicap refusal to accommodate discrimination civil action against the NCUA; c) the scheduled trial start-date in the Gard v NCUA civil action was on or about April 17, 1989; d) Plaintiff was a narcoleptic; e) flying from Denver, CO, to Washington, D.C., and back to Denver, CO, the week prior to the commencement of the trial would cause Plaintiff narcoleptic problems during trial due to the time-zone changes; and f) he was requesting a reasonable accommodation revised employment start-date of

April 24, 1989.

411.    The Defendants immediately approved the reasonable accommodation Plaintiff requested and authorized a revised employment start-date of April 24, 1989.

412.    Plaintiff's employment with the Defendants started on April 24, 1989.

413.    From April 24, 1989, through approximately 1993 or later, Mr. Ronald Oleyar was the Director, Financial Management Service (FMS), Defendants. The Defendants reorganized this position and office. Mr. Oleyar retired.

414.    From April 24, 1989, through approximately 1993 or later, Ms. Betty Hepak was Director, Financial Operations Division (FOD), FMS, Defendants. Ms. Hepak reported to Mr. Oleyar. The Defendants reorganized this position and office. Ms. Hepak left the Defendants in 1998 or 1999. Ms. Hepak retired.

415.    From April 24, 1989, through approximately 1993 or later, Mr. John Murphy was the Chief, Program Financing Branch (PFB), FOD. Mr. Murphy reported to Ms. Hepak. The Defendants reorganized this position and office. Mr. Murphy retired.

416.    From April 24, 1989, through approximately 1993 or later, Ms. Shirley Jackson was the Chief, Liaison Section I, PFB. Ms. Jackson reported to Mr. Murphy. The Defendants reorganized this position and office.

417.    Ms. Jackson continues to work for the Defendants.

418.    Ms. Jackson was Plaintiff's supervisor in 1989 and through approximately 1993 or later.

419.    Ms. Jackson has knowledge of Plaintiff's medical conditions.

420.    Mr. Oleyar called Ms. Jackson, Plaintiff's supervisor, and Plaintiff to his office in late April or early May 1989. Mr. Oleyar told Plaintiff that: a) Plaintiff would not have to file

a discrimination complaint while employed for Defendants, b) Plaintiff was to let Mr. Oleyar know if there was a reasonable accommodation problem, c) Defendants would accommodate Plaintiff, and d) <u>there would be no reasonable accommodation problems</u>.

421.    There were no reasonable accommodation problems between Plaintiff and the Defendants from 1990 through November 19, 2004, which required Plaintiff to file an EEO complaint against the Defendants, because, just as Mr. Oleyar stated the Defendants would do, the Defendants provided Plaintiff with the reasonable accommodation Plaintiff requested from 1990 through November 18, 2004.

422.    Plaintiff did not have reasonable accommodation problems with the Defendants until after Plaintiff's disclosures involving grantee and Defendants employee internal fraud in July 2004, other internal employee disclosures he made in August 2004, and the filing of a handicap reasonable accommodation discrimination complaint against the Defendants in January 2005.

423.    Plaintiff's Oct. 19, 1990, memorandum marked "confidential" to Mr. Oleyar, through Ms. Jackson, Mr. John Murphy, and Ms. Betty Hepak, Defendants, states in the subject "Notification of Equal Employment Opportunity problem." Paragraph one's opening sentence states "As instructed[42] when hired, I am hereby notifying the Department of Education (ED) of a pending Equal Employment Opportunity problem prior to the commencement of EEO action." That is all Plaintiff had to do as Mr. Oleyar had told Plaintiff that: a) Plaintiff would not have to file a discrimination complaint while employed

---

[42] As instructed by Mr. Oleyar within a few weeks of starting work for the Defendants.

for Defendants, b) Plaintiff was to let Mr. Oleyar know if there was a reasonable accommodation problem, c) Defendants would accommodate Plaintiff, and d) there would be no reasonable accommodation problems.

424. On October 19, 1990, Plaintiff submitted a written request for reasonable accommodation to the Defendants. Exhibit # 10.

A. Defendants requested Plaintiff submit medical documentation.

B. Plaintiff and/or Plaintiff's physicians submitted the requested medical documentation to the Defendants.

C. Defendants determined Plaintiff was an otherwise qualified handicap employee entitled to reasonable accommodation.

D. Defendants approved Plaintiff's October 19, 1990, request for reasonable accommodation.

E. Defendants provided Plaintiff with the requested reasonable accommodation from the date of the Defendants' approval of Plaintiff's October 19, 1990, request for reasonable accommodation through November 18, 2004.

F. Plaintiff has never received written notice from the Defendants that Plaintiff's October 19, 1990, request for reasonable accommodation had been denied.

G. The Defendants have never notified Plaintiff of his EEO and handicap discrimination appeal rights.

425. The Defendants did not deny Plaintiff's October 19, 1990, request for reasonable accommodation.

426. The Defendants authorized and provided Plaintiff with the reasonable accommodation Plaintiff requested on October 19, 1990.

427.    As stated by Mr. Robert Kilpatrick, EEOG, Defendants, on March 14, 2005, the Defendants' granting of reasonable accommodation doesn't have to be in writing. It can be verbal.

428.    The Defendants' actions granted Plaintiff's October 19, 1990, request for reasonable accommodation.

429.    The Defendants provided Plaintiff with the requested accommodation as the Defendants' denial of Plaintiff's October 19, 1990, request for reasonable accommodation would have triggered the statutory time-period for requesting EEO counseling and filing an appeal, which would have caused the Plaintiff to file a handicap refusal to accommodate discrimination complaint against the Defendants in this District Court, which Plaintiff did not file because the Defendants approved Plaintiff's October 19, 1990, request for reasonable accommodation.

430.    On December 16, 1991, Plaintiff submitted a written request for reasonable accommodation to the Defendants. Exhibit # 15.

   A.   Defendants requested Plaintiff submit medical documentation.

   B.   Plaintiff and/or Plaintiff's physicians submitted the requested medical documentation to the Defendants.

   C.   Defendants determined Plaintiff was an otherwise qualified handicap employee entitled to reasonable accommodation.

   D.   Defendants approved Plaintiff's December 16, 1991, request for reasonable accommodation.

   E.   Defendants provided Plaintiff with the requested reasonable accommodation from the date

Page 92 of 230

of the Defendants' approval of Plaintiff's December 16, 1991, request for reasonable accommodation through November 18, 2004.

F.   Plaintiff has never received written notice from the Defendants that Plaintiff's December 16, 1991, request for reasonable accommodation had been denied.

G.   The Defendants have never notified Plaintiff of his EEO and handicap discrimination appeal rights.

431.   The Defendants did not deny Plaintiff's December 16, 1991, request for reasonable accommodation.

432.   The Defendants authorized and provided Plaintiff with the reasonable accommodation Plaintiff requested on December 16, 1991.

433.   The Defendants' actions granted Plaintiff's December 16, 1991, request for reasonable accommodation.

434.   The Defendants provided Plaintiff with the requested accommodation as the Defendants' denial of Plaintiff's December 16, 1991, request for reasonable accommodation would have triggered the statutory time-period for requesting EEO counseling and filing an appeal, which would have caused the Plaintiff to file a handicap refusal to accommodate discrimination complaint against the Defendants in this District Court, which Plaintiff did not file because the Defendants approved Plaintiff's December 16, 1991, request for reasonable accommodation.

435.   On March 4, 1992, Plaintiff submitted a written request for reasonable accommodation to Defendants. Exhibit # 16.

A.   Defendants requested Plaintiff submit medical documentation.

Page 93 of 230

B.  Plaintiff and/or Plaintiff's physicians submitted the requested medical documentation to the Defendants.

C.  Defendants determined Plaintiff was an otherwise qualified handicap employee entitled to reasonable accommodation.

D.  Defendants approved Plaintiff's March 4, 1992, request for reasonable accommodation.

E.  Defendants provided Plaintiff with the requested reasonable accommodation from the date of the Defendants' approval of Plaintiff's March 4, 1992, request for reasonable accommodation through November 18, 2004.

F.  Plaintiff has never received written notice from the Defendants that Plaintiff's March 4, 1992, request for reasonable accommodation had been denied.

G.  The Defendants have never notified Plaintiff of his EEO and handicap discrimination appeal rights.

436.  The Defendants did not deny Plaintiff's March 4, 1992, request for reasonable accommodation.

437.  The Defendants authorized and provided Plaintiff with the reasonable accommodation Plaintiff requested on March 4, 1992.

438.  The Defendants' actions granted Plaintiff's March 4, 1992, request for reasonable accommodation.

439.  The Defendants provided Plaintiff with the requested accommodation as the Defendants' denial of Plaintiff's March 4, 1992, request for reasonable accommodation would have triggered the statutory time-period for requesting EEO counseling and filing an appeal, which would have caused the Plaintiff to file a handicap refusal to accommodate

discrimination complaint against the Defendants in this District Court, which Plaintiff did not file because the Defendants approved Plaintiff's March 4, 1992, request for reasonable accommodation.

440.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, was the supervisor of Mr. Richard Esterbrook from April 1, 2005 through September 30, 2007.

441.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, was the supervisor of Ms. Marsha Mast from April 1, 2005 through September 30, 2007.

442.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, was the supervisor of Ms. Gail Cornish from April 1, 2005 through September 30, 2007.

443.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, was the supervisor of Mr. Robert Theobald from April 1, 2005 through September 30, 2007.

444.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, was the supervisor of Plaintiff from April 1, 2005 through September 30, 2007.

445.    Mr. Miller told Plaintiff that Mr. Esterbrook had the disability/impairment of leg problems from April 1, 2005 through September 30, 2007.

446.    Mr. Miller told Plaintiff that Ms. Mast had the disability/impairment of heart condition from April 1, 2005 through September 30, 2007.

447.    Mr. Miller told Plaintiff that Ms. Cornish had the disability/impairment of air quality and breathing problems from April 1, 2005 through September 30, 2007.

448.    Mr. Miller told Plaintiff that Mr. Theobald had the disability/impairment of migraine headaches from April 1, 2005 through September 30, 2007.

449.    Mr. Miller told Plaintiff that Plaintiff did not have a disability/impairment from April 1,

2005 through September 30, 2007, per Defendants' officials believed to be: a) Ms. Linda Stracke, Director, FIPAO, OCFO; b) Mr. Danny Harris, Deputy CFO, OCFO; and c) Ms. Joanna Dailey, Esq., OGC, Defendants.

450.    Plaintiff had the disabilities/impairments of: a) chronic pain from a gun shot injury, b) hearing loss, c) narcolepsy, and d) post-traumatic stress disorder (PTSD) from April 1, 2005 through September 30, 2007.

451.    Mr. Miller told Plaintiff that Mr. Miller had authorized Mr. Esterbrook reasonable accommodation from April 1, 2005 through September 30, 2007.

452.    Mr. Miller told Plaintiff that Mr. Miller had authorized Ms. Mast reasonable accommodation from April 1, 2005 through September 30, 2007.

453.    Mr. Miller told Plaintiff that Mr. Miller had authorized Ms. Cornish reasonable accommodation from April 1, 2005 through September 30, 2007.

454.    Mr. Miller told Plaintiff that Mr. Miller had authorized Mr. Theobald reasonable accommodation from April 1, 2005 through September 30, 2007.

455.    Mr. Chuck Miller, Director, Post Audit Group, Defendant, did **NOT** authorize Plaintiff reasonable accommodation from April 1, 2005 through September 30, 2007.

456.    Mr. Esterbrook's disability is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

457.    Ms. Mast's disability is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

458.    Ms. Cornish's disability is documented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

459.    Mr. Theobald's disability is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

460.    Plaintiff's disability is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

461.    Mr. Esterbrook's reasonable accommodation is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

462.    Ms. Mast's reasonable accommodation is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

463.    Ms. Cornish's reasonable accommodation is documented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

464.    Mr. Theobald's reasonable accommodation is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

465.    Plaintiff's reasonable accommodation is undocumented per the Defendants' Report of Investigation issued January 10, 2006, for ED-2005-28-00.  ROI-1 @ and Tab F9-1 - 3.

466.    Mr. Miller authorized Mr. Esterbrook reasonable accommodation of working at home on a Flexiplace alternate work schedule.

467.    Mr. Miller authorized Ms. Mast reasonable accommodation of: a) working at home on a Flexiplace alternate work schedule, and b) working at night through the use of credit hours.

468.    Mr. Miller authorized Ms. Cornish reasonable accommodation of working in the Defendants' FOB6 facility instead of the UCP facility.

469.    Mr. Miller authorized Mr. Theobald  reasonable accommodation of: a) working at home on a Flexiplace alternate work schedule, b) working when Mr. Theolbald's migraine

headache allowed him to work, and c) working during the day, night or any combination thereof of continuous or split hours through the use of credit hours.[43]

470.    Mr. Miller would **NOT** authorize Plaintiff reasonable accommodation of: a) working at home on the Flexiplace alternate work schedule dated February 2000, b) working when Plaintiff's pain, narcolepsy and PTSD allowed him to work, and c) working during the day, night or any combination thereof of continuous or split hours through the use of credit hours.

471.    Plaintiff had been authorized to use credit hours prior to November 19, 2004, through reasonable accommodation.

472.    From April 1, 2005 through September 30, 2007, Mr. Miller refused to authorize Plaintiff the reasonable accommodation the Defendants had provided Plaintiff prior to November 19, 2004.

473.    Mr. Miller complied with the reasonable accommodation requirements of the Rehab. Act and EEOC handicap and reasonable accommodation regulations and guidelines when Mr. Miller approved reasonable accommodation for Mr. Esterbrook.

474.    Mr. Miller complied with the reasonable accommodation requirements of the Rehab. Act and EEOC handicap and reasonable accommodation regulations and guidelines when Mr. Miller approved reasonable accommodation for Ms. Mast.

475.    Mr. Miller complied with the reasonable accommodation requirements of the Rehab. Act and EEOC handicap and reasonable accommodation regulations and guidelines when Mr.

---

[43] Which credit hours may or may not have been recorded on the Defendants' records.

Miller approved reasonable accommodation for Ms. Cornish.

476.    Mr. Miller complied with the reasonable accommodation requirements of the Rehab. Act
        and EEOC handicap and reasonable accommodation regulations and guidelines when Mr.
        Miller approved reasonable accommodation for Mr. Theobald.

477.    Mr. Miller did not comply with the reasonable accommodation requirements of the Rehab.
        Act and EEOC handicap and reasonable accommodation regulations and guidelines when
        Mr. Miller denied reasonable accommodation for Plaintiff.

478.    The supervisor's approval of an employee's request for reasonable accommodation can be
        verbal.

479.    The supervisor's denial of an employee's request for reasonable accommodation has to be
        in writing.

480.    Defendants' assertion that the Defendants' supervisors comply with the Defendants'
        Handbook for Reasonable Accommodations is bogus.

481.    Mr. Miller's release of Mr. Esterbrook's disability/impairment and reasonable
        accommodation information to Plaintiff violated Mr. Esterbrook's Privacy Act rights unless
        Mr. Esterbrook had authorized Mr. Miller to release said information to Plaintiff.

482.    Mr. Miller's release of Ms. Mast's disability/impairment and reasonable accommodation
        information to Plaintiff violated Ms. Mast's Privacy Act rights unless Ms. Mast had
        authorized Mr. Miller to release said information to Plaintiff.

483.    Mr. Miller's release of Ms. Cornish's disability/impairment and reasonable accommodation
        information to Plaintiff violated Ms. Cornish's Privacy Act rights unless Ms. Cornish had
        authorized Mr. Miller to release said information to Plaintiff.

484.    Mr. Miller's release of Mr. Theobald's disability/impairment and reasonable accommodation information to Plaintiff violated Mr. Theobald's Privacy Act rights unless Mr. Theobald had authorized Mr. Miller to release said information to Plaintiff.

485.    Mr. Richard Mueller, Director, Indirect Cost Group, Defendant, was the supervisor of Ms. Linda Feeney from March 1, 2004 through September 30, 2004.

486.    Mr. Richard Mueller, Director, Indirect Cost Group, Defendant, was the supervisor of Plaintiff from March 1, 2004 through September 30, 2004.

487.    Mr. Mueller told Plaintiff that Ms. Feeney had been "castrated." He then explained that her female organs had been removed.

488.    Mr. Mueller's release of Ms. Feeney's private medical information to Plaintiff violated Ms. Feeney's Privacy Act rights unless Ms. Feeney had authorized Mr. Mueller to release said information to Plaintiff.

489.    The federal oath of office administered to Plaintiff when Plaintiff was sworn in and became a federal employee stated Plaintiff would support and defend[44] the Constitution of the United States, which automatically includes the federal employee's compliance with federal laws, and did NOT state Plaintiff relinquished his U.S. citizenship, Privacy Act rights, EEO and handicap discrimination and accommodation and reprisal rights, and/or his Constitutional due process, discovery, hearing, and adjudication rights, and/or his right to sue the sovereign in a Federal District Court as the Federal Government does NOT have

_____

[44] And, did not state federal employees were authorized to violate the U.S. Constitution and federal laws or retain their federal employment through their acceptance of "bribes" in exchange for their violation of federal laws.

the legal authority to rescind/deny/take away the Constitutional due process, discovery, hearing, and adjudication rights of a law-abiding U.S. citizen. Federal criminals relinquish some, but not all, of their rights[45] guaranteed by the United States Constitution and Bill of Rights when they are convicted of a federal crime; however, even convicted federal criminals do NOT relinquish their Privacy Act rights or their right to sue the sovereign for violations of their Privacy Act rights. Likewise, a U.S. citizen does NOT relinquish the citizen's rights guaranteed by the United States Constitution and Bill of Rights or the citizen's right to sue the sovereign in a Federal District Court and obtain justice and relief when the citizen accepts federal employment.

490. Federal statutes require a Federal employee to report all fraud the employee has knowledge of to the legal authorities.

491. Federal statutes required Plaintiff to report in July 2004 the grantee fraud he had knowledge of, which involved the Nevada LEA, to the legal authorities.

492. Plaintiff reported in July 2004 the grantee fraud Plaintiff had knowledge of, which involved the Nevada LEA, to the legal authorities.

493. The Inspector General, Defendant, is a legal authority.

494. Mr. Richard Mueller, Director, Indirect Cost Group, Defendants, is not a legal authority.

495. Mr. Mueller stated in July 2004 that Plaintiff could not report the grantee fraud Plaintiff had knowledge of, which involved the Nevada LEA, to the legal authorities.

496. Mr. Mueller stated in July 2004 that Plaintiff was not authorized to report grantee fraud

---

[45] Is this why Ms. Joanna Dailey falsely accused the Plaintiff of criminally violating Federal statutes and Defendants' regulations?

Plaintiff had knowledge of to the legal authorities.

497.    Defendants could have legally terminated Plaintiff's employment in or after July 2004 if Plaintiff had not reported the grantee fraud Plaintiff had knowledge of, which involved the Nevada LEA, to the legal authorities.

498.    The **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were legal.

499.    Defendants could have legally implemented disciplinary action against Plaintiff in or after July 2004 if the **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were not legal.

500.    Defendants did not implement disciplinary action against Plaintiff in or after July 2004 because the **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were legal.

501.    The **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were legal.

502.    Defendants could have legally implemented disciplinary action against Plaintiff in or after July 2004 if the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were not legal.

503.    Defendants did not implement disciplinary action against Plaintiff in or after July 2004 because the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were legal.

504.    The **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were within the "bounds of the standards

of conduct."

505.     Defendants could have legally implemented disciplinary action against Plaintiff in or after

July 2004 if the **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's

disclosure of the Nevada LEA fraud to the legal authorities were not within the "bounds

of the standards of conduct."

506.     Defendants did not implement disciplinary action against Plaintiff in or after July 2004

because the **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's

disclosure of the Nevada LEA fraud to the legal authorities were within the "bounds of the

standards of conduct."

507.     The **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's

disclosure of the Nevada LEA fraud to the legal authorities were within the "bounds of the

standards of conduct."

508.     Defendants could have legally implemented disciplinary action against Plaintiff in or after

July 2004 if the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and

Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities were not within the

"bounds of the standards of conduct."

509.     Defendants did not implement disciplinary action against Plaintiff in or after July 2004

because the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's

disclosure of the Nevada LEA fraud to the legal authorities were within the "bounds of the

standards of conduct."

510.     Defendants through Mr. Mueller did implement reprisal action(s), i.e., discontinuance of

Plaintiff's reasonable accommodation in November 2004, against Plaintiff because of the

**actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities.

511.    Defendants through Mr. Mueller did implement reprisal action(s), i.e., discontinuance of Plaintiff's reasonable accommodation in November 2004, against Plaintiff because of the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities.

512.    Defendants through Mr. Miller did implement reprisal action(s), i.e., Mr. Miller's bogus audit analysis assignment on April 4, 2005, against Plaintiff because of the **actions** Plaintiff took in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities.

513.    Defendants through Mr. Miller did implement reprisal action(s), i.e., Mr. Miller's bogus audit analysis assignment on April 4, 2005, against Plaintiff because of the **statements** Plaintiff made in July 2004 concerning Mr. Mueller and Plaintiff's disclosure of the Nevada LEA fraud to the legal authorities.

514.    Mr. Miller was the Director, Post Audit Group (PAG), from April 1, 2003, through September 30, 2007.   ED-2006-11-00.

515.    Mr. Miller was the Acting Director, Financial Improvement and Post Audit Operations (FIPAO), Defendant, from April 1 through June 30, 2005.   ED-2006-11-00.

516.    Plaintiff's position reported to the Director, FIPAO, per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

517.    Plaintiff's supervisor was the Director, FIPAO, per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

518.    From April 1 through June 30, 2005, Plaintiff reported to Mr. Miller, Acting Director, FIPAO.

519.    Mr. Miller, Director, Post Audit Group (PAG), and Acting Director, Financial Improvement and Post Audit Operations (FIPAO), Defendants, required Plaintiff to sign a receipt for a work assignment on April 5, 2005.   ED-2006-11-00.

520.    Mr. Miller was complying with the directions of Mr. Danny Harris, Deputy CFO, Defendants, when Mr. Miller required Plaintiff to sign a receipt for a work assignment on April 5, 2005.   ED-2006-11-00.

521.    The work assignment Plaintiff signed a receipt for on April 5, 2005, was originally named "Audit Finding Analysis."[46]   ED-2006-11-00.

522.    Plaintiff had never been required to sign a receipt for a work assignment prior to April 5, 2005.   ED-2006-11-00.

523.    Defendants did not have a valid, bona fide reason to require Plaintiff to sign a receipt for a work assignment on April 5, 2005.   ED-2006-11-00.

524.    The "Audit Finding Analysis" work assignment Mr. Miller required Plaintiff to sign a receipt for on April 5, 2005, is a "hoax" work assignment. ED-2006-11-00.

525.    Mr. Miller refused to authorize Plaintiff access to the audit finding data the "Audit Finding Analysis" work assignment required Plaintiff to analyze. ED-2006-11-00.

526.    Mr. Miller had the authority to authorize Plaintiff access to the audit finding data the "Audit Finding Analysis" work assignment required Plaintiff to analyze. ED-2006-11-00.

---

[46]    Other names have been used to refer to this work assignment.

527.    Ms. Linda Stracke is the Director, Financial Improvement and Post Audit Operations (FIPAO), Office of the Chief Financial Officer (OCFO), Defendant. Ms. Stracke was assigned to this position on or about July 1, 2005.

528.    Plaintiff informed Ms. Stracke, Director, FIPAO, by email dated on or about July 6, 2005, that Plaintiff was a "narcoleptic."

529.    Plaintiff informed Ms. Stracke, Director, FIPAO, by email dated on or about July 6, 2005, that Plaintiff was an otherwise qualified handicapped employee.

530.    Plaintiff informed Ms. Stracke, Director, FIPAO, by email dated on or about July 6, 2005, that Plaintiff's use of credit hours assisted the Plaintiff in the control of his narcolepsy.

531.    Ms. Stracke, Director, FIPAO, denied Plaintiff the continued use of credit hours.

532.    Ms. Stracke, Director, FIPAO, denied Plaintiff the continued use of credit hours after being informed that Plaintiff's use of credit hours assisted the Plaintiff in the control of his narcolepsy.

533.    Plaintiff's reasonable accommodation of being allowed to work and use credit hours was effective.

534.    Allowing Plaintiff to continue to work and use credit hours would not have caused the Defendant an "undue hardship."

535.    Ms. Stracke, Director, FIPAO, OCFO, Defendant, did not inform Plaintiff that she was reassigning Plaintiff's position from reporting to the Director, FIPAO, to reporting to the Director, Post Audit Group (PAG), FIPAO.

536.    Ms. Stracke, Director, did not discuss the reassignment of the Plaintiff's position with Plaintiff prior to and/or after the effective date of the reassignment.

537.    Ms. Stracke's reassignment of Plaintiff's position from reporting to the Director, FIPAO, to reporting to the Director, PAG, FIPAO, violates the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

538.    Ms. Stracke's reassignment of Plaintiff's supervisor from the Director, FIPAO, to the Director, PAG, FIPAO, violates the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998.*

539.    Reassignment of an employee due to the employee's reporting of supervisor EEO violations to senior Defendants officials constitutes a prohibited personnel practice and EEO reprisal.

540.    Reassignment of an employee due to the employee's reporting of grantee fraud to senior Defendants officials constitutes a prohibited personnel practice and whistleblower reprisal.

541.    Discontinuing Plaintiff's reasonable accommodation authorized by former Agency officials constitutes intentional handicap discrimination.

542.    Mr. Miller refused to authorize Plaintiff access to the audit finding data the "Audit Finding Analysis" work assignment required Plaintiff to analyze from April 5 through August 5, 2005. ED-2006-11-00.

543.    Mr. Miller refused to provide Plaintiff with the audit data the "Audit Finding Analysis" work assignment required Plaintiff to analyze from April 5 through August 5, 2005. ED-2006-11-00.

544.    The minute amount of audit finding data that Mr. Miller provided Plaintiff commencing in August 2005 has been, in some instances, incomplete, missing data, and/or invalid.

545.    Plaintiff informed Mr. Miller and Ms. Stracke that it was impossible to comply with the

requirements of the "Audit Finding Analysis" without having the data or being authorized access to the data.

546.    Mr. Miller and Ms. Stracke refused to authorize Plaintiff access to the audit finding data the "Audit Finding Analysis" work assignment required Plaintiff to analyze from August through October 2005. ED-2006-11-00.

547.    Mr. Miller and Ms. Stracke refused to provide Plaintiff with the audit data the "Audit Finding Analysis" work assignment required Plaintiff to analyze from August through October 2005. ED-2006-11-00.

548.    Mr. Miller and Ms. Stracke would provide Plaintiff with incomplete bits and pieces of the audit data the "Audit Finding Analysis" work assignment required Plaintiff to analyze from August through October 2005. ED-2006-11-00.

549.    As of October 25, 2005, only part of the audit data that Plaintiff was to analyze has been provided. The provided data continues to be incomplete, missing data, and/or invalid. ED-2006-11-00.

550.    Defendants through Mr. Miller and Ms. Stracke were requiring Plaintiff to analyze audit data known to them to be incorrect, invalid and incomplete.

551.    Defendants through Mr. Miller and Ms. Stracke were requiring Plaintiff to analyze "ghost" data. ED-2006-11-00.

552.    Defendants through Mr. Miller and Ms. Stracke were creating a hostile work environment for Plaintiff by demanding Plaintiff analyze incorrect, invalid and incomplete audit data and audit data not available to Plaintiff. ED-2006-11-00.

553.    Defendants through Mr. Miller and Ms. Stracke were creating a hostile work environment

for Plaintiff by creating due dates for the completion of the "Audit Finding Analysis" work assignment, which they knew Plaintiff could not comply with because they had refused to provide the audit data to Plaintiff or authorize Plaintiff access to the audit data the "Audit Finding Analysis" work assignment required Plaintiff to analyze.

554.    Plaintiff was forced to use annual and sick leave when Defendants officials on or about November 22, 2004, discontinued Plaintiff's reasonable accommodation that had authorized Plaintiff to work at home.

555.    Allowing Plaintiff to continue to work at home would not have caused the Defendant an "undue hardship."

556.    Plaintiff's reasonable accommodation of being allowed to work at home was effective.

557.    Defendants did not place Mr. Sandberg on administrative leave and have him barred from entering the Defendants' facilities in 1998 when there was a loud confrontation between Mr. Sandberg and Ms. Ora Alger.

558.    Defendants did not place Mr. Sandberg on administrative leave and have him barred from entering the Defendants' facilities in 1998 when there was a loud vocal confrontation between Mr. Sandberg and Ms. Jeanne Johnson.

559.    Mr. Sandberg did not report Defendants' gross mismanagement activities to the legal authorities.

560.    Mr. Sandberg did not report Defendants' employees fraud activities to the legal authorities.

561.    Defendants' did not place Messrs. Carney and Higgins on administrative leave and have them barred from entering the Defendants facilities in 1998 or 1999 when there was a very loud, vocal, close-to-physical blows, confrontation between them.

562. Messrs. Carney and Higgins did not report Defendants' gross mismanagement activities to the legal authorities. Mr. Carney was the Deputy CFO, Defendants. Mr. Higgins is the Inspector General, Defendants.

563. Messrs. Carney and Higgins did not report Defendants' employee fraud activities to the legal authorities. Mr. Carney was the Deputy CFO, Defendants. Mr. Higgins is the Inspector General, Defendants.

564. In September 2005, Plaintiff sent a specific request to Mr. White requesting the new EEO handicap refusal to accommodate discrimination and reprisal issues of ED-2006-11-00 be combined with the EEO handicap refusal to continue reasonable accommodation discrimination issue the agency had accepted and was investigating of ED-2005-28-00.

565. Mr. Wortham's November 16, 2005, email response states: "Hi John, I received the official word from EEOG that your current issues will not be able to included in your previous complaint. Therefore, I am to treat these allegations as new ones and conduct pre-complaint counseling. Please complete the attached form and return it to me as soon as possible. When I receive it, I will schedule a time for us to talk. My secure fax number is (202) 619-9726 or you can scan in the document and return it via email. I apologize for the delay in processing your complaint. David Wortham, IRD Center" ED-2006-11-00.

566. Plaintiff and Defendants have been involved in MSPB whistleblower reprisal administrative proceedings and/or litigation from June 1998 forward.[47]

   A. The Board awarded and Ordered the Defendants to pay Plaintiff more than $150,000 in

---

[47] Plaintiff is the Appellant in Merit Systems Protective Board (MSPB or Board) appeal.

attorney fees, costs and consequential damages in early 2005, which is approximately one half of the total amount of attorney fees, costs and consequential damages expenses the Plaintiff actually incurred and does not include any damage amount for other damages.[48]

B.   The Office of General Counsel, Defendants, and Defendants' officials were upset with Plaintiff because the Defendants had been Ordered to pay Plaintiff more than $150,000 in attorney fees, costs and consequential damages due to Defendants' whistleblower reprisal acts, which reprisal acts were taken against the Plaintiff due to Plaintiff's 1998 disclosures of Defendants gross mismanagement and fraud (0128-W-1).

C.   The Defendants paid Plaintiff through Plaintiff's MSPB whistleblower reprisal appeal more than the $150,000 in April 2005, (0128-W-1).

D.   Ms. Joanna Dailey, Esq., OCG, lost the respect of senior Defendants' officials when the Defendants had to pay Plaintiff more than $150,000 as ordered by the MSPB (0128-W-1).

E.   Defendants attempted to use pending MSPB and EEO litigation (ED-2005-28-00) to not pay Plaintiff the Board ordered amount.

567.   In July 2004 and thenceforth Plaintiff disclosed external grantee and potential internal employee fraud and gross mismanagement to Mr. Jack Martin, Chief Financial Officer (CFO), Mr. Mark Carney, Deputy CFO, and Mr. Jack Higgins, Inspector General, Office of Inspector General, Defendants. Plaintiff's July 2004 whistleblower disclosures involved the Indirect Cost Group, FIPAO, which was the group Plaintiff was working in at the time of his disclosures. Plaintiff's July 2004 disclosures named some of the employees who

---

[48] MSPB reprisal Docket No. DC-1221-02-0128-W-1. MSPB attorney ... damages Docket Nos. DC-1221-02-0128-A-2 and DC-1221-02-0128-P-2. (0128-W-1)

worked in the Indirect Cost Group. The supervisor of the Indirect Cost Group, Mr. Richard Mueller, was upset with Plaintiff for making disclosures that involved the Indirect Cost Group.

568.   Mr. Richard Mueller, Supervisor, Indirect Cost Group, is the supervisor of Ms. Feeney.

569.   Mr. Mueller told Ms. Linda Feeney prior to the Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing[49] that she would be asked embarrassing personal sexual questions when she testified.

570.   Ms. Joanna Dailey, Esq., and/or Ms. Deborah Friendly, Esq., OGC, Defendants legal counsel, followed Ms. Feeney out of the hearing room upon the conclusion of her testimony in Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing (0764-W-2), and told Ms. Feeney that there had been no need to ask her embarrassing personal sexual questions.

571.   Plaintiff's email communication is monitored and/or reviewed by Mr. Danny Harris, Deputy CFO, Defendants, or members of his staff.

572.   Plaintiff's email communication is monitored and/or reviewed by staff of the Office of General Counsel, Defendants, and/or Defendants legal counsel, e.g., Ms. Joanna Dailey, Esq., and Ms. Deborah Friendly, Esq., OGC.

573.   Defendants maintain an "executive file on Plaintiff."

574.   Defendants "executive file on Plaintiff" is reviewed by Defendants senior staff and legal counsel.

---

[49] MSPB Docket Nos. DC-1221-06-0764-W-2 and DC-1221-05-0518-W-4 (0764-W-2).

575.    Mr. Mueller's testimony during Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing (0764-W-2) concerning the November 29, 2004, Drew analysis work assignment[50] involving Mr. Max Rudmann and Plaintiff was not truthful.

576.    Ms. Joanna Dailey, Esq., and/or Ms. Deborah Friendly, Esq., OGC, Defendants legal counsel, knew or should have known Mr. Mueller's testimony during Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing (0764-W-2) concerning the November 29, 2004, Drew analysis work assignment was not truthful.

577.    Ms. Joanna Dailey, Esq., and/or Ms. Deborah Friendly, Esq., OGC, Defendants' legal counsel, knew or should have known the Defendants defense put forth by them during Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing (0764-W-2) concerning Mr. Mueller's testimony and the November 29, 2004, Drew analysis work assignment was not truthful.

578.    Ms. Joanna Dailey, Esq., and/or Ms. Deborah Friendly, Esq., OGC, Defendants' legal counsel, knew that the Defendants' defense concerning the November 29, 2004, Drew analysis work assignment put forth by them during Plaintiff's January 29 and 30, 2008, MSPB whistleblower reprisal hearing (0764-W-2) was unknown to the Plaintiff prior to the hearing.

579.    On March 14, 2005, Plaintiff hand-delivered Plaintiff's formal complaint of discrimination for ED-2005-28-00 to Mr. Robert Kilpatrick, Equal Employment Opportunity Group (EEOG), Defendants. ROI-1 @ p. 7 and Tabs A and C1.

---

[50] Various names have been used to identify this work assignment: IG, IG analysis, etc.

580.   On March 14, 2005, Mr. Robert Kilpatrick, EEOG, Defendants, stated in response to Plaintiff's questions concerning the reasonable accommodation the Defendants had provided Plaintiff from approximately 1991 through November 18, 2004, that:

   A.   "Again, agency officials are not following agency procedures. Still valid."

   B.   "Request for reasonable accommodation doesn't have to be in writing."

   C.   "Don't have to request medical records. Only request if needed."

   D.   "Granting of reasonable accommodation doesn't have to be in writing. Can be verbal."

581.   Ms. Joanna Dailey, Esq., Defendants' MSPB Representative, in August 2006 during a MSPB teleconference(s), stated and agreed in order to: a) convince the Plaintiff that the Defendants' request to discuss settlement was sincere and was NOT made to stall the litigation proceedings, and b) obtain Plaintiff's agreement to agree to the Defendants' August 2006 request to discuss settlement, that upon the unsuccessful conclusion of the settlement negotiations,:

   A.   The Defendants would **ANSWER** Plaintiff's discovery requests and **PRODUCE** the specified documents within the remaining time limit pertaining to Plaintiff's discovery requests for ED-2005-28-00.

   B.   The Defendants would **Forward** to the EEOC the Defendants' Report of Investigation for ED-2005-28-00.

   C.   The Defendants would **Forward** to the EEOC the Defendants' Report of Investigation for ED-2006-11-00.

   D.   The Defendants would **File** the Defendants' "narrative response to the appeal and all material issues raised by appellant," and "Copies of all other documents which are relevant

and material to this appeal," with the MSPB upon the timely re-filing of Plaintiff's third WB reprisal appeal, which was timely re-filed on July 3, 2007.

582.    Plaintiff did not relinquish and did not agree to relinquish Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights when he agreed to the Defendants' August 2006 request to discuss settlement.

583.    The Defendants did not **ANSWER** Plaintiff's discovery requests for ED-2005-28-00 from the June 2007 failure of settlement negotiations through January 31, 2008.

584.    The Defendants did not **PRODUCE** the documents specified in Plaintiff's discovery requests for ED-2005-28-00 from the June 2007 failure of settlement negotiations through January 31, 2008.

585.    The Defendants did not **Forward** to the EEOC the Defendants' Report of Investigation for ED-2005-28-00 from the June 2007 failure of settlement negotiations through January 31, 2008.

586.    The Defendants did not **Forward** to the EEOC the Defendants' Report of Investigation for ED-2006-11-00 from the June 2007 failure of settlement negotiations through January 31, 2008.

587.    The Defendants did not **File** the Defendants' "narrative response to the appeal and all material issues raised by appellant," and "Copies of all other documents which are relevant and material to this appeal," with the MSPB upon the timely re-filing of Plaintiff's third WB reprisal appeal (0764-W-2), which was timely re-filed on July 3, 2007.

588.    Defendants intentionally did not comply with the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication

rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that <u>Defendants' refusal to comply with the law and ANSWER Plaintiff's discovery requests in ED-2005-28-00</u> from the June 2007 failure of settlement negotiations through January 31, 2008, would violate the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, and adjudication rights.

589.    Defendants intentionally did not comply with the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to knowing that <u>Defendants' refusal to comply with the law and FORWARD the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC</u>  from the June 2007 failure of settlement negotiations through January 31, 2008, would violate the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights.

590.    Defendants intentionally did not comply with the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that <u>Defendants' refusal to comply with the law and FORWARD the Report of Investigation for ED-2006-11-00 to the EEOC</u> from the June 2007 failure of settlement negotiations through January 31, 2008, would violate the Rehabilitation Act and EEOC

Page 116 of 230

regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights.

591. Defendants intentionally did not comply with the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that <u>Defendants' refusal to comply with the law and ISSUE the final decision for ED-2005-28-00</u> from the June 2007 failure of settlement negotiations through January 31, 2008, would violate the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights.

592. Defendants intentionally did not comply with the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that <u>Defendants' refusal to comply with the law and ISSUE the final decision for ED-2006-11-00</u> from the June 2007 failure of settlement negotiations through January 31, 2008, would violate the Rehabilitation Act and EEOC regulations, and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights.

593. Defendants intentionally did not comply with MSPB regulations and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights through the Defendants' refusal to take an official act said statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that

Defendants' refusal to comply with the law and FILE the Defendants narrative response in Plaintiff's whistleblower appeal (0764-W-2) from the June 2007 failure of settlement negotiations through the hearing date, would violate MSPB regulations and Plaintiff's Constitutional due process, discovery, hearing, and adjudication rights.

594. Ms. Linda Stracke is the Director, Financial Improvement and Post Audit Operations (FIPAO), Office of the Chief Financial Officer (OCFO), Defendants, and was assigned to this position in July 2005.

595. On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Plaintiff had submitted requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, to Defendants' officials.

596. On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Plaintiff had timely submitted to Defendants' officials the medical information and documentation Defendants officials had requested the Plaintiff submit pursuant to the Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992.

597. On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Defendants' officials timely approved Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, in accordance with the Rehabilitation Act.

598. On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Plaintiff requested reasonable accommodation from Defendants' officials, i.e., Mr. Danny Harris, now Deputy CFO, and Mr. Phil Maestri, Director, FIPAO, OCFO, during the October

through December 21, 1998, medical and return-to-work discussions Mr. Harris held with the Plaintiff as required by and in accordance with the Rehabilitation Act.

599.    On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Defendants' officials, e.g., Mr. Harris, Acting Director, Financial Management Operations, and Mr. Phil Maestri, Director, FIPAO, OCFO, Defendants, had all of the medical information and documentation they needed from the Plaintiff to make a reasonable accommodation determination concerning Plaintiff's reasonable accommodation requests made during the October through December 21, 1998, medical and return-to-work discussions Messrs. Harris and Maestri held with the Plaintiff due to the medical information and documentation Defendants' officials had on file because they had previously requested the Plaintiff submit the same, which he did submit, pursuant to Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992.

600.    On, about or after June 19, 1998, Mr. Danny Harris, Acting Director, Financial Management Operations, Defendants, took possession of the Defendants' file or files pertaining to Plaintiff.

601.    On or about June 19, 1998, Mr. Danny Harris, Acting Director, Financial Management Operations, Defendants, took possession of the Defendants supervisory file or files pertaining to Plaintiff.

602.    On or about June 19, 1998, Mr. Danny Harris, Acting Director, Financial Management Operations, Defendants, took possession of the Defendants medical file or files pertaining to Plaintiff.

603.    The Defendants' file or files pertaining to Plaintiff, which Mr. Harris took possession of, can't be located.

604.    Mr. Harris is the last known Defendants employee who had possession of the Defendants' file or files pertaining to Plaintiff.

605.    Mr. Phil Maestri, Director, FIPAO, was in attendance at all of the October through December 1998 medical and return-to-work discussions Mr. Harris held with the Plaintiff as the Defendants had decided Plaintiff's supervisor would be Mr. Maestri.

606.    Mr. Maestri was fully aware of and involved in Plaintiff's and Defendants' October through December 1998 reasonable accommodation, medical and return-to-work discussions and the medical documentation the Defendants had on file.

607.    Mr. Maestri was the Director of FIPAO from, at least, 1998 through 2002.

608.    Mr. Maestri's affidavit in ED-2005-28-00 indicates Mr. Maestri has a memory problem.

609.    On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Defendants' officials timely approved Plaintiff's requests for reasonable accommodation made during the October through December 21, 1998, medical and return-to-work discussions in accordance with the Rehabilitation Act.

610.    On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Plaintiff had requested reasonable accommodation from Defendants' officials in February 2000 as required by and in accordance with the Rehabilitation Act.

611.    On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Defendants' officials had all of the medical information and documentation they needed from Plaintiff to make a reasonable accommodation determination concerning Plaintiff's reasonable

accommodation requests made during February 2000 due to the medical information and documentation Defendants' officials had on file because they had previously requested Plaintiff submit the same, which he did submit, pursuant to Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992.

612.   On November 24, 2006, Ms. Linda Stracke failed/refused to acknowledge that Defendants' officials timely approved Plaintiff's request for reasonable accommodation made during February 2000 in accordance with the Rehabilitation Act.

613.   On November 24, 2006, Ms. Linda Stracke stated the Defendants failed/refused to correctly file, maintain, and safeguard Plaintiff's medical information and documentation on file with the Defendants because Defendants' officials had previously requested the Plaintiff submit the same, which he did submit, pursuant to Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, as required by and in accordance with the Rehabilitation Act and the Privacy Act.

614.   On November 24, 2006, Ms. Linda Stracke admitted through her statement(s) that the Defendants do not have on file any requests for reasonable accommodation or medical documentation pertaining to Plaintiff because Plaintiff never submitted the same to the Defendants that Mr. Harris failed/refused to correctly file, maintain, and safeguard Plaintiff's medical information and documentation on file with the Defendants because Defendants' officials had previously requested the Plaintiff submit the same, which he did submit, pursuant to Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, as required by and in accordance with the

Rehabilitation Act and the Privacy Act.

615.   On November 24, 2006, Ms. Linda Stracke failed/refused to accommodate the Plaintiff.

616.   On November 24, 2006, Ms. Linda Stracke failed/refused to continue Plaintiff's reasonable accommodation.

617.   From approximately September 20, 2006 through the date of this Complaint, the Defendants have denied that Plaintiff submitted a request or any requests for reasonable accommodation to the Defendants prior to November 19, 2004.  Exhibit # 445.

618.   Defendants' denial that Plaintiff submitted a request or any requests for reasonable accommodation to the Defendants is an adverse employment action.

619.   Defendants' denial that Plaintiff submitted a request or any requests for reasonable accommodation to the Defendants prior to November 19, 2004, is an acknowledgment that the Defendants have failed to safeguard and maintain Plaintiff's requests for reasonable accommodation as Plaintiff submitted three requests for reasonable accommodation to the Defendants.  Exhibit # 445 is contradicted by Exhibit #s 10, 15 and 16.

620.   Defendants' denial that Plaintiff submitted a request or any requests for reasonable accommodation to the Defendants prior to November 19, 2004, is an acknowledgment that the Defendants have destroyed Plaintiff's requests for reasonable accommodation as Plaintiff submitted three written requests for reasonable accommodation to the Defendants prior to November 19, 2004.   Exhibit # 445 is contradicted by Exhibit #s 10, 15 and 16.

621.   Defendants' failure to safeguard and maintain the requests for reasonable accommodation Plaintiff submitted to the Defendants prior to November 19, 2004,  violates the PA and FRA and OPM and NARA regulations, which require the Defendants to safeguard and

maintain Plaintiff's medical documentation.

622.    Plaintiff and/or Plaintiff's physicians submitted medical documentation to the Defendants prior to June 1998. E.g., Exhibit #s 11 through 25 and others.

623.    Defendants' destruction of the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants prior to November 19, 2004, is an adverse employment action.

624.    From approximately September 20, 2006 through the date of this Complaint, the Defendants have denied that Plaintiff and/or Plaintiff's physicians submitted medical documentation to the Defendants prior to November 19, 2004. Exhibit #s 445.

625.    Defendants' denial that Plaintiff and/or Plaintiff's physicians submitted medical documentation to the Defendants prior to November 19, 2004, is an adverse employment action.

626.    Defendants' denial that Plaintiff and/or Plaintiff's physicians submitted medical documentation to the Defendants prior to November 19, 2004, is an acknowledgment that the Defendants have failed to safeguard and maintain the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants as Plaintiff and Plaintiff's physicians did submit medical documentation to the Defendants. Exhibit # 445 is contradicted by Exhibit #s 11 through 25 and others.

627.    Defendants' failure to safeguard and maintain the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants prior to November 19, 2004, is an adverse employment action.

628.    Defendants' failure to safeguard and maintain the medical documentation Plaintiff and/or

Plaintiff's physicians submitted to the Defendants prior to November 19, 2004,  violates the PA and FRA and OPM and NARA regulations, which require the Defendants to safeguard and maintain Plaintiff's medical documentation.

629.    Defendants' denial that Plaintiff and/or Plaintiff's physicians submitted medical documentation to the Defendants prior to November 19, 2004, is an acknowledgment that the Defendants have destroyed the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants as Plaintiff and Plaintiff's physicians did submit medical documentation to the Defendants.

630.    Defendants' destruction of the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants prior to November 19, 2004, is an adverse employment action.

631.    Defendants' destruction of the medical documentation Plaintiff and/or Plaintiff's physicians submitted to the Defendants prior to November 19, 2004,  violates the PA and FRA and OPM and NARA regulations, which require the Defendants to safeguard and maintain Plaintiff's medical documentation.

632.    Prior to November 19, 2004, Plaintiff's medical documentation was on file with the Defendants.  Exhibit # 116-1.

633.    From approximately September 20, 2006 through the date of this Complaint, Defendants states that Plaintiff's medical documentation is NOT on file with the Defendants.

634.    Defendants' denial that Plaintiff's medical documentation is on file with the Defendants is an adverse employment action.

635.    The Defendants had all of Plaintiff's medical documentation, which the Defendants needed

to make a reasonable accommodation determination prior to June 1998.

636.    The Defendants states the Defendants no longer have Plaintiff's medical documentation on file from approximately September 20, 2006 through the date of this Complaint.

637.    Defendants' failure to safeguard and maintain Plaintiff's medical documentation is an adverse employment action.

638.    Prior to June 1998 the Defendants determined Plaintiff was handicapped.

639.    Prior to November 19, 2004, Plaintiff was a handicapped employee of the Defendants.

640.    Prior to November 19, 2004, Plaintiff was a qualified handicapped employee working for the Defendants.

641.    Prior to November 19, 2004, Plaintiff was a qualified, reasonably accommodated handicapped employee working for the Defendants.

642.    From approximately September 20, 2006 through the date of this Complaint the Defendants have denied Plaintiff is handicapped.  Exhibit #s 442 through 445.

643.    Defendants' denial that Plaintiff is handicapped is an adverse employment action.

644.    The Defendants determined Plaintiff was an otherwise qualified handicapped employee entitled to reasonable accommodation prior to November 19, 2004.

645.    From on or about November 22, 2004, through the date of this Complaint the Defendants have denied Plaintiff is an otherwise qualified handicapped employee entitled to reasonable accommodation.

646.    Defendants' denial that Plaintiff is an otherwise qualified handicapped employee entitled to reasonable accommodation is an adverse employment action.

647.    Prior to November 19, 2004, the Defendants authorized Plaintiff reasonable

accommodation.

648. From on or about November 22, 2004, through the date of this Complaint the Defendants have denied Plaintiff was authorized reasonable accommodation.

649. Defendants' denial that Plaintiff was authorized reasonable accommodation is an adverse employment action.

650. Defendants provided Plaintiff with reasonable accommodation from approximately October 20, 1990, through November 18, 2004, which is approximately 14 years.

651. On or about November 22, 2004, the Defendants through Mr. Richard Mueller, who was Plaintiff's supervisor, notified Plaintiff that the reasonable accommodation the Defendants had provided Plaintiff would no longer be provided.  Exhibits # 169 and 170.

652. Defendants' On or about November 22, 2004, discontinuance of Plaintiff's reasonable accommodation is an adverse employment action.

653. Defendants' refusal to continue Plaintiff's reasonable accommodation after on or about November 22, 2004, is an adverse employment action taken by Defendants' officials to punish Plaintiff because Plaintiff had disclosed grantee and Defendants fraud and gross mismanagement in June 1998 and again in July 2004 and later to the legal authorities.

654. On September 5, 2006, Plaintiff sent an email to Ms. Linda Stracke, and Messrs. Charles Miller and Robert Kilpatrick, copied John Gard.  The subject of Plaintiff's email states "Attached is additional reasonable accommodation and medical documentation." The body of Plaintiff's email states:  (Sub-Item #s A - D are direct quotes.)

A. "Ms. Stracke and Messrs. Miller and Kilpatrick,

B. Attached is additional reasonable accommodation and medical documentation that I located

Page 126 of  230

this Labor Day weekend. This documentation, like the prior documentation that has been submitted to agency officials, again reflects I requested reasonable accommodation and submitted medical documentation to the agency, i.e., agency officials, in accordance with and as required by the Rehabilitation Act.

C.  Pursuant to and in accordance with the Rehabilitation Act, I again request current agency officials promptly restore the reasonable accommodation former agency officials had provided and authorized me.

D.  Pursuant to the Privacy Act and the Freedom of Information Act, I again request that this agency promptly locate all reasonable accommodation and medical documentation concerning John Gard that was submitted to the agency through former and some current agency officials to include, but not be limited to, letters, memos, documents, email, notes and medical records. The Privacy Act and the Rehabilitation Act requires this agency to safeguard, file and maintain all of the reasonable accommodation and medical documentation concerning John Gard that was submitted to the agency." Exhibit # 442.

655.  The following documents were attached to Plaintiff's September 5, 2006, email to Ms. Stracke: [Exhibit #s 436. 437, 438, 440 and 441 were attached to Exhibit # 442.

A.  Medical Ltr to ED 10-13-1989.pdf, [Exhibit # 436];

B.  Reasonable Accommodation Request dtd 06-20-1997.pdf, [Exhibit # 441];

C.  Medical Info to FOB6 Health Unit 06-01-1990.pdf, [see attachment to 442]; and

D.  Medical Notes 09-13-1990.pdf.  [Exhibit # 437].

656.  On September 20, 2006, Ms. Linda Stracke sent an email to Plaintiff and copied Messrs. Charles Miller and Robert Kilpatrick. The subject of Ms. Stracke's email states "FW:

Attached is additional reasonable accommodation and medical documentation." The body of Ms. Stracke's email states:        (Sub-Item #s A - D are direct quotes.)

A.  "John,

B.  Thank you for the information.

C.  As you know, the Department has located no record of any written approval for a reasonable accommodation request from you. You indicated to me that Phil Maestri had verbally approved your reasonable accommodation request; however, this information was not confirmed by Phil. Also, verbal approval would be unlikely given the Department's policy on reasonable accommodation.

D.  As I indicated to you last summer, if your medical condition warrants a reasonable accommodation, we will entertain such a request. However, we will need more recent medical documentation (i.e., last three months) in order to consider your request. I am somewhat perplexed that accommodation remains an issue, since the Department has given you a private office and allows you to work at home most days on an "as needed" flex schedule." Exhibit # 443.

657.  On October 3, 2006, Plaintiff sent an email to Ms. Linda Stracke, and copied Messrs. Charles Miller, Robert Kilpatrick, and John Gard. The subject of Plaintiff's email states "RE: Attached is additional reasonable accommodation and medical documentation." The body of Plaintiff's email states:        (Sub-Item #s A - D are direct quotes.)

A.  "Ms. Stracke,

B.  Former and some current agency officials made the agency's determination that my medical condition warrants reasonable accommodation. The agency has no legal right to withdraw,

revoke and/or deny, and/or attempt to withdraw, revoke and/or deny the reasonable accommodation determination they made. Said reasonable accommodation determination was made in accordance with the Rehabilitation Act and agency procedures and regulations. I requested reasonable accommodation and my physicians and I responded to the agency's questions and requests for medical records. The medical records agency officials requested were submitted to the agency and the agency's failure to safeguard and maintain those records is a violation of the Privacy Act and the Rehabilitation Act.

C. Current agency officials do not have the legal right to:

(1). a)    Withdraw, revoke and/or deny, and/or attempt to withdraw, revoke and/or deny the reasonable accommodation determination that was made and/or the reasonable accommodation that has been authorized and provided me,

(2). b)    Destroy my requests for reasonable accommodation and/or the medical information my physicians and I submitted to the agency,

(3). c)    Request I submit "more recent medical documentation" and/or to make a new reasonable accommodation determination.

D. Your response is further proof that the U.S. Department of Education has violated, at a minimum, to include, but not be limited to, the record keeping requirements of the Privacy Act and the record keeping and reasonable accommodation requirements of the Rehabilitation Act." Exhibit # 444.

658.    On November 24, 2006, Ms. Linda Stracke sent an email to Plaintiff and copied Messrs. Charles Miller and Robert Kilpatrick. The subject of Ms. Stracke's email states "Response to e-mail dated October 3, 2006." The body of Ms. Stracke's email states:    (Sub-Item #s

A - E are direct quotes.)

A.  "John,

B.  This is in response to your e-mail to me dated October 3, 2006, in which you assert that "former and some current agency officials made the agency's determination that my medical condition warrants reasonable accommodation." It is difficult for me to follow up on your statement as it contains no specific information regarding when and by whom a determination to provide you a reasonable accommodation was made,   . and you have submitted no documentary evidence of any such determination. I have checked with OCFO Human Resources Officer, Gerri Wright, and also with the Department's disability/Section 504 Coordinator, JoAnn Cottman, and have located no record of an agency determination that you are or have ever been a qualified individual with a disability or of any decision to provide you with any reasonable accommodation of a disability. When I became the Director of Financial Improvement and Post Audit Operations in June 2005,  I was not made aware that any reasonable accommodation was in place for you.

C.  You previously informed me that Phil Maestri had orally approved your request for a reasonable accommodation. However, Mr. Maestri's sworn testimony in the Report of Investigation  prepared in connection with your EEO complaint counters your assertion. My understanding is that the oral approval you describe would not comport with agency policy and standard practice, as the Handbook for Reasonable Accommodations (Handbook) states that an "employee must be notified in writing" of the agency's decision on a request for accommodation.  Given that Mr. Maestri has denied approving any accommodation for you, and the oral approval you claim occurred would not be in

accordance with Department policy, I cannot find a basis to conclude that you were ever given an accommodation.

D.  Given that your alleged disability and/or need for accommodation are not obvious to me or your supervisor, and we are unable to locate any record of any agency determination that you are or have ever been a qualified individual with a disability, we are unable to consider your request further without current medical documentation.

E.  For these reasons, if you wish further consideration of your request, please submit current documentation containing a description of your disability, and a statement of the accommodation needed and how it will assist you in performing the duties of your job. You are not required to use the Reasonable Accommodation Request Form at pages 66-69 of the Handbook, but may find it helpful to do so to ensure that you provide all the required information." Exhibit # 445.

659.    Mr. Maestri apparently has a memory problem because the written documentation contradicts Mr. Maestri's sworn testimony. The exhibits prove that Mr. Phil Maestri, Director, FIPAO, was in attendance at all of the October through December 1998 medical and return-to-work discussions Mr. Harris held with the Plaintiff as the Defendants had decided Plaintiff's supervisor would be Mr. Maestri.

660.    Mr. Maestri was fully aware of, and involved in, Plaintiff's and Defendants' October through December 1998 reasonable accommodation, medical and return-to-work discussions and the medical documentation the Defendants had on file.

661.    During the October through December 21, 1998, medical and return-to-work discussions, the Defendants had on file a) Plaintiff's requests for reasonable accommodation dated

October 19, 1990, December 16, 1991, and March 4, 1992, and medical documentation, and b) the Defendants' reasonable accommodation determinations and the reasonable accommodation authorized. Otherwise, the Defendants would have informed, i.e., had an affirmative duty and obligation to inform, Plaintiff at that time, which the Defendants did NOT do, that the Defendants did not have on file a) Plaintiff's requests for reasonable accommodation and medical documentation, and b) the Defendants' reasonable accommodation determinations and the reasonable accommodation authorized.

662.    Ms. Linda Stracke told the Plaintiff that if the Plaintiff is handicapped and requires reasonable accommodation then the Plaintiff must start the reasonable accommodation process from the beginning by submitting both a) a new request for reasonable accommodation and b) new and updated medical documentation. Upon receipt of Plaintiff's new request for reasonable accommodation and medical documentation, Plaintiff's supervisor would then make a new determination as to whether: a) Plaintiff is handicapped; b) if handicapped, if Plaintiff is an otherwise qualified handicap employee entitled to reasonable accommodation; c), if an otherwise qualified handicap employee, if reasonable accommodation will be provided; and d) if reasonable accommodation will be provided, the type of reasonable accommodation the Defendants will authorize and provide the Plaintiff.

663.    Defendants' position that the Plaintiff must start the reasonable accommodation process from the beginning by submitting a) a new request for reasonable accommodation and b) submitting new and updated medical documentation, is illegal, violates the Rehabilitation Act, and is an adverse employment action.

664.    Defendants' position that upon receipt of Plaintiff's new request for reasonable accommodation and medical documentation, Plaintiff's supervisor will then make a new determination as to whether: a) Plaintiff is handicapped; b) if handicapped, if Plaintiff is an otherwise qualified handicap employee entitled to reasonable accommodation; c), if an otherwise qualified handicap employee, if reasonable accommodation will be provided; and d) if reasonable accommodation will be provided, the type of reasonable accommodation the Defendants will authorize and provide the Plaintiff, is illegal, violates the Rehabilitation Act, and is an adverse employment action.

665.    The Rehabilitation Act does not authorize the Defendants to revise the Defendants' determination that Plaintiff is an otherwise qualified handicap employee entitled to reasonable accommodation once the Defendants have determined that Plaintiff is an otherwise qualified handicap employee entitled to reasonable accommodation.

666.    The Rehabilitation Act does not authorize an employee's new supervisor to make a **NEW** Defendants' determination as to whether an employee is or is not an otherwise qualified handicapped employee entitled to reasonable accommodation once the Defendants' determination that the employee is an otherwise qualified handicap employee entitled to reasonable accommodation has been made.

667.    The Rehabilitation Act does not authorize the Defendants to request additional medical documentation from an employee once the employee has submitted the medical documentation the Defendants requested and the Defendants found the medical documentation submitted sufficient to make the Rehabilitation Act's: a) handicap employee, b) otherwise qualified, and c) reasonable accommodation determinations, unless

Page 133 of 230

the employee submits a new request for reasonable accommodation, unrelated to the prior requests for reasonable accommodation and not covered by the medical documentation the employee has already submitted.

668.    Plaintiff's previous Defendants' supervisory officials made the Defendants' Rehabilitation Act's determination in the early 1990's and determined that the Plaintiff was an otherwise qualified handicapped employee entitled to reasonable accommodation.

669.    Defendants' current supervisory officials cannot undo the Defendants' Rehabilitation Act determination made by Plaintiff's previous Defendants supervisory officials.

670.    Ms. Stracke's refusal to provide Plaintiff with reasonable accommodation commencing in November 2006 after receipt of Plaintiff's written documentation, which confirmed Plaintiff had requested reasonable accommodation from and had submitted medical documentation to the Defendants, is: a) handicap discrimination, b) handicap refusal to accommodate discrimination, c) handicap refusal to continue reasonable accommodation discrimination, d) handicap reprisal, e) Title VII reprisal, f) EEO reprisal, and g) an adverse employment action, taken by the Defendants because Plaintiff reports/reported, and will not agree to stop reporting, external grantee and internal employee fraud and gross mismanagement to the legal authorities.

671.    From approximately September 20, 2006 through the date of this Complaint, the Defendants have stated through Ms. Linda Stracke that the Plaintiff did not submit any requests for reasonable accommodation. Defendants' statement, i.e., Exhibit # 445 is contradicted by Exhibit #s 11 through 25 and others. Defendants have admitted failure to safeguard and maintain the requests for reasonable accommodation Plaintiff submitted to

the Defendants. Defendants have admitted destruction of the requests for reasonable accommodation Plaintiff submitted to the Defendants.

672.   From approximately September 20, 2006 through the date of this Complaint, the Defendants have stated through Ms. Linda Stracke that the Defendants do not have on file any requests for reasonable accommodation from the Plaintiff. Defendants' statement, i.e., Exhibit # 445 is contradicted by Exhibit #s 11 through 25 and others. Defendants have admitted failure to safeguard and maintain the requests for reasonable accommodation Plaintiff submitted to the Defendants. Defendants have admitted destruction of the requests for reasonable accommodation Plaintiff submitted to the Defendants.

673.   From approximately September 20, 2006 through the date of this Complaint, the Defendants have stated through Ms. Linda Stracke that the Plaintiff did not submit medical documentation to the Defendants. Defendants' statement, i.e., Exhibit # 445, is contradicted by Exhibit #s 11 through 25 and others. Defendants have admitted failure to safeguard and maintain the medical documentation Plaintiff submitted to the Defendants. Defendants have admitted destruction of the medical documentation Plaintiff submitted to the Defendants.

674.   From approximately September 20, 2006 through the date of this Complaint, the Defendants have stated through Ms. Linda Stracke that the Defendants does not have on file any medical documentation pertaining to the Plaintiff. Defendants' statement, i.e., Exhibit # 445, is contradicted by Exhibit #s 11 through 25 and others. Defendants have admitted failure to safeguard and maintain the medical documentation Plaintiff submitted to the Defendants. Defendants have admitted destruction of the medical documentation

Plaintiff submitted to the Defendants.

675. The Rehab. Act, PA and FRA statutes, and EEOC, OPM and NARA regulations require the Defendants to secure, safeguard and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff for the benefit and on behalf of the Defendants and Plaintiff.

676. The Rehab. Act, PA and FRA statutes, and EEOC, OPM and NARA regulations require the Defendants to file official Federal records pertaining to Plaintiff's medical in the Defendants' Employee Medical Folder pertaining to Plaintiff.

677. "Plaintiff's reasonable accommodation and medical documentation records" consist of: a) Plaintiff's requests for reasonable accommodation records dated October 19, 1990, December 16, 1991, and March 4, 1992; and b) the medical documentation Plaintiff and Plaintiff's physicians submitted to the Defendants from 1990 through 1992 and prior to 1998.

678. "Plaintiff's reasonable accommodation and medical documentation records" are official Federal records pertaining to Plaintiff's medical.

679. Prior to November 19, 2004, the Defendants filed "Plaintiff's reasonable accommodation and medical documentation records" in the Defendants' Employee Medical Folder pertaining to Plaintiff.

680. Prior to November 19, 2004, the Defendants secured, safeguarded and maintained the Defendants' Employee Medical Folder pertaining to Plaintiff.

681. Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have not secured, safeguarded or maintained the Defendants' Employee Medical Folder pertaining to Plaintiff.

682.    Prior to November 19, 2004, the Defendants secured, safeguarded and maintained the Defendants' Employee Medical Folder pertaining to Plaintiff as "Plaintiff's reasonable accommodation and medical documentation records" were on file in the Defendants' Employee Medical Folder pertaining to Plaintiff.

683.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have not secured, safeguarded or maintained the Defendants' Employee Medical Folder pertaining to Plaintiff as "Plaintiff's reasonable accommodation and medical documentation records" are NOT on file in the Defendants' Employee Medical Folder pertaining to Plaintiff.

684.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have intentionally refused/failed to secure, safeguard and accurately maintain the Defendants' Employee Medical Folder pertaining to Plaintiff as the Defendants' Employee Medical Folder pertaining to Plaintiff contained proof of: 1) "Plaintiff's reasonable accommodation and medical documentation records;" 2) the Defendants' handicap, otherwise qualified and reasonable accommodation determination records; and 3) the records of the reasonable accommodation the Defendants had authorized and provided Plaintiff prior to November 19, 2004.

685.    The Defendants intentional removal of official Federal records, i.e., "Plaintiff's reasonable accommodation medical documentation records," from the Defendants' Employee Medical Folder pertaining to Plaintiff violated the Rehab. Act, PA and FRA, and OPM, EEOC and NARA regulations.

686.    The Defendants intentional destruction of official Federal records, i.e., "Plaintiff's

reasonable accommodation medical documentation records," filed in the Defendants' Employee Medical Folder pertaining to Plaintiff violated the Rehab. Act, PA and FRA, and OPM, EEOC and NARA regulations, and are criminal offenses per the FRA.

687.    Prior to November 19, 2004, the Defendants:

A.    Acknowledged "Plaintiff's reasonable accommodation and medical documentation records;"

B.    Determined Plaintiff was handicapped;

C.    Determined Plaintiff was an otherwise qualified handicapped employee entitled to reasonable accommodation;

D.    Authorized and provided Plaintiff reasonable accommodation from approximately 1991 through November 18, 2004; and

E.    Complied with the Rehab. Act, PA and FRA, and OPM, EEOC and NARA regulations.

688.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have:

A.    Refused to acknowledge "Plaintiff's reasonable accommodation and medical documentation records;"

B.    Denied Plaintiff requested reasonable accommodation;

C.    Stated the Defendants do not have on file reasonable accommodation requests for/from Plaintiff;

D.    Stated Plaintiff never submitted reasonable accommodation medical documentation to the Defendants;

E.    Stated the Defendants have not authorized Plaintiff reasonable accommodation;

Page 138 of 230

F.   Stated the Defendants have not provided Plaintiff reasonable accommodation;

G.   Stated Plaintiff would have to submit up-to-date medical documentation[51];

H.   Stated reasonable accommodation medical documentation must be updated every five years[52]; and

I.   Stated an employee's reassignment to a different supervisor requires the employee to submit a new request for reasonable accommodation and up-to-date medical documentation as approval of reasonable accommodation is supervisor, and not Agency, specific.[53]

689.   Through the Defendants' actions and statements, the Defendants have admitted:

A.   Intentional failure to secure, safeguard and maintain "Plaintiff's reasonable accommodation and medical documentation records;"

B.   Intentional handicap refusal to continue reasonable accommodation discrimination;

C.   Intentional removal of "Plaintiff's reasonable accommodation and medical documentation records" from Defendants' Employee Medical Folder pertaining to Plaintiff;

D.   Intentional destruction of "Plaintiff's reasonable accommodation and medical documentation records" from Defendants' Employee Medical Folder pertaining to Plaintiff;

E.   Intentional failure to secure, safeguard and maintain Defendants' Employee Medical Folder pertaining to Plaintiff;  and

F.   Intentionally violating the Rehab. Act, PA, FRA, Title VII, and CRA statutes and OPM,

---

[51]  Defendants' statement is an admission that Plaintiff did submit requests for reasonable accommodation and medical documentation to the Defendants from 1990 through 1992 and prior to 1998.

[52]  See footnote 51.

[53]  See footnote 51.

EEOC and NARA regulations.

690.   The Defendants' intentional illegal action(s) of **removing** official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records," from the Defendants' Employee Medical Folder pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to: a) **DENY** Plaintiff the reasonable accommodation Defendants had authorized and provided Plaintiff prior to November 19, 2004; b) **DENY** Plaintiff the reasonable accommodation Plaintiff was and is entitled to as a handicapped otherwise qualified employee of the Defendants; and c) **PUNISH** the Plaintiff for: 1) disclosing grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, Office of Inspector General, in July 2004; and 2) filing a handicap discrimination claim against the Defendants.

691.   Defendants' record removal actions were intentional as they: a) violated the security, safeguard, maintenance and non-destruction mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) resulted in the illegal removal of official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records," from the Defendants' Employee Medical Folder pertaining to Plaintiff.

692.   The Defendants' intentional illegal action(s) of **destroying** official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records," filed in the Defendants' Employee Medical Folder pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to: a) **DENY** Plaintiff the reasonable accommodation Defendants

had authorized and provided Plaintiff prior to November 19, 2004; b) **DENY** Plaintiff the reasonable accommodation Plaintiff was and is entitled to as a handicapped otherwise qualified employee of the Defendants; and c) **PUNISH** the Plaintiff for: 1) disclosing grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, Office of Inspector General, in July 2004; and 2) filing a handicap discrimination claim against the Defendants.

693.    Defendants' record destruction actions were intentional as they: a) violated the security, safeguard, maintenance and non-destruction mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) <u>resulted in the illegal destruction of official Federal records</u>, i.e., "Plaintiff's reasonable accommodation and medical documentation records," from the Defendants' Employee Medical Folder pertaining to Plaintiff.

694.    The Defendants' intentional illegal action(s) of **refusing/failing to restore** official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records," to the Defendants' Employee Medical Folder pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to: a) **DENY** Plaintiff the reasonable accommodation Defendants had authorized and provided Plaintiff prior to November 19, 2004; b) **DENY** Plaintiff the reasonable accommodation Plaintiff was and is entitled to as a handicapped otherwise qualified employee of the Defendants; and c) **PUNISH** the Plaintiff for: 1) disclosing grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, Office of Inspector General, in July 2004; and 2) filing a handicap discrimination

claim against the Defendants.

695. Defendants' refusal/failure to restore record actions were intentional as they: a) violated the maintenance and restoration/restore mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) resulted in the Defendants refusal/failure to restore official Federal records, i.e., "Plaintiff's reasonable accommodation and medical documentation records," to the Defendants' Employee Medical Folder pertaining to Plaintiff.

696. The PA and FRA and OPM and NARA regulations require the Defendants to secure, safeguard and maintain the Defendants' Official Personnel File pertaining to Plaintiff for the benefit and on behalf of the Defendants and Plaintiff.

697. The PA and FRA and OPM and NARA regulations require the Defendants to file official Federal records pertaining to Plaintiff's Federal retirement benefits in the Defendants' Official Personnel File pertaining to Plaintiff.

698. "Plaintiff's military retirement records" consist of:  a) military service-time records, b) proof of military service-time and calculation records, and c) proof of military service-time deposit records required for Federal Employees Retirement System (FERS) retirement benefits, and were submitted to the Defendants prior to 1998.

699. "Plaintiff's military retirement records" are official Federal records pertaining to Plaintiff's FERS retirement.

700. Prior to November 19, 2004, the Defendants filed "Plaintiff's military retirement records" in the Defendants' Official Personnel File pertaining to Plaintiff.

701. Prior to November 19, 2004, the Defendants secured, safeguarded and maintained the

Defendants' Official Personnel File pertaining to Plaintiff.

702.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have not secured, safeguarded or maintained the Defendants' Official Personnel File pertaining to Plaintiff.

703.    Prior to November 19, 2004, the Defendants secured, safeguarded and maintained the Defendants' Official Personnel File pertaining to Plaintiff as "Plaintiff's military retirement records" were on file in the Defendants' Official Personnel File pertaining to Plaintiff.

704.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have not secured, safeguarded or maintained the Defendants' Official Personnel File pertaining to Plaintiff as "Plaintiff's military retirement records" are NOT on file in the Defendants' Official Personnel File pertaining to Plaintiff.

705.    Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have intentionally refused/failed to secure, safeguard and accurately maintain the Defendants' Official Personnel File pertaining to Plaintiff as the Defendants' Official Personnel File pertaining to Plaintiff contained proof of "Plaintiff's military retirement records."

706.    The Defendants intentional removal of official Federal records, i.e., "Plaintiff's military retirement records," from the Defendants' Official Personnel File pertaining to Plaintiff violated the PA and FRA and OPM and NARA regulations.

707.    The Defendants intentional destruction of official Federal records, i.e., "Plaintiff's military retirement records," filed in the Defendants' Official Personnel File pertaining to Plaintiff violated the PA and FRA and OPM and NARA regulations, and are criminal offenses per

the FRA.

708.   Prior to November 19, 2004, the Defendants:

A.   Acknowledged Plaintiff submitted "Plaintiff's military retirement records" to the Defendants prior to 1998;

B.   Acknowledged "Plaintiff's military retirement records" were filed in the Defendants' Official Personnel File pertaining to Plaintiff; and

C.   Complied with the PA and FRA, and OPM and NARA regulations.

709.   Commencing on or about November 22, 2004, and continuing at least through April 15, 2008, the Defendants have:

A.   Denied Plaintiff submitted "Plaintiff's military retirement records" to the Defendants prior to 1998;

B.   Denied "Plaintiff's military retirement records" were filed in the Defendants' Official Personnel File pertaining to Plaintiff;

C.   Stated the Defendants do not have on file "Plaintiff's military retirement records;"

D.   Stated Plaintiff would have to re-submit "Plaintiff's military retirement records;" and

E.   Intentionally violated the PA and FRA, and OPM and NARA regulations.

710.   Through the Defendants' actions and statements, the Defendants have admitted:

A.   Intentional failure to secure, safeguard and maintain "Plaintiff's military retirement records;"

B.   Intentional removal of "Plaintiff's military retirement records" from Defendants' Official Personnel File pertaining to Plaintiff;

C.   Intentional destruction of "Plaintiff's military retirement records" filed in the Defendants'

Official Personnel File pertaining to Plaintiff;

D.  Intentional failure to secure, safeguard and maintain Defendants' Official Personnel File pertaining to Plaintiff;  and

E.  Intentionally violating the PA and FRA and OPM and NARA regulations.

711.  The Defendants' intentional illegal action(s) of **removing** official Federal records, i.e., "Plaintiff's military retirement records," from the Defendants' Official Personnel File pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to:  a) **DENY** Plaintiff the military service time FERS benefits Plaintiff would have been entitled to receive upon retirement; and b) **PUNISH** Plaintiff 1) for disclosing and reporting grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, OIG, in July 2004; and 2) for filing a handicap discrimination claim against the Defendants.

712.  Defendants' record removal actions were intentional as they: a) violated the security, safeguard, maintenance and non-destruction mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) resulted in the illegal removal of official Federal records, i.e., "Plaintiff's military retirement records," from the Defendants' Official Personnel File pertaining to Plaintiff.

713.  The Defendants' intentional illegal action(s) of **destroying** official Federal records, i.e., "Plaintiff's military retirement records," filed in the Defendants' Official Personnel File pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to:  a) **DENY** Plaintiff the military service time FERS benefits Plaintiff would have been entitled to receive upon

retirement; and b) **PUNISH** Plaintiff 1) for disclosing and reporting grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, OIG, in July 2004; and 2) for filing a handicap discrimination claim against the Defendants.

714.    Defendants' record destruction actions were intentional as they: a) violated the security, safeguard, maintenance and non-destruction mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) <u>resulted in the illegal destruction of official Federal records</u>, i.e., "Plaintiff's military retirement records," from the Defendants' Official Personnel File pertaining to Plaintiff.

715.    The Defendants' intentional illegal action(s) of **refusing/failing to restore** official Federal records, i.e., "Plaintiff's military retirement records," to the Defendants' Official Personnel File pertaining to Plaintiff were intentionally implemented against the Plaintiff as proven by the dates and time-frame of Defendants' actions and statements to: a) **DENY** Plaintiff the military service time FERS benefits Plaintiff would have been entitled to receive upon retirement; and b) **PUNISH** Plaintiff 1) for disclosing and reporting grantee fraud and potential Defendants' employee fraud to the Defendants' Inspector General, OIG, in July 2004; and 2) for filing a handicap discrimination claim against the Defendants.

716.    Defendants' refusal/failure to restore record actions were intentional as they: a) violated the maintenance and restoration/restore mandatory requirements of the PA and FRA statutes and OPM and NARA regulations, and b) <u>resulted in the Defendants refusal/failure to restore official Federal records</u>, i.e., "Plaintiff's military retirement records," to the Defendants' Official Personnel File pertaining to Plaintiff.

717.    "The Federal Records Act of 1950, as amended, establishes the framework for records

management programs in Federal Agencies. As the primary agency for records management oversight, the National Archives and Records Administration (NARA) is responsible for assisting Federal agencies in maintaining adequate and proper documentation of policies and transactions of the Federal Government." *Direct quote from the Defendants' website.* www.ed.gov/print/policy/gen/leg/fra.html

718. "Federal records may not be destroyed-except in accordance with the procedures described in Chapter 33 of Title 44, United States Code. These procedures allow for records destruction only under the authority of a records disposition schedule approved by the Archivist of the United States." *Direct quote from the Defendants' website.* www.ed.gov/print/policy/gen/leg/fra.html

719. "Agency civilian personnel records relate to the supervision over and management of Federal civilian employees. This schedule covers the disposition of Official Personnel Folders (OPF) of civilian employees and other records relating to civilian personnel, wherever located in the agency." *General Records Schedule 1*, Transmittal No. 12, dated July 2004, @ p. 1-1.

720. "The most important types of Federal civilian employee records, the Official Personnel Folders, the Service Record Cards, and the Employee Medical Folders, are maintained according to *The Guide to Personnel Recordkeeping*, a U.S. Office of Personnel Management (OPM), manual that prescribes a system of recordkeeping for Federal civilian personnel." *General Records Schedule 1*, Transmittal No. 12, dated July 2004, @ p. 1-1.

721. The most important types of Federal civilian employee records, i.e., the **Official Personnel Folders** and the **Employee Medical Folders**, are required to be maintained by the

Defendants according to *The Guide to Personnel Recordkeeping*, an Office of Personnel Management (hereafter "OPM"), manual that prescribes a system of recordkeeping for Federal civilian personnel. *General Records Schedule 1*, Transmittal No. 12, dated July 2004, @ p. 1-1.

722.    "The Department's [meaning Defendants] Records Management Program is responsible for ensuring that the legal, financial, evidentiary and historical transactions are recorded accurately and completely." *Direct quote from the Defendants' website.* www.ed.gov/print/policy/gen/leg/fra.html

723.    "The law provides that Federal records may only be destroyed with NARA authorization." *Direct quote from the National Archives and Records Administration (NARA) website,* http://www.archives.gov/records-mgmt/policy/documenting-your-public-service.html.

724.    The NARA did NOT authorize the Defendants to not file: a) "Plaintiff's reasonable accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation authorization records, in the Defendants' Employee Medical Folder pertaining to Plaintiff. The Defendants did not have the legal authority to not file the records identified herein in the Defendants' Employee Medical Folder pertaining to Plaintiff.

725.    The NARA did NOT authorize the Defendants to not file "Plaintiff's military retirement records" in the Defendants' Official Personnel File pertaining to Plaintiff. The Defendants did not have the legal authority to not file the records identified herein in the Defendants' Official Personnel File pertaining to Plaintiff.

726.    The NARA did NOT authorize the Defendants to not maintain: a) "Plaintiff's reasonable

accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation authorization records, filed in the Defendants' Employee Medical Folder pertaining to Plaintiff. The Defendants did not have the legal authority to not maintain the records identified herein filed in the Defendants' Employee Medical Folder pertaining to Plaintiff.

727.    The NARA did NOT authorize the Defendants to not maintain "Plaintiff's military retirement records" filed in the Defendants' Official Personnel File pertaining to Plaintiff. The Defendants did not have the legal authority to not maintain the records identified herein filed in the Defendants' Official Personnel File pertaining to Plaintiff.

728.    The NARA did NOT authorize the Defendants to remove: a) "Plaintiff's reasonable accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation authorization records, from the Defendants' Employee Medical Folder pertaining to Plaintiff. The Defendants did not have the legal authority to remove the records identified herein from the Defendants' Employee Medical Folder pertaining to Plaintiff.

729.    The NARA did NOT authorize the Defendants to remove "Plaintiff's military retirement records" from the Defendants' Official Personnel File pertaining to Plaintiff. The Defendants did not have the legal authority to remove the records identified herein from the Defendants' Official Personnel File pertaining to Plaintiff.

730.    The NARA did NOT authorize the Defendants to destroy: a) "Plaintiff's reasonable accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation

authorization records, filed in Defendants' Employee Medical Folder pertaining to Plaintiff. The Defendants did not have the legal authority to destroy the records identified herein filed in Defendants' Employee Medical Folder pertaining to Plaintiff.

731.    The NARA did NOT authorize the Defendants to destroy "Plaintiff's military retirement records" filed in the Defendants' Official Personnel File pertaining to Plaintiff. The Defendants did not have the legal authority to destroy the records identified herein filed in the Defendants' Official Personnel File pertaining to Plaintiff.

732.    The NARA did NOT authorize the Defendants to not restore: a) "Plaintiff's reasonable accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation authorization records, to the Defendants' Employee Medical Folder pertaining to Plaintiff. The Defendants did not have the legal authority to not restore the records identified herein to the Defendants' Employee Medical Folder pertaining to Plaintiff.

733.    The NARA did NOT authorize the Defendants to not restore "Plaintiff's military retirement records" to the Defendants' Official Personnel File pertaining to Plaintiff. The Defendants did not have the legal authority to not restore the records identified herein to the Defendants' Official Personnel File pertaining to Plaintiff.

734.    The Defendants have failed to secure, safeguard and maintain: a) "Plaintiff's reasonable accommodation and medical documentation records," b) Defendants' reasonable accommodation determination records, and/or c) Defendants reasonable accommodation authorization records, filed in the Defendants' Employee Medical Folder pertaining to Plaintiff as required by the PA and FRA and OPM and NARA regulations when the

Page 150 of  230

Defendants do not have on file in the Defendants' Employee Medical Folder pertaining to Plaintiff the records identified herein. The Defendants did not have the legal authority to not secure, safeguard and maintain the records identified herein.

735.    The Defendants have failed to secure, safeguard and maintain "Plaintiff's military retirement records" filed in the Defendants' Official Personnel File pertaining to Plaintiff as required by the PA and FRA and OPM and NARA regulations when the Defendants do not have on file in the Defendants' Official Personnel File pertaining to Plaintiff the records identified herein. The Defendants did not have the legal authority to not secure, safeguard and maintain the records identified herein.

736.    At all times relevant to this complaint and specifically since June 2, 1998, the Plaintiff and Defendants have been involved in:  a) litigation, b) pending litigation, c) potential litigation, d) litigation temporarily on hold, and/or e) active litigation, due to the communication between Plaintiff, Plaintiff's legal counsels, Defendants, and Defendants' legal counsels resulting from Defendants' action(s): a) litigation, b) pending litigation, c) potential litigation, d) litigation temporarily on hold, and/or e) active litigation.

737.    At all times relevant to this complaint and specifically since June 2, 1998, the Defendants were legally required to secure, safeguard and maintain all records and evidence the Defendants have, or should have, control or possession of, which pertained to the Plaintiff.

738.    At all times relevant to this complaint and specifically since June 2, 1998, the Defendants did not secure, safeguard and/or  maintain all records and evidence the Defendants have, or should have, control or possession of, which pertained to the Plaintiff.

739.    The Defendants did NOT secure, safeguard and maintain the Defendants' Employee

Medical Folder pertaining to Plaintiff, which the Defendants are required by statute to secure, safeguard and maintain for and on behalf of the Federal government and the Plaintiff.

740.   Prior to 1998, Plaintiff requested reasonable accommodation, worked with Defendants' personnel, and submitted all of the medical documentation Defendants requested to substantiate his disabilities/impairments and ensure the Defendants approval of his requests for reasonable accommodation.  Plaintiff's requests for reasonable accommodation were timely approved by the Defendants.

741.   Commencing on or about November 22, 2004, Defendants' informed Plaintiff that he would have to submit new requests for reasonable accommodation and updated medical documentation to substantiate his disabilities/impairments, which requests and medical documentation Plaintiff had already provided the Defendants.

742.   Commencing on or about November 22, 2004, the Defendants have **REFUSED TO RESTORE** "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants' Employee Medical Folder pertaining to Plaintiff.

743.   The Defendants have admitted to destroying official Federal records and/or evidence pertaining to "Plaintiff's reasonable accommodation and medical documentation records" as the Defendants had on file, but do not now have on file "Plaintiff's reasonable accommodation and medical documentation records."

744.   The Defendants have admitted in writing that the Defendants have violated Plaintiff's rights and the record-keeping requirements of the PA and FRA and OPM and NARA regulations pertaining to the record-keeping requirements for Federal agencies for

Defendants' Employee Medical Folder pertaining to Plaintiff.

745.   The Defendants did NOT secure, safeguard and maintain the Defendants' Official Personnel Folder pertaining to Plaintiff, which the Defendants are required by statute to secure, safeguard and maintain for and on behalf of the Federal government and the Plaintiff.

746.   In the mid-1990s, Plaintiff worked with Defendants' employee relations personnel to identify and locate all of the records required to substantiate his military service-time to ensure his military service-time would count towards his Federal retirement and be included in the calculation of Plaintiff's FERS annuity retirement benefits. Plaintiff made the required military service-time deposit upon the conclusion of this process, and Defendants' employee relations personnel placed all of the "Plaintiff's military retirement records" required to substantiate Plaintiff's military service-time and proof of deposit in the Defendants' Official Personnel Folder pertaining to Plaintiff.

747.   In January 2007, upon Plaintiff's inspection of Defendants' Official Personnel Folder pertaining to Plaintiff, Plaintiff learned that "Plaintiff's military retirement records" required for FERS annuity retirement benefits had been removed from Defendants' Official Personnel Folder pertaining to Plaintiff.

748.   In January 2007, when meeting with Defendants' employee relations personnel pursuant to retirement considerations, Plaintiff learned that his military service-time would NOT count towards and would NOT be used in the calculation of his Federal employment service-time and FERS retirement annuity **UNLESS PLAINTIFF PROVIDED** the Defendants' employee relations personnel with the required "Plaintiff's military retirement

records"and deposit, which records and deposit Plaintiff had already provided the Defendants and made.

749.    In January and February 2007, the Defendants' **REFUSED TO RESTORE** "Plaintiff's military retirement records" to the Defendants' Official Personnel Folder pertaining to Plaintiff, which records and deposit documentation Plaintiff had provided the Defendants prior to 1998, and which records and deposit documentation Defendants' employee relations personnel had filed in the Defendants' Official Personnel Folder pertaining to Plaintiff after they had assisted the Plaintiff in obtaining and preparing said records to ensure Plaintiff's FERS retirement annuity included Plaintiff's military service-time.

750.    The Defendants have admitted to destroying official Federal records and/or evidence pertaining to "Plaintiff's military retirement records" as the Defendants had on file, but do not now have on file "Plaintiff's military retirement records."

751.    The Defendants have admitted in writing that the Defendants have violated Plaintiff's rights and the record-keeping requirements of the PA and FRA and OPM and NARA regulations pertaining to the record-keeping requirements for Federal agencies for Defendants' Official Personnel Folder pertaining to Plaintiff.

752.    "The head of each Federal Def. shall establish safeguards against the removal or loss of records he determines to be necessary and required by regulations of the Archivist. Safeguards shall include making it known to officials and employees of the Def. –

    A.  (1) that records in the custody of the Def. are not to be ... or destroyed except in accordance with sections 3301 - 3314 of this title, and

    B.  (2) the penalties provided by law for the unlawful removal or destruction of records."

*Records Management by Federal Agencies*, 44 U.S.C. Chapter 31, NARA Basic Laws and

Authorities, //www.archives.gov/about/laws/fed-agencies.html

753.    One of the penalties provided by law for the unlawful removal or destruction of records is

that the unlawful removal or destruction of records is a federal criminal offense.

754.    Defendants' officials involved in the unlawful removal or destruction of Plaintiff's records

should be charged with committing a federal crime.

755.    Defendants' officials involved in the unlawful removal or destruction of Plaintiff's records

will not be charged with a federal crime as they have apparently been granted immunity

from prosecution for the reprisal acts they take or cause others to take against Plaintiff as

Plaintiff is a known whistleblower who will disclose and who will not agree to not disclose

grantee and internal Defendants fraud to the legal authorities.

756.    It is legally permissible to include evidence in a complaint when that evidence provides

support for the claims set forth in that Complaint.

757.    "Plaintiff's reasonable accommodation and medical documentation records" provide

support for the claims set forth in ED-2005-28-00, ED-2006-11-00 and ED-2007-15-00.

758.    Plaintiff's complaints assigned ED-2005-28-00, ED-2006-11-00 and ED-2007-15-00 do

NOT allege the same discriminatory claims.

759.    The EEOC will NOT forward a complainant's Request for Hearing to an EEOC

Administrative Judge for adjudication until the Defendants' agency has forwarded the

Defendants' Report of Investigation to the EEOC.

760.    The Defendants did not forward the Defendants' Report of Investigation for ED-2005-28-

00 to the EEOC upon Plaintiff's timely re-filing of ED-2005-28-00 in July 2007.

761.    The Defendants did not forward the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC upon Plaintiff's timely re-filing of ED-2005-28-00 in July 2007 because the EEOC would then forward Plaintiff's Request for Hearing to an EEOC Administrative Judge for adjudication.

762.    The Defendants did not forward the Defendants' Report of Investigation for ED-2005-28-00 to the EEOC upon Plaintiff's timely re-filing of ED-2005-28-00 in July 2007 because the Defendants do not want Plaintiff's complaints adjudicated.

763.    The Defendants did not include "Plaintiff's reasonable accommodation and medical documentation records" in the Defendants' Report of Investigation for ED-2005-28-00.

764.    Defendants should have included "Plaintiff's reasonable accommodation and medical documentation records" in the Defendants' Report of Investigation for ED-2005-28-00.

765.    The Defendants' Report of Investigation for ED-2005-28-00 excludes "Plaintiff's reasonable accommodation and medical documentation records" because said records proves intentional handicap refusal to continue reasonable accommodation discrimination.

766.    The Defendants did not include "Plaintiff's reasonable accommodation and medical documentation records" in the Defendants' Report of Investigation for ED-2005-28-00 because the inclusion of "Plaintiff's reasonable accommodation and medical documentation records" proves intentional and willful PA and FRA and Rehab. Act and OPM, EEOC and NARA regulations violations, to include but not be limited to, failure to safeguard, secure and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff and the destruction of said records.

767.    Mr. Larry F. Ross, Director, Equal Employment Opportunity Services, Defendants, did not

include "Plaintiff's reasonable accommodation and medical documentation records" in the
Defendants' September 20, 2007, decision letter that dismissed ED-2007-15-00.

768.   Mr. Ross' September 20, 2007, decision to dismiss letter for ED-2007-15-00 excludes
"Plaintiff's reasonable accommodation and medical documentation records" evidence
because said evidence proves intentional handicap refusal to continue reasonable
accommodation discrimination.

769.   Mr. Ross' September 20, 2007, decision to dismiss letter for ED-2007-15-00 excludes
"Plaintiff's reasonable accommodation and medical documentation records" evidence
because the inclusion of said evidence proves intentional and willful PA and FRA and
Rehab. Act and OPM, EEOC and NARA regulations violations, to include but not be
limited to, failure to safeguard, secure and maintain the Defendants' Employee Medical
Folder pertaining to Plaintiff and the destruction of said records.

770.   The Defendants have admitted intentional handicap refusal to continue reasonable
accommodation discrimination when Mr. Ross states in his September 20, 2007, decision
letter for ED-2007-15-00 that the claims set forth in Plaintiff's complaints assigned ED-
2005-28-00 and ED-2006-11-00 are the "same claims" as the claims set forth in Plaintiff's
complaint assigned ED-2007-15-00.

771.   The Defendants have admitted intentional and willful Privacy Act, Federal Records Act,
Rehabilitation Act, and OPM, EEOC and NARA regulations violations, to include but not
be limited to, failure to safeguard, secure and maintain the Defendants' Employee Medical
Folder pertaining to Plaintiff and the destruction of "Plaintiff's reasonable accommodation
and medical documentation records" when Mr. Ross states in his September 20, 2007,

Page 157 of 230

decision letter for ED-2007-15-00 that the claims set forth in Plaintiff's complaints assigned ED-2005-28-00 and ED-2006-11-00 are the "same claims" as the claims set forth in Plaintiff's complaint assigned ED-2007-15-00.

772.    "Plaintiff's reasonable accommodation and medical documentation records" were included with Plaintiff's request for EEO counseling for ED-2007-15-00 to ensure that said records would be included in the Defendants' Report of Investigation and decision letter for ED-2007-15-00.

773.    "Plaintiff's reasonable accommodation and medical documentation records" were included with Plaintiff's request for EEO counseling for ED-2007-15-00 to ensure that said records would be included in the Defendants' decision letter for ED-2007-15-00 as the Defendants CANNOT LEGALLY EXCLUDE from the Defendants' decision letter documentation submitted to an EEO counselor.

774.    The Defendants did not include "Plaintiff's reasonable accommodation and medical documentation records" in Mr. Ross' September 20, 2007, decision letter that dismissed ED-2007-15-00.

775.    Defendants should have included "Plaintiff's reasonable accommodation and medical documentation records" in Mr. Ross' September 20, 2007, decision letter for ED-2007-15-00.

776.    The Defendants' refusal to include "Plaintiff's reasonable accommodation and medical documentation records" in Mr. Ross September 20, 2007, decision letter that dismissed ED-2007-15-00 provides proof of the Defendants' intentional and willful handicap refusal to continue reasonable accommodation discrimination and handicap and EEO reprisal acts.

777.    The oath taken by every Federal employee when hired requires said employee to obey
        federal laws and uphold the United States Constitution.

778.    The legally permissible scope of assigned act(s) requires the federal employee's
        compliance with federal laws.

779.    The legally permissible scope of taken act(s) requires the federal employee's compliance
        with federal laws.

780.    Act(s) taken by a federal employee that do not comply with federal laws are unlawful
        act(s).

781.    Act(s) a federal employee directs another federal employee to take that do not comply with
        federal laws are unlawful act(s).

782.    Federal employees are only authorized to take lawful act(s).

783.    Unlawful act(s) are not legally authorized official act(s).

784.    The processing actions taken by Mr. Ross, Director, Equal Employment Opportunity
        Services, Defendants, for ED-2005-28-00 were detrimental to the Plaintiff as set forth and
        pleaded in this complaint are outside the legally permissible scope of Mr. Ross' assigned
        duties and are NOT legal authorized "Official Act(s)." Mr. Ross' failure to forward the
        Defendants' Report of Investigation (ROI) for ED-2005-28-00 constitutes [_____ insert the
        word or phrase from sub-paragraph "A through E" into the paragraph's statement and
        answer each] as the Defendants and Mr. Ross both have an affirmative, non-discretionary
        "official duty" to promptly forward the Defendants' ROI for ED-2005-28-00 to the EEOC,
        which duty is required by Federal statute to be performed, and which duty Mr. Ross did
        NOT perform from July 2007 through January 31, 2008, per the EEOC.

A. a **"Breach of Duty"**

B. **"Misconduct in Office"**

C. **"Nonfeasance"**

D. **"Malfeasance"** and

E. **"Official Misconduct."**

F. Mr. Ross violated the "Official Immunity Doctrine" pertaining to his office, position and duties when he failed to perform the non-discretionary "official duty" to promptly forward the Defendants' ROI for ED-2005-28-00 to the EEOC, which duty is required by Federal statute to be performed, and which duty Mr. Ross did NOT perform from July 2007 through January 31, 2008 per the EEOC.

G. Mr. Ross is no longer entitled to: a) Federal employer/employee immunity and b) Federal employer legal representation as the scope of his act(s) taken pertaining to ED-2005-28-00 are outside the scope of legally authorized Federal employer/employee authorized act(s).

H. Mr. Ross was complying with the instructions of Defendants' officials when he did NOT forward the Defendants' ROI for ED-2005-28-00 to the EEOC. Mr. Ross complied with the instructions of Defendants' officials even though he knew, or should have known, that his compliance with the requirements of said instructions was outside the legally permissible scope of his assigned duties and was NOT a legally authorized "Official Act". Mr. Ross complied with the instructions of Defendants' officials to NOT forward the Defendants' ROI for ED-2005-28-00 to the EEOC in order to continue his employment with the Defendants. Mr. Ross has therefore accepted a "Bribe" and committed "Bribery" through his actions when he complied with the instructions of Defendants' officials to NOT

forward the ROI for ED-2005-28-00 to the EEOC in return for the continuation of his employment with the Defendants.[54]

785.    The processing actions taken by Mr. Ross, Director, Equal Employment Opportunity Services, Defendants, for ED-2006-11-00 were detrimental to the Plaintiff as set forth and pleaded in this complaint are outside the legally permissible scope of Mr. Ross' assigned duties and are NOT legally authorized "Official Act(s)." Mr. Ross' failure to forward the Defendants' Report of Investigation (ROI) for ED-2006-11-00 constitutes [_____insert the word or phrase from sub-paragraph "A through E" into the paragraph's statement and answer each] as the Defendants and Mr. Ross both have an affirmative, non-discretionary "official duty" to promptly forward the Defendants' ROI for ED-2006-11-00 to the EEOC, which duty is required by Federal statute to be performed, and which Mr. Ross did NOT perform from July 2007 through January 31, 2008, per the EEOC.

A.    a **"Breach of Duty"**

B.    **"Misconduct in Office"**

C.    **"Nonfeasance"**

D.    **"Malfeasance"**

E.    **"Official Misconduct."**

F.    Mr. Ross violated the "Official Immunity Doctrine" pertaining to his office, position and duties when he failed to perform the non-discretionary "official duty" to promptly forward

---

[54] All of the elements required to justify the filing of a federal bribery charge against Mr. Ross are there. But then, this is a Federal agency and Ms. Ross is a Federal political official and we all know the US-DOJ will not bring a federal charge against a political federal official, and, if the US-DOJ did bring said charge, the US-DOJ would whitewash and not prosecute said charge.

the Defendants' ROI for ED-2006-11-00 to the EEOC, which duty is required by Federal statute to be performed, and which duty Mr. Ross did NOT perform from July 2007 through January 31, 2008, per the EEOC.

G.   Mr. Ross is no longer entitled to: a) Federal employer/employee immunity and b) Federal employer legal representation as the scope of his act(s) taken pertaining to ED-2006-11-00 are outside the scope of legally authorized Federal employer/employee authorized act(s).

H.   Mr. Ross was complying with the instructions of Defendants' officials when he did NOT forward the Defendants' ROI for ED-2006-11-00 to the EEOC. Mr. Ross complied with the instructions of Defendants' officials even though he knew, or should have known, that his compliance with the requirements of said instructions was outside the legally permissible scope of his assigned duties and was NOT a legal authorized "Official Act". Mr. Ross complied with the instructions of Defendants' officials to NOT forward the Defendants' ROI for ED-2006-11-00 to the EEOC in order to continue his employment with the Defendants. Mr. Ross has therefore accepted a "Bribe" and committed "Bribery" through his actions when he complied with the instructions of Defendants' officials to NOT forward the Defendants' ROI for ED-2006-11-00 to the EEOC in return for the continuation of his employment with the Defendants.[55]

786.   The processing actions taken by Mr. Ross, Director, Equal Employment Opportunity Services, Defendants, for ED-2007-15-00 were detrimental to the Plaintiff as set forth and

---

[55] All of the elements required to justify the filing of a federal bribery charge against Mr. Ross are there. But then, this is a Federal agency and Ms. Ross is a Federal political official and we all know the US-DOJ will not bring a federal charge against a political federal official, and, if the US-DOJ did bring said charge, the US-DOJ would whitewash and not prosecute said charge.

pleaded in this complaint are outside the legally permissible scope of Mr. Ross' assigned

duties and are NOT legally authorized "Official Act(s)." Mr. Ross' failure to include

"Plaintiff's reasonable accommodation and medical documentation records" in Mr. Ross'

September 20, 2007, decision letter for ED-2007-15-00 constitutes [_____insert the word

or phrase from sub-paragraph "A through E" into the paragraph's statement and answer

each] as the Defendants and Mr. Ross both have an affirmative, non-discretionary "official

duty" to include "Plaintiff's reasonable accommodation and medical documentation

records" in Mr. Ross' September 20, 2007, decision letter for ED-2007-15-00, which duty

is required by Federal statute to be performed, and which duty Mr. Ross did NOT perform

on September 20, 2007.

A.  a **"Breach of Duty"**

B.  **"Misconduct in Office"**

C.  **"Nonfeasance"**

D.  **"Malfeasance"**

E.  **"Official Misconduct."**

F.  Mr. Ross violated the "Official Immunity Doctrine" pertaining to his office, position and

duties when he failed to perform the non-discretionary "official duty" to include "Plaintiff's

reasonable accommodation and medical documentation records" in Mr. Ross' September

20, 2007, decision letter for ED-2007-15-00, which duty is required by Federal statute to

be performed, and which duty Mr. Ross did NOT perform on September 20, 2007.

G.  Mr. Ross is no longer entitled to: a) Federal employer/employee immunity and b) Federal

employer legal representation as the scope of his act(s) taken pertaining to his failure to

include "Plaintiff's reasonable accommodation and medical documentation records" in the Defendants' decision letter are outside the scope of legally authorized Federal employer/employee authorized act(s).

H.   Mr. Ross was complying with the instructions of Defendants' officials when he did NOT include "Plaintiff's reasonable accommodation and medical documentation records" in his September 20, 2007, decision letter for ED-2007-15-00. Mr. Ross complied with the instructions of Defendants' officials even though he knew, or should have known, that his compliance with said instructions was outside the legally permissible scope of his assigned duties and was NOT a legally authorized "Official Act". Mr. Ross complied with the instructions of Defendants' officials to NOT acknowledge, and to NOT acknowledge the existence of, and to NOT include "Plaintiff's reasonable accommodation and medical documentation records" in his September 20, 2007, decision letter for ED-2007-15-00 in order to continue his employment with the Defendants. Mr. Ross has therefore accepted a "Bribe" and committed "Bribery" through his actions when he complied with the instructions of Defendants' officials to NOT include "Plaintiff's reasonable accommodation and medical documentation records" in his September 20, 2007, decision letter for ED-2007-15-00 in return for the continuation of his employment with the Defendants.[56]

787.   The November 24, 2006, actions taken, and attempted to be taken, by Ms. Linda Stracke,

---

[56] All of the elements required to justify the filing of a federal bribery charge against Mr. Ross are there. But then, this is a Federal agency and Ms. Ross is a Federal political official and we all know the US-DOJ will not bring a federal charge against a political federal official, and, if the US-DOJ did bring said charge, the US-DOJ would whitewash and not prosecute said charge.

Director, Financial Improvement and Post Audit Operations, Defendants, concerning "Plaintiff's reasonable accommodation and medical documentation records" were detrimental to the Plaintiff as set forth and pleaded in this complaint are outside the legally permissible scope of Ms. Stracke's assigned duties and are NOT legally authorized "Official Act(s)." Ms. Stracke's refusal to acknowledge, which includes her refusal to acknowledge even the existence of, "Plaintiff's reasonable accommodation and medical documentation records" and then her statements and instructions to Plaintiff that, if the Plaintiff needed reasonable accommodation, Plaintiff had to submit a new request for reasonable accommodation from scratch, from the beginning, and had to submit medical documentation are not legally authorized "Official Act(s)" when Plaintiff had: 1) previously requested reasonable accommodation from the Defendants and 2) submitted to the Defendants the medical information and documentation Defendants' officials had requested and constitutes [_____insert the word or phrase from sub-paragraph "A through E" into the paragraph's statement and answer each] as the Defendants and Ms. Stracke both have an affirmative, non-discretionary "official duty" to promptly: 1) acknowledge, which includes the existence of, "Plaintiff's reasonable accommodation and medical documentation records," and 2) comply with federal laws, which duty is required by Federal statute to be performed, and which duty Ms. Stracke did NOT perform on and/or from November 24, 2006, through the date of this complaint.[57]

---

[57] Ms. Stracke's acknowledgment of "Plaintiff's reasonable accommodation and medical documentation records" would provide Plaintiff with direct proof of the Defendants: a) intentional handicap refusal to continue reasonable accommodation and reprisal acts, and b) intentional and willful violations of the PA, FRA. Rehab. Act, and OPM, EEOC and NARA regulations, to include but not be limited to, failure to safeguard, secure and maintain the

A.  a **"Breach of Duty"**

B.  **"Misconduct in Office"**

C.  **"Nonfeasance"**

D.  **"Malfeasance."**

E.  **"Official Misconduct"**

F.  Ms. Stracke violated the "Official Immunity Doctrine" pertaining to her office, position and duties when she failed to perform the non-discretionary "official duty" to promptly acknowledge "Plaintiff's reasonable accommodation and medical documentation records," which duty is required by Federal statute to be performed, and which duty Ms. Stracke did NOT perform on and/or from November 24, 2006, and through the date of this complaint.

G.  Ms. Stracke is no longer entitled to: a) Federal employer/employee immunity and b) Federal employer legal representation as the scope of her act(s) taken pertaining to "Plaintiff's reasonable accommodation and medical documentation records" are outside the scope of legally authorized Federal employer/employee authorized act(s).

H.  Ms. Stracke was complying with the instructions of Defendants' officials when she did NOT acknowledge "Plaintiff's reasonable accommodation and medical documentation records." Ms. Stracke complied with the instructions of Defendants' officials even though she knew, or should have known, that her compliance with said instructions was outside the legally permissible scope of her assigned duties and was NOT a legally authorized "Official Act." Ms. Stracke complied with the instructions of Defendants' officials to NOT acknowledge, and to NOT acknowledge the

---

Defendants' Employee Medical Folder pertaining to Plaintiff and the destruction of "Plaintiff's reasonable accommodation and medical documentation records."

existence of, "Plaintiff's reasonable accommodation and medical documentation records" in order to continue her employment with the Defendants. Ms. Stracke has therefore accepted a "Bribe" and committed "Bribery" through her actions when she complied with the instructions of Defendants' officials to NOT acknowledge, and to NOT acknowledge the existence of, "Plaintiff's reasonable accommodation and medical documentation records" in return for the continuation of her employment with the Defendants.[58]

788.    The Defendants cannot legally ignore the existence of "Plaintiff's reasonable accommodation and medical documentation records."

789.    The Defendants cannot legally deny the existence of "Plaintiff's reasonable accommodation and medical documentation records."

790.    The Federal government's three hundred thousand dollar award damage amount can be exceeded when the Defendants' act(s) justify an award amount that exceeds $300,000.

    A.    The United States Department of Justice (DOJ) awards and authorizes the approval and payment of award damage amounts that exceed $300,000.

    B.    One specific case where the DOJ approved an award damage amount that exceeded $300,000 involved a female and her disclosure of sexual misconduct of a politician. The DOJ approved an award damage amount and payment thereof in the $600,000 plus range.

    C.    The Court can award and authorize the approval and payment of award damage amounts that exceed $300,000.

---

[58] All of the elements required to justify the filing of a federal bribery charge against Ms. Stracke are there. But then, this is a Federal agency and Ms. Stracke is a Federal official and we all know the US-DOJ will not bring a federal charge against a federal official, and, if the US-DOJ did bring said charge, the US-DOJ would whitewash and not prosecute said charge.

    D.  One specific case where the Court approved an award damage amount that exceeded $300,000 involved a female and her disclosure of sexual misconduct of a politician. The Court approved an award damage amount and payment thereof in the $600,000 plus range.

791.    The DOJ can award a Plaintiff in a federal complaint, which involves a federal agency, damages that exceed $300,000 if the DOJ finds and determines the Defendants' act(s) justify an award and payment of an amount that exceeds $300,000.

792.    The Court can award a Plaintiff in a federal complaint, which involves a federal agency, damages that exceed $300,000 if the Court finds and determines the Defendants' act(s) justify the Court's award and payment of an amount that exceeds $300,000.

793.    This Court can award this Plaintiff in this federal complaint, which involves this federal Defendants agency, damages that exceed $300,000 if the Court finds and determines the Defendants' act(s) justify the Court's award and payment of an amount that exceeds $300,000.

794.    The duration, quantity and seriousness of the Defendants' continuous and numerous reprisal act(s) Defendants' officials and employees have taken against this Plaintiff because this Plaintiff is a known whistleblower who will disclose, and **who will not agree to not disclose**, external grantee and internal Defendants employee fraud to the legal authorities will justify the Court's findings and determination that the Defendants' reprisal act(s) justifies the Court's award and payment of a damage amount that substantially exceeds $300,000 when the duration, quantity and seriousness of the Defendants' continuous and numerous reprisal act(s) Defendants' officials and employees have taken against this Plaintiff are taking into consideration.

795.    Plaintiff's 1998 disclosures saved the U.S. taxpayers millions of dollars[59] by not having unauthorized disbursements made. Plaintiff's 2004 disclosures involved the recovery of more than $27 million of U.S. taxpayers funds. Plaintiff's disclosures do not involve the sexual misconduct of a politician. One would think that the saving and/or recovery of millions of dollars of U.S. taxpayers funds would justify the DOJ and the Court's award and payment of a damage amount that substantially exceeds $300,000 especially when the duration, quantity and seriousness of the Defendants' continuous and numerous reprisal act(s) Defendants' officials and employees have taken against this Plaintiff are taking into consideration.

796.    Since June 1998, there have been two attempts on Plaintiff's life and one break-in of Plaintiff's property, which can be attributed through circumstantial evidence to the Defendants. Plaintiff has been the target of intimidation and criminal acts, which logically can only be explained as attributable to, and involving, the Defendants and/or Defendants' employees. The intimidation and criminal acts commenced the evening of June 2, 1998, which is the date Plaintiff filed and notified the Defendants that he had filed a whistleblower disclosure complaint against the Defendants, and have continued throughout the duration of the litigation involving Plaintiff and the Defendants. The circumstantial evidence is currently insufficient to justify the filing of criminal charges.

A.    There has been, at least, one (1) break-in of Plaintiff's property that can be attributed to the Defendants.

B.    There have been intimidation acts directed towards Plaintiff and his wife that can be

---

[59] Actual amount is unknown.

attributed to the Defendants.

C.   There have been two (2) serious attempts on Plaintiff's life, i.e., to actually kill the Plaintiff, that can be attributed to the Defendants.

797.   The United States Department of Justice has offered immunity from prosecution of perjury to Defendants' employees who provide testimony detrimental to the Plaintiff.

798.   The exhibits attached to and filed with the original Complaint, which was filed in the Court on December 21, 2007, are hereby attached hereto and incorporated herein by reference as if fully filed with this Revised Amended Complaint.

799.   This Revised Amended Complaint is supported by approximately 450 exhibits. The Defendants have a copy of Plaintiff's exhibits because Plaintiff timely and legally answered the Defendants discovery requests for ED-2005-28-00. However, the Defendants have illegally refused to answer Plaintiff's discovery requests for ED-2005-28-00.

800.   Defendants have at all times relevant herein intentionally and willfully denied Plaintiff the continuation of the reasonable accommodation the Defendants provided Plaintiff prior to November 19, 2004, pursuant to the Rehabilitation Act by:  a) refusing to continue after on or about November 22, 2004, the reasonable accommodation the Defendants had provided Plaintiff prior to November 19, 2004; b) denying Plaintiff submitted "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants; c) removing "Plaintiff's reasonable accommodation and medical documentation records" from the Defendants' Employee Medical Folder pertaining to Plaintiff; d) destroying "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee Medical Folder pertaining to Plaintiff; e) denying Plaintiff is an

otherwise qualified handicap employee entitled to reasonable accommodation; f) denying Defendant authorized Plaintiff reasonable accommodation; g) denying Defendant provided Plaintiff with reasonable accommodation; h) refusing to acknowledge the existence of "Plaintiff's reasonable accommodation and medical documentation records;" I) refusing/failing to restore "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants' Employee Medical Folder pertaining to Plaintiff; j) refusing/failing to safeguard, secure and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff; and k) refusing to comply with the Rehabilitation Act's reasonable accommodation requirements, through the Defendants' refusal to take an official act(s) said statutes and regulations required the Defendants to take, which official act(s) the Defendants refused to take knowing that Defendants' refusal to continue on and after November 22, 2004, the reasonable accommodation the Defendants had provided Plaintiff prior to November 19, 2004, cease retaliatory acts and comply with the Rehab. Act, PA and FRA statutes and OPM, EEOC and NARA regulations would result in Defendants actions that would: a) violate the reasonable accommodation requirement of the Rehab. Act; b) result in the denial of the reasonable accommodation the Defendants had provided Plaintiff prior to November 19, 2004; c) deny Plaintiff reasonable accommodation; d) cause Plaintiff major life activity problems; e) cause Plaintiff reasonable accommodation problems; f) cause Plaintiff work problems; g) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; h) cause Plaintiff monetary and emotional problems; and I) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and

damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

801.    Defendants have at all times relevant herein intentionally and willfully implemented: a) Refusal to Accommodate, b) Assignment of Duties, c) Duty hours (Flexi place), d) Harassment (General), e) Reasonable Accommodation, f) Reassignment Directed, g) Discipline (Other), h) Terms and Conditions of Employment (credit hours), I) Performance Evaluation, j) Performance Standards, k) hostile work environment, l) removing "Plaintiff's reasonable accommodation and medical documentation records" from the Defendants' Employee Medical Folder pertaining to Plaintiff, m) destroying "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee Medical Folder pertaining to Plaintiff,  n) refusing to acknowledge the existence of "Plaintiff's reasonable accommodation and medical documentation records," o) refusing/failing to restore "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants' Employee Medical Folder pertaining to Plaintiff, and p) refusing/failing to safeguard, secure and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff,  retaliatory acts against the Plaintiff commencing on or about and after November 22, 2004, through the Defendants' refusal

to take an official act(s) said statutes and regulations required the Defendants to take, which official act(s) the Defendants refused to take knowing that Defendants' refusal to cease retaliatory acts and comply with the Rehab. Act, PA and FRA statutes and OPM, EEOC and NARA regulations would result in Defendants actions that would: a) violate the reasonable accommodation requirement of the Rehab. Act; b) deny Plaintiff reasonable accommodation; c) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; d) create a hostile work environment; e) violate the Terms and Conditions of Employment; f) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* g) cause Plaintiff major life activity problems; h) cause Plaintiff reasonable accommodation problems; I) cause Plaintiff work problems; j) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; k) cause Plaintiff monetary and emotional problems; and l) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

802.    Defendants have at all times relevant herein intentionally and willfully refused to comply with the security, safeguard, maintenance, record-keeping, removal, non-destroy and

restore requirements of and as pertaining to the Rehab. Act, PA and FRA and EEOC, NARA and OPM regulations which statutes and regulations require the Defendants to comply with the requirements of said statutes and regulations for the benefit and on behalf of the Defendants and Plaintiff, knowing that Defendants' failure to comply with the security, safeguard, maintenance, record-keeping, removal, non-destroy and restore requirements of said statutes and regulations would result in Defendants actions that would: a) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States, b) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages, c) remove "Plaintiff's reasonable accommodation and medical documentation records" from the Defendants' Employee Medical Folder pertaining to Plaintiff, d) destroy "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee Medical Folder pertaining to Plaintiff, e) deny Plaintiff is an otherwise qualified handicap employee entitled to reasonable accommodation, f) deny Defendant authorized Plaintiff reasonable accommodation, g) deny Defendant provided Plaintiff with reasonable accommodation, h) refuse to acknowledge the existence of "Plaintiff's reasonable accommodation and medical documentation records," I) refuse/fail to restore "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants' Employee Medical Folder pertaining to Plaintiff, j) refuse/fail to safeguard, secure and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff, and k) refuse to comply with the Rehabilitation Act's reasonable accommodation requirements. As a result of such failure Defendants' actions and determinations were and continue to be made

and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

803. Defendants have at all times relevant herein intentionally and willfully refused to secure, safeguard, and maintain the Defendants' Official Personnel File pertaining to Plaintiff, which contained "Plaintiff's military retirement records," as required by and pertaining to the PA and FRA and NARA and OPM regulations, which statutes and regulations require the Defendants to secure, safeguard and maintain for the benefit and on behalf of the Defendants and Plaintiff, knowing that Defendants' failure to secure, safeguard, and maintain Defendants' Official Personnel File pertaining to Plaintiff, which contained "Plaintiff's military retirement records," would result in Defendants illegal actions that would: a) result in the Defendants refusal/failure to secure, safeguard and maintain Defendants' Official Personnel File pertaining to Plaintiff; b) result in the removal of official records from the Defendants' Official Personnel File pertaining to Plaintiff; c) result in the destruction of official records filed in the Defendants' Official Personnel File pertaining to Plaintiff; d) result in the Defendants intentional refusal to restore official records removed from the Defendants' Official Personnel File pertaining to Plaintiff; e) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States, f) result in the illegal removal of "Plaintiff's military retirement records" from the Defendants' Official Personnel File pertaining to Plaintiff, g) result in the illegal

destruction of "Plaintiff's military retirement records" filed in the Defendants' Official Personnel File pertaining to Plaintiff, h) result in the denial of Plaintiff's FERS retirement benefits he would be entitled to receive from "Plaintiff's military retirement records" upon retirement, I) result in an attempt to illegally deny Plaintiff his full FERS retirement benefits because the Defendants allowed the illegal removal of "Plaintiff's military retirement records" from the Defendants' Official Personnel File pertaining to Plaintiff, and j) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

804.    Defendants have at all times relevant herein intentionally and willfully refused to secure, safeguard, and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff, which contained "Plaintiff's reasonable accommodation and medical documentation records," as required by and pertaining to the Rehab. Act, PA and FRA and EEOC, NARA and OPM regulations, which statutes and regulations require the Defendants to secure, safeguard and maintain for the benefit and on behalf of the Defendants and Plaintiff, knowing that Defendants' failure to secure, safeguard, and maintain Defendants' Employee Medical Folder pertaining to Plaintiff, which contained "Plaintiff's reasonable

accommodation and medical documentation records," would result in Defendants illegal actions that would: a) result in the Defendants refusal/failure to secure, safeguard and maintain Defendants' Employee Medical Folder pertaining to Plaintiff; b) result in the removal of official records from the Defendants' Employee Medical Folder pertaining to Plaintiff; c) result in the destruction of official records filed in the Defendants' Employee Medical Folder pertaining to Plaintiff; d) result in the Defendants intentional refusal to restore official records removed from the Defendants' Employee Medical Folder pertaining to Plaintiff; e) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States, f) result in the illegal removal of "Plaintiff's reasonable accommodation and medical documentation records" from the Defendants' Employee Medical Folder pertaining to Plaintiff, g) result in the illegal destruction of "Plaintiff's reasonable accommodation and medical documentation records" filed in the Defendants' Employee Medical Folder pertaining to Plaintiff, h) result in Defendants actions that would result in an attempt to illegally deny Plaintiff reasonable accommodation because the Defendants allowed the illegal destruction of Plaintiff's medical records from the Defendants' Employee Medical Folder pertaining to Plaintiff, and I) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and

fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

805.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and combine the claims of ED-2006-11-00 with the claim of ED-2005-28-00 would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and

emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

806.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and answer Plaintiff's discovery requests for ED-2008-28-00 from the June 2007 failure of settlement negotiations through January 31, 2008, would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a  fair hearing; e) prolong the adjudication of

Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

807.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law

and forward the Defendants Report of Investigation for ED-2005-28-00 to the EEOC upon Plaintiff's timely re-filing of Plaintiff's request for a hearing with the EEOC from the June 2007 failure of settlement negotiations through January 31, 2008, would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and

for filing a handicap discrimination claim against the Defendants in January 2005.

808.    Defendants have at all times relevant herein intentionally and willfully attempted to deny

Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and

adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC,

OPM and NARA regulations, and Constitutional due process, discovery, and adjudication

rights and record requirements through the Defendants' refusal to take an official act said

Constitution and statutes and regulations required the Defendants to take, which official

act the Defendants refused to take knowing that Defendants' refusal to comply with the law

and forward the Defendants Report of Investigation for ED-2006-11-00 to the EEOC upon

Plaintiff's timely re-filing of Plaintiff's request for a hearing with the EEOC from the June

2007 failure of settlement negotiations through January 31, 2008, would result in

Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's

Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and

adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of

the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the

Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a  fair hearing;

e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal

requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g)

create a hostile work environment; h) violate the Terms and Conditions of Employment;

I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff

major life activity problems; k) cause Plaintiff reasonable accommodation problems; l)

cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an

employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

809.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and issue the Defendants final decision for ED-2005-28-00 upon Plaintiff's timely recision of Plaintiff's request for a hearing with the EEOC on January 31, 2008, would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the

Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

810.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official

act the Defendants refused to take knowing that Defendants' refusal to comply with the law and issue the Defendants final decision for ED-2006-11-00 upon Plaintiff's timely recision of Plaintiff's request for a hearing with the EEOC on January 31, 2008, would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and

for filing a handicap discrimination claim against the Defendants in January 2005.

811.    Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and not "tampering with a witness" prior to and during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a  fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement  dtd Dec. 14, 1998;* j)  cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the

Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

812. Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and encourage Defendants' witness to commit perjury during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing would result in Defendants actions that would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a  fair hearing; e) prolong the adjudication of

Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

813. Defendants have at all times relevant herein intentionally and willfully attempted to deny Plaintiff his Rehab. Act, EEOC, and Constitutional due process, discovery, and adjudication rights by refusing to comply with the Rehab. Act and FRA statutes, EEOC, OPM and NARA regulations, and Constitutional due process, discovery, and adjudication rights and record requirements through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law

and file the Defendants' Board required "narrative response to the appeal and all material issues raised by appellant," and "Copies of all other documents which are relevant and material to this appeal," with the MSPB upon the timely re-filing of Plaintiff's third WB reprisal appeal (0764-W-2), which was timely re-filed on July 3, 2007, would: a) violate, result in the denial of, and deny Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; c) deny Plaintiff's right to have knowledge of the Defendants evidence prior to the hearing/trial; d) deny Plaintiff's right to a fair hearing; e) prolong the adjudication of Plaintiff's EEO and PA complaints; f) violate the legal requirements of the Rehab. Act, PA, FRA and OPM, EEOC and NARA regulations; g) create a hostile work environment; h) violate the Terms and Conditions of Employment; I) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* j) cause Plaintiff major life activity problems; k) cause Plaintiff reasonable accommodation problems; l) cause Plaintiff work problems; m) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; n) cause Plaintiff monetary and emotional problems; and o) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff. Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee EEO and

fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

814.    Defendants has at all times relevant herein intentionally and willfully failed and refused to maintain Defendants' records concerning Plaintiff with such accuracy, relevance, timeliness and completeness as necessary to assure accuracy and fairness in determinations related to retirement benefits and reasonable accommodation rights and opportunities of, or benefits to, Plaintiff that may be made on the basis of such records, after which determinations were and continue to be made that were and continue to be adverse to Plaintiff to require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages.    As a result of such failure Defendants' actions and determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.  Defendants took and implemented the above described retaliatory acts against the Plaintiff on and after November 22, 2004, because of Plaintiff's June 2, 1998, and July and August 2004 gross mismanagement, grantee fraud and Defendants' employee fraud disclosures, and for filing a handicap discrimination claim against the Defendants in January 2005.

## COUNT I        Refusal to Continue Reasonable Accommodation

815.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

816.    Defendants has at all times relevant herein intentionally and willfully violated the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA by the Defendants' refusal to continue from on or about November 22, 2004, through the date of

this complaint the reasonable accommodation Defendants had authorized and provided Plaintiff from approximately October 1990 through on or about November 18, 2004, knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate the reasonable accommodation requirement of the Rehab. Act; b) deny Plaintiff reasonable accommodation; c) violate the legal requirements of the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations; d) create a hostile work environment; e) violate the Terms and Conditions of Employment; f) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* g) cause Plaintiff major life activity problems; h) cause Plaintiff reasonable accommodation problems; i) cause Plaintiff work problems; j) violate Plaintiff's Constitutional and statutory and regulatory rights; k) be detrimental to the Plaintiff; l) violate the provisions of the Rehabilitation Act; m) have an adverse effect on Plaintiff; n) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; o) cause Plaintiff monetary and emotional problems; p) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a ; q) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); r) violate the provisions of the Federal Records Act; s) violate the provisions of the Rehabilitation Act; t) violate the provisions of the NARA and OPM regulations; and u) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages.

817.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional

opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## **COUNT II**     **Refusal to Accommodate**

818.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

819.    Defendants has at all times relevant herein intentionally and willfully violated the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA by denying "Plaintiff's reasonable accommodation and medical documentation records" were submitted to the Defendants knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate the reasonable accommodation requirement of the Rehab. Act; b) deny Plaintiff reasonable accommodation; c) violate the legal requirements of the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations; d) create a hostile work environment; e) violate the Terms and Conditions of Employment; f) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* g) cause Plaintiff major life activity problems; h) cause Plaintiff reasonable accommodation problems; i) cause

Plaintiff work problems; j) violate Plaintiff's Constitutional and statutory and regulatory rights; k) be detrimental to the Plaintiff; l) violate the provisions of the Rehabilitation Act; m) have an adverse effect on Plaintiff; n) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; o) cause Plaintiff monetary and emotional problems; p) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a ; q) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); r) violate the provisions of the Federal Records Act; s) violate the provisions of the Rehabilitation Act; t) violate the provisions of the NARA and OPM regulations; and u) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages.

820.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT III    Retaliatory Acts

821.   Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

822.   Defendants has at all times relevant herein intentionally and willfully violated the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations by taking the retaliatory acts identified in this Revised Amended Complaint knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate the  reasonable accommodation requirement of the Rehab. Act; b) deny Plaintiff reasonable accommodation; c) violate the legal requirements of the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations; d) create a hostile work environment; e) violate the Terms and Conditions of Employment; f) violate the terms of the *Return-to-Work Agreement  dtd Dec. 14, 1998;* g)  cause Plaintiff major life activity problems; h) cause Plaintiff reasonable accommodation problems; i) cause Plaintiff work problems; j) violate Plaintiff's Constitutional and statutory and regulatory rights; k) be detrimental to the Plaintiff; l) violate the provisions of the Rehabilitation Act;  m) have an adverse effect on Plaintiff; n) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; o) cause Plaintiff monetary and emotional problems; p) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a ; q) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); r) violate the provisions of the Federal Records Act; s) violate the provisions of the Rehabilitation Act; t) violate the provisions of the NARA and OPM regulations; and u)

require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages.

823.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT IV    Refusing to Acknowledge the Existence of "Plaintiff's reasonable accommodation and medical documentation records"

824.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

825.    Defendants has at all times relevant herein intentionally and willfully violated the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations by refusing to acknowledge the existence of "Plaintiff's reasonable accommodation and medical documentation records" knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate the reasonable accommodation requirement of the Rehab. Act; b) deny

Plaintiff reasonable accommodation; c) violate the legal requirements of the Rehab. Act, Title VII, CRA, PA and FRA statutes and OPM, EEOC and NARA regulations; d) create a hostile work environment; e) violate the Terms and Conditions of Employment; f) violate the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998;* g) cause Plaintiff major life activity problems; h) cause Plaintiff reasonable accommodation problems; i) cause Plaintiff work problems; j) violate Plaintiff's Constitutional and statutory and regulatory rights; k) be detrimental to the Plaintiff; l) violate the provisions of the Rehabilitation Act; m) have an adverse effect on Plaintiff; n) deny Plaintiff his rights, benefits and privileges as an employee of the Defendants and the United States; o) cause Plaintiff monetary and emotional problems; p) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a ; q) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); r) violate the provisions of the Federal Records Act; s) violate the provisions of the Rehabilitation Act; t) violate the provisions of the NARA and OPM regulations; and u) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages.

826.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur

legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT V    Unlawful maintenance of "Plaintiff's reasonable accommodation and medical documentation records"

827.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

828.    Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful maintenance of the Defendants' Employee Medical Folder pertaining to Plaintiff of "Plaintiff's reasonable accommodation and medical documentation records" filed in Defendants' Employee Medical Folder pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

829.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and

continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT VI    Unlawful removal of "Plaintiff's reasonable accommodation and medical documentation records"

830.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

831.    Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful removal from the Defendants' Employee Medical Folder pertaining to Plaintiff of "Plaintiff's reasonable accommodation and medical documentation records" filed in Defendants' Employee Medical Folder pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C.

§552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate

the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act,

violate the provisions of the NARA and OPM regulations, as a result of which

determinations were and continue to be made that were and continue to be adverse to

Plaintiff.

832.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and

continues to suffer loss of Constitutional and statutory and regulatory rights, promotional

opportunities, loss of income, loss of other employment benefits, loss of reasonable

accommodation, and has suffered and continues to suffer reprisal, hostile work

environment, severe distress, emotional pain and suffering, mental anguish, humiliation,

embarrassment, inconvenience, damage to his reputation, unfairness and loss of the

enjoyment of life, and has required the Plaintiff to secure legal representation and incur

legal and attorney fees, costs and consequential expenses and damages. As a result of such

failure Defendants determinations were and continue to be made and taken that had and

continue to have adverse effects on Plaintiff.

## COUNT VII    Unauthorized and illegal destruction of "Plaintiff's reasonable accommodation and medical documentation records"

833.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the

previous paragraphs as if the same were set forth in full herein.

834.    Defendants's intentional and willful failure and refusal to establish appropriate

administrative, technical and physical safeguards to insure the security of records

pertaining to Plaintiff and to protect Plaintiff from the unlawful destruction from the

Defendants' Employee Medical Folder pertaining to Plaintiff of "Plaintiff's reasonable accommodation and medical documentation records" filed in Defendants' Employee Medical Folder pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

835.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

**COUNT VIII**        **Unlawful refusal to restore "Plaintiff's reasonable accommodation and medical documentation records"**

836.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

837.    Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful refusal to restore "Plaintiff's reasonable accommodation and medical documentation records" to the Defendants' Employee Medical Folder pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

838.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation,

embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT IX    Unlawful maintenance of "Plaintiff's military retirement records"

839.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

840.    Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful maintenance of the Defendants' Official Personnel File pertaining to Plaintiff of "Plaintiff's military retirement records" filed in Defendants' Official Personnel File pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

841.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and

continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT X    Unlawful removal of "Plaintiff's military retirement records"

842.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

843.    Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful removal from the Defendants' Official Personnel File pertaining to Plaintiff  of "Plaintiff's military retirement records" filed in Defendants' Official Personnel File pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal

Page 203 of  230

Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

844.   As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT XI    Unauthorized and illegal destruction of "Plaintiff's military retirement records"

845.   Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

846.   Defendants's intentional and willful failure and refusal to establish appropriate administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful destruction from the Defendants' Official Personnel File pertaining to Plaintiff  of "Plaintiff's military retirement records" filed in Defendants' Official Personnel File pertaining to Plaintiff,

which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

847.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT XII    Unlawful refusal to restore "Plaintiff's military retirement records"

848.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

849.    Defendants's intentional and willful failure and refusal to establish appropriate

administrative, technical and physical safeguards to insure the security of records pertaining to Plaintiff and to protect Plaintiff from the unlawful refusal to restore "Plaintiff's military retirement records" to the Defendants' Official Personnel File pertaining to Plaintiff, which failures and refusals have resulted and continue to result in substantial harm, embarrassment, inconvenience and unfairness to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(10), violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a, violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2), violate the provisions of the Federal Records Act, violate the provisions of the Rehabilitation Act, violate the provisions of the NARA and OPM regulations, as a result of which determinations were and continue to be made that were and continue to be adverse to Plaintiff.

850.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

**COUNT XIII**      **PA security, safeguarding, maintenance and record-keeping**

851.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

852.    Defendants has at all times relevant herein intentionally and willfully refused to comply with the security, safeguarding, maintenance, and record-keeping requirements of and as pertaining to the Privacy Act and Federal Records Act and NARA and OPM regulations knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate Plaintiff's Constitutional and statutory and regulatory rights; b) be detrimental to the Plaintiff; c) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; d) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); and e) have an adverse effect on Plaintiff.

853.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

**COUNT XIV    PA security, safeguarding, maintenance and record-keeping for Rehab. Act**

854.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

855.    Defendants has at all times relevant herein intentionally and willfully refused to comply with the security, safeguard, maintenance, record-keeping, accommodation and non-reprisal requirements of and as pertaining to the Rehabilitation Act and EEO regulations knowing that the Defendants' compliance was required and the Defendants' noncompliance with the requirements of said statutes and regulations would: a) violate Plaintiff's Constitutional and statutory and regulatory rights; b) be detrimental to the Plaintiff; c) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; d) violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (e)(2); and e) have an adverse effect on Plaintiff. Paragraph 810 is incorporated herein by reference.

856.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and

continue to have adverse effects on Plaintiff.

**COUNT XV**     **Refusal to answer discovery request for ED-2005-28-00**

857.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

858.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and answer Plaintiff's discovery requests for ED-2005-28-00 from the June 2007 failure of settlement negotiations through the date of this Complaint would: a) violate Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff  his reasonable accommodation and EEOC adjudication rights; c) violate Plaintiff's Constitutional and statutory and regulatory rights; d) be detrimental to the Plaintiff; e) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; f) violate the provisions of the Rehabilitation Act; g) violate the provisions of the EEOC regulations; and h) have an adverse effect on Plaintiff.

859.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work

environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## **COUNT XVI**        **Refusal to forward ROI for ED-2005-28-00 to EEOC**

860.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

861.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and forward the Defendants' Reports of Investigation for ED-2005-28-00 from the June 2007 failure of settlement negotiations through the date of this Complaint to the EEOC would: a) violate Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights; b) deny Plaintiff his reasonable accommodation and EEOC adjudication rights; c) violate Plaintiff's Constitutional and statutory and regulatory rights; d) be detrimental to the Plaintiff; e) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; f) violate the provisions of the Rehabilitation Act; g) violate the

provisions of the EEOC regulations; and h) have an adverse effect on Plaintiff.

862.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT XVII        Refusal to forward ROI for ED-2006-11-00 to EEOC

863.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

864.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and forward the Defendants' Reports of Investigation for ED-2006-11-00 from the June 2007 failure of settlement negotiations through the date of this Complaint to the EEOC would:

a)    violate Plaintiff's Rehabilitation Act, EEOC regulations, and Constitutional due

process, discovery, and adjudication rights; b) deny Plaintiff his reasonable accommodation and EEOC adjudication rights; c) violate Plaintiff's Constitutional and statutory and regulatory rights; d) be detrimental to the Plaintiff; e) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; f) violate the provisions of the Rehabilitation Act; g) violate the provisions of the EEOC regulations; and h) have an adverse effect on Plaintiff.

865.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT XVIII        Tampering with witness

866.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

867.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's MSPB regulations and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and

regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' tampering with a witness during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing would result in Defendants actions that would: a) violate Plaintiff's MSPB regulations and Constitutional due process, discovery, and adjudication rights; b) be detrimental to the Plaintiff; c) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; d) violate the provisions of the MSPB regulations; and e) have an adverse effect on Plaintiff.

868.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

## COUNT XIX        Defendants witness perjury

869.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

870.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's

MSPB regulations and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and encourage Defendants' witness to commit perjury during Plaintiff's MSPB January 29 and 30, 2008, whistleblower reprisal hearing would: a) violate Plaintiff's MSPB regulations and Constitutional due process, discovery, and adjudication rights; b) be detrimental to the Plaintiff; c) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; d) violate the provisions of the MSPB regulations; and e) have an adverse effect on Plaintiff.

871.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life, and has required the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages. As a result of such failure Defendants determinations were and continue to be made and taken that had and continue to have adverse effects on Plaintiff.

**COUNT XX**        **Refusal to file Board appeal answer**

872.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

873.    Defendants has at all times relevant herein intentionally and willfully violated Plaintiff's MSPB regulations and Constitutional due process, discovery, and adjudication rights through the Defendants' refusal to take an official act said Constitution and statutes and regulations required the Defendants to take, which official act the Defendants refused to take knowing that Defendants' refusal to comply with the law and file the Defendants' Board required "narrative response to the appeal and all material issues raised by appellant," and "Copies of all other documents which are relevant and material to this appeal," with the MSPB upon the timely re-filing of Plaintiff's third WB reprisal appeal (0764-W-2), which was timely re-filed on July 3, 2007, would: a) violate Plaintiff's MSPB regulations and Constitutional due process, discovery, and adjudication rights; b) be detrimental to the Plaintiff; c) require the Plaintiff to secure legal representation and incur legal and attorney fees, costs and consequential expenses and damages; d) violate the provisions of the MSPB regulations; and e) have an adverse effect on Plaintiff.

874.    As a direct and proximate result of such failure and refusal Plaintiff has suffered and continues to suffer loss of Constitutional and statutory and regulatory rights, promotional opportunities, loss of income, loss of other employment benefits, loss of reasonable accommodation, and has suffered and continues to suffer reprisal, hostile work environment, severe distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the

enjoyment of life, and has required the Plaintiff to secure legal representation and incur

legal and attorney fees, costs and consequential expenses and damages. As a result of such

failure Defendants determinations were and continue to be made and taken that had and

continue to have adverse effects on Plaintiff.

## **COUNT XXI**      **PA record maintenance**

875.    Plaintiff adopts and incorporates by reference each and every allegation set forth in the

previous paragraphs as if the same were set forth in full herein.

876.    Defendants's intentional and willful maintenance of records which were and continue to

be used by Defendants in making determinations about Plaintiff that contain information

regarding Plaintiff that was and is not accurate, truthful, relevant, timely or complete, and

which, accordingly did and does not reasonably assure fairness to Plaintiff in making such

determinations, violated and continues to violate the provisions of the Privacy Act

embodied in 5 U.S.C. §552a (e)(5), as a result of which determinations were and continue

to be made that were and continue to be adverse to Plaintiff.

877.    As a direct and proximate result of Defendants' maintenance of such records, Plaintiff has

suffered and continues to suffer loss of reasonable accommodation, promotional

opportunities, loss of income, loss of other employment benefits, loss of potential

retirement benefits, and has suffered and continues to suffer reprisal, a hostile work

environment, distress, emotional pain and suffering, mental anguish, humiliation,

embarrassment, inconvenience, damage to his reputation, unfairness and loss of the

enjoyment of life.

**COUNT XXII**       **PA record maintenance**

878.   Plaintiff adopts and incorporates by reference each and every allegation set forth in the previous paragraphs as if the same were set forth in full herein.

879.   Defendants's intentional and willful maintenance of records containing information regarding Plaintiff which was and is not accurate, truthful, relevant, timely or complete, and which, accordingly, did and does not assure fairness to Plaintiff in making determinations related to the retirement, reasonable accommodation, qualifications, character, rights and opportunities of, or benefits to, Plaintiff that were made and continue to be made on the basis of such records, as a result of which determinations were made that were and continue to be adverse to Plaintiff, violated and continue to violate the provisions of the Privacy Act embodied in 5 U.S.C. §552a (g)(1)('c).

880.   As a direct and proximate result of Defendants' maintenance of such records, Plaintiff has suffered and continues to suffer loss of reasonable accommodation, loss of promotional opportunities, loss of income, loss of other employment benefits, loss of potential retirement benefits, and has suffered and continues to suffer reprisal, a hostile work environment, distress, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenience, damage to his reputation, unfairness and loss of the enjoyment of life.

**RELIEF**

WHEREFORE, Plaintiff respectfully hereby prays that this Court grant him the following relief against Defendants:

1.   Order the Defendants to put up or shut up.  Order the Defendants to not ever again accuse

Plaintiff of criminally violating Federal statutes and Defendants regulations without being prepared to bring and prove said criminal accusation.

2.  Order Defendants to secure, safeguard and maintain the Defendants' Official Personnel File pertaining to Plaintiff in accordance with the requirements of Federal statutes and regulations,

3.  Order Defendants to return and restore to the Defendants' Official Personnel File pertaining to Plaintiff all of the papers and records removed from the Defendants' Official Personnel File pertaining to Plaintiff, which should not have been removed,

4.  Order Defendants to return and restore to the Defendants' Official Personnel File pertaining to Plaintiff, Plaintiff's military retirement records, i.e., 1) military service-time records, 2) proof of military service-time and calculation records, and/or 3) proof of military service-time deposit records required for retirement,

5.  Order Defendants to correct the Defendants' Official Personnel File pertaining to Plaintiff, Plaintiff's military retirement records,

6.  Order the Defendants to provide Plaintiff with a notarized certified true and correct copy of the complete Defendants' Official Personnel File pertaining to Plaintiff after the Defendants has returned and restored to Defendants' Official Personnel File pertaining to Plaintiff ALL records, which should not have been removed,

7.  Retain the District Court's jurisdiction in this Complaint for one (1) year after the Defendants has submitted to the Court the Defendants' notarized certification statement signed by the Secretary and General Counsel, Defendants, which clearly states and certifies that the Defendants is in total and full compliance with the Court's Order and has returned and restored to Defendants' Official Personnel File pertaining to Plaintiff ALL records, which should not

have been removed, to ensure the Defendants' total and full compliance with the Court's Orders as the Defendants' actions confirmed that this Defendants will not voluntarily comply with the requirements of Federal statutes and related regulations or the Orders of the EEOC, MSPB and District Court,

8. Order Defendants to secure, safeguard and maintain the Defendants' Employee Medical Folder pertaining to Plaintiff in accordance with the requirements of Federal statutes and regulations,

9. Order Defendants to return and restore to the Defendants' Employee Medical Folder pertaining to Plaintiff all of the papers and records removed from the Defendants' Employee Medical Folder pertaining to Plaintiff, which should not have been removed,

10. Order the Defendants to return and restore to the Defendants' appropriate files all of Defendants' reasonable accommodation determination records pertaining to Plaintiff's requests for reasonable accommodation,

11. Order Defendants to return and restore to the Defendants' Employee Medical Folder pertaining to Plaintiff, Plaintiff's requests for reasonable accommodation dated October 19, 1990, December 16, 1991, and March 4, 1992, records and the medical documentation records Plaintiff and/or Plaintiff's physician submitted to the Defendants,

12. Order Defendants to correct the Defendants' Employee Medical Folder pertaining to Plaintiff, "Plaintiff reasonable accommodation and medical documentation records,"

13. Order the Defendants to provide Plaintiff with a notarized certified true and correct copy of the complete Defendants' Employee Medical Folder pertaining to Plaintiff after the Defendants has returned and restored to Defendants' Employee Medical Folder pertaining to Plaintiff  ALL records, which should not have been removed,

14. Retain the District Court's jurisdiction in this Complaint for one (1) year after the Defendants has submitted to the Court the Defendants' notarized certification statement signed by the Secretary and General Counsel, Defendants, which clearly states and certifies that the Defendants is in total and full compliance with the Court's Order and has returned and restored to Defendants' Employee Medical Folder pertaining to Plaintiff ALL records, which should not have been removed, to ensure the Defendants' total and full compliance with the Court's Orders as the Defendants' actions confirmed that this Defendants will not voluntarily comply with the requirements of Federal statutes and related regulations or the Orders of the EEOC, MSPB and District Court,

15. Order the Defendants to provide Plaintiff with a copy of all records the Defendants returns and restores to the Defendants' appropriate files,

16. Order a finding against Defendants' employees that Defendants employees committed a prohibited personnel practice against the Plaintiff,

17. Order the Defendants to terminate the employment of every Defendants employee involved in taking reprisal acts against the Plaintiff,

18. Order the Defendants to terminate the employment of every Defendants employee instructing other Defendants employees to take reprisal acts against the Plaintiff,

19. Order the Defendants to terminate the employment of every Defendants employee who had the authority to intervene and instruct Defendants' employees to stop taking reprisal acts against the Plaintiff who failed to intervene,

20. Order the permanent garnishment of all Defendants' management and supervisory employees' wages they receive from any and all sources in the amount of four (4) percent per year for every

year of their involvement in the reprisal acts they took against the Plaintiff payable to the United

States Taxpayers through and for deposit into the United States Treasury,

21. Order the permanent garnishment of all Defendants' non-management and non-supervisory

employees' wages they receive from any and all sources in the amount of two (2) percent per

year for every year of their involvement in the reprisal acts they took against the Plaintiff

payable to the United States taxpayers through and for deposit into the United States Treasury,

22. Order the permanent garnishment of all Defendants' management and supervisory employees'

retirement funds they receive from any and all sources in the amount of four (4) percent per year

for every year of their involvement in the reprisal acts they took against the Plaintiff payable to

the United States taxpayers through and for deposit into the United States Treasury,

23. Order the permanent garnishment of all Defendants' non-management and non-supervisory

employees' retirement funds they receive from any and all sources in the amount of two (2)

percent per year for every year of their involvement in the reprisal acts they took against the

Plaintiff payable to the United States taxpayers through and for deposit into the United States

Treasury,

24. Order the Defendants to make the Plaintiff whole through the total and full restoration of all of

the reasonable accommodation[60] the Defendants were providing the Plaintiff prior to November

2004,

25. Order the Defendants to make the Plaintiff whole through the total and full restoration of the

*Return-to-Work Agreement dtd Dec. 14, 1998,*

26. Order the Defendants to comply with the terms of the *Return-to-Work Agreement dtd Dec. 14,*

---

[60] as set forth in Plaintiff's request for stipulations.

1998,

27. Order the Defendants to restore Plaintiff's position per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998,*

28. Order the Defendants to restore Plaintiff's supervisor per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998,*

29. Order the Defendants to restore Plaintiff's job title per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998,*

30. Order the Defendants to restore Plaintiff's job duties per the terms of the *Return-to-Work Agreement dtd Dec. 14, 1998,*

31. Order the Defendants to recognize and confirm in writing Plaintiff's disabilities and impairments,

32. Order the Defendants to reasonable accommodation and confirm in writing Plaintiff's disabilities and impairments,

33. Order the Defendants to restore and confirm in writing all of the reasonable accommodation the Defendants were providing Plaintiff prior to November 19, 2004,

34. Order the Defendants to make the Plaintiff whole through the total and full restoration of bona fide work assignments,

35. Order the Defendants to make the Plaintiff whole through the total and full restoration of Plaintiff's unrestricted ability to earn and use credit hours on a daily basis as credit hours assist the Plaintiff in the control of his narcolepsy,

36. Order the Defendants to make the Plaintiff whole through the total and full restoration of promotions, back pays, front pay, bonuses, restoration of annual leave and credit hours,

37. Order the Defendants to make the Plaintiff whole through the total and full establishment of a non-hostile work environment,

38. Order the Defendants to immediately cease all reprisal acts against the Plaintiff,

39. Order the Defendants to not implement any new reprisal acts against the Plaintiff,

40. Order the Defendants to reimburse Plaintiff for all attorney fees, costs and consequential damages incurred in any and all of the litigation involving Plaintiff and Defendants,

41. Order the Defendants to "make whole" the Plaintiff and that means all costs, expenses and damages Plaintiff has incurred because of the Defendants' acts will be paid and reimbursed to the Plaintiff in full without reduction,

42. Order the Defendants that to "make whole" the Plaintiff includes the payment of all income taxes  owed due to the Plaintiff's reimbursement of attorney fees, costs and consequential expenses and damages,

43. Order the Defendants to award Plaintiff full make-whole relief to include, but not be limited to, reasonable accommodation, correction of Defendants' unlawful employment practices and acts, equitable relief, injunctive relief, monetary damages, emotional damages, declaratory relief, compensatory damages, marital damages, termination of Defendants' employees, referral of Defendants' employees to disciplinary boards/bodies, and all reasonable attorney fees, costs and consequential damages,

44. Enjoin Defendants from continuing to maintain records regarding Plaintiff in violation of the Privacy Act;

45. Enjoin Defendants from continuing to engage in further conduct in violation of the Privacy Act,

46. Enjoin Defendants from continuing to maintain records regarding Plaintiff in violation of the

Rehabilitation Act,

47. Enjoin Defendants from continuing to engage in further conduct in violation of the Rehabilitation Act,

48. Damages in amount of $1,000 or more to be determined at time of trial for Privacy Act violations pertaining to Defendants' Official Personnel File pertaining to Plaintiff, "Plaintiff's military retirement records,"

49. Damages in amount of $1,000 or more to be determined at time of trial for Privacy Act violations pertaining to Defendants' Employee Medical Folder pertaining to Plaintiff, "Plaintiff's reasonable accommodation and medical documentation records,"

50. Damages in amount of $1,000 or more to be determined at time of trial for Privacy Act violations pertaining to Plaintiff's requests for reasonable accommodation,

51. Damages in amount of $10,000 or more to be determined at time of trial for Rehabilitation Act refusal to accommodate violations,

52. Damages in amount of $10,000 or more to be determined at time of trial for Rehabilitation Act and EEOC reprisal acts violations,

53. Order the Defendants to pay Plaintiff any other monetary damages the law allows the Court to award,

54. Plaintiff requests any and all other monetary damages the law allows the Court to award,

55. Plaintiff requests any and all other non-monetary damages the law allows the Court to award,

56. Award to Plaintiff such other and further relief as the Court shall deem just and appropriate under the circumstances.

57. Order the Defendants to pay Plaintiff damages to be determined at time of trial but not less than

$10,000 due to Plaintiff's damage to reputation, unfairness and loss of the enjoyment of life,

58. Order Defendants to reimburse Plaintiff for all cost and expenses, including reasonable attorneys fees, incurred in this matter.

59. Order any other relief the Court is authorized to award,

60. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count I of this Complaint, but in no event less than $1,000;

61. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count II of this Complaint, but in no event less than $1,000;

62. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count III of this Complaint, but in no event less than $1,000;

63. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count IV of this Complaint, but in no event less than $1,000;

64. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count V of this Complaint, but in no event less than $1,000;

65. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count VI of this Complaint, but in no event less than $1,000;

66. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count VII of this Complaint, but in no event less than $1,000;

67. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count VIII of this Complaint, but in no event less than $1,000;

68. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count IX of this Complaint, but in no event less than $1,000;

69. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count X of this Complaint, but in no event less than $1,000;

70. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XI of this Complaint, but in no event less than $1,000;

71. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XII of this Complaint, but in no event less than $1,000;

72. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XIII of this Complaint, but in no event less than $1,000;

73. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of

Defendants' violation of the law set forth in Count XIV of this Complaint, but in no event less than $1,000;

74. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XV of this Complaint, but in no event less than $1,000;

75. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XVI of this Complaint, but in no event less than $1,000;

76. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XVII of this Complaint, but in no event less than $1,000;

77. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XVIII of this Complaint, but in no event less than $1,000;

78. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XIV of this Complaint, but in no event less than $1,000;

79. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XX of this Complaint, but in no event less than $1,000;

80. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XXI of this Complaint, but in no event less

than $1,000;

81. Order Defendants to pay to Plaintiff the damages sustained by Plaintiff as a result of Defendants' violation of the law set forth in Count XXII of this Complaint, but in no event less than $1,000.

**The Notarized Declaration and Verification statements and signatures are on the next page.**

SUBSCRIBE AND SWORN TO:

Respectfully submitted,

_april 17, 2008_     _John Gard_
Date

John Gard, Pro se
5045 Rush Light Path
Columbia, MD 21044-1295
(H) 410-715-0244     (W) 202-377-3830

<u>JURY DEMAND</u>

Plaintiff demands trial by jury as to all issues triable by jury.

_John Gard_

John Gard

**DECLARATION.**

I, John Gard, do hereby declare under the penalty of perjury under the laws of the United States of America that the statements above are true and correct.

_april 17, 2008_     _John Gard_
Date

John Gard, Pro se
5045 Rush Light Path
Columbia, MD 21044-1295
(H) 410-715-0244     (W) 202-377-3830

The Notarization for the Declaration and Verification statements are on the next page.

Page 228 of 230

## VERIFICATION

The undersigned, being first duly sworn, deposes and states that I, John F. Gard, appellant in this Board appeal, has read the above and foregoing, and the statements made therein are true and correct to the best of my knowledge, information and belief.

_april 17, 2008_          _John Gard_

| Date |

John Gard, Pro se
5045 Rush Light Path
Columbia, MD 21044-1295
(H) 410-715-0244     (W) 202-377-3830

STATE OF MARYLAND    )
                     ) ss.
COUNTY OF HOWARD     )

Subscribed and sworn to before me on this _17th_ day of _April_ _____, 2008.

Witness my hand and official seal.

My commission expires: _Sept 14 2009_

_____
Notary Public

ERIC T. BROOKS, JR.
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires 09/14/2009

File ref:    2008-04-16 Revised Amended Complaint 04.wpd

Page 229 of 230

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the date set forth below a true and correct copy of the above and foregoing document entitled "Notarized Revised Amended Complaint" including the exhibits as specified therein was filed with and set to the offices and individuals as specified below by FedEx:

Clerk's Office, Clerk of the Court
United States District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

OLIVER W. McDANIEL, D.C. BAR # 377360
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530

Attorney General of the United States
950 Independence Ave., NW
Washington, D.C. 20530

United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

Margaret Spelling, Secretary
United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

William Haubert
Office of the General Counsel
United States Department of Education
400 Maryland Avenue, S.W., Room 6C106
Washington, D.C. 20202

_April 18, 2008_            _John Gard_
Date                 John Gard, Pro se
                  5045 Rush Light Path
                  Columbia, MD 21044-1295
        (H) 410-715-0244        (W) 202-377-3830
File ref: 2008-04-16 Revised Amended Complaint 01.wpd