# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                                       |   |                                  |
|---------------------------------------|---|----------------------------------|
| **JOHN GARD,**                        | ) |                                  |
|                                       | ) |                                  |
| **Plaintiff,**                        | ) |                                  |
|                                       | ) |                                  |
| v.                                    | ) | Civil Action No. 07-2303 (RMC)   |
|                                       | ) |                                  |
| **UNITED STATES DEPARTMENT OF**       | ) |                                  |
| **EDUCATION,** *et al.*,              | ) |                                  |
|                                       | ) |                                  |
| **Defendants.**                       | ) |                                  |

## MEMORANDUM OPINION

John Gard, proceeding *pro se*, sues the United States Department of Education and its Secretary, Arne Duncan ("Defendants"), for alleged retaliation under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* Mr. Gard filed a charge in March 2005 alleging that Defendants were violating the Rehabilitation Act by not continuing in-place reasonable accommodations for his disabilities. That charge has been dismissed by the Court.[1] At issue now is whether Defendants retaliated against Mr. Gard because of that charge by increasing the difficulties he experienced in securing reasonable accommodations. Having carefully reviewed the parties' briefs, exhibits, and the entire record, the Court finds no evidentiary support for Mr. Gard's argument that it was his filing a discrimination complaint, rather than his refusal to provide current medical records, that caused Defendants to deny him a reasonable accommodation. Therefore, summary judgment will be granted to the Defendants.

---

[1] *See* Memorandum Opinion dated March 5, 2010 [Dkt # 45].

# I. FACTS

Mr. Gard has worked for the Department of Education since April of 1989. Second Am. Compl. [Dkt. # 29] ¶ 8. He alleges that he suffers from chronic pain, narcolepsy, and Post Traumatic Stress Disorder ("PTSD"), all of which are "interrelated and what happens in one disability/impairment affects the condition and control of the other disabilities/impairments and Plaintiff's major life activities." *Id.* ¶ 58. He states that Defendants "were fully aware" of these disabilities when they hired him, and that they "considered Plaintiff to be handicapped, treated Plaintiff as being handicapped and provided Plaintiff with reasonable accommodation from approximately April 1, 1989 through November 22, 2004." *Id.* ¶¶ 54-55.

At some point prior to October 1998, for reasons not specified in the Second Amended Complaint, Mr. Gard appears to have taken leave from his employment. He states that from October through December 1998, he was engaged in "return-to-work" discussions with the Department, during which time the Department had on file "a) Plaintiff's medical records, and b) Defendants' reasonable accommodation determinations and the reasonable accommodation authorized." *Id.* ¶ 42. He returned to work in December 1998 pursuant to a Return-to-Work Agreement dated December 14, 1998. *Id.* ¶¶ 44-45. He states that he disclosed some internal employee fraud to Jack Martin, Chief Financial Office, and John Higgins, Inspector General, in July and August of 2004. *Id.* ¶¶ 47-48. In November 2004, Mr. Gard's supervisor, Richard Mueller, notified Mr. Gard that the reasonable accommodation he had been provided as per the Return-to-Work Agreement (*i.e.*, ability to work from home on an unspecified "case") would no longer be provided. *Id.* ¶ 49. Mr. Gard filed a "formal [EEO] handicap refusal to continue reasonable

accommodation complaint against Defendants on March 14, 2005." *Id.* ¶¶ 16.C.; 50. Thereafter, he alleges his difficulties in securing a reasonable accommodation for his disabilities increased. *Id.* ¶ 50.

On September 5, 2006, Mr. Gard sent an email to his supervisor, Linda A. Stracke, Director of Financial Improvement and Post Audit Operations, to request a reasonable accommodation, attaching what he described as medical documentation and prior requests for reasonable accommodations which he had just located. *See id.*, Ex. 1 (Pl.'s Ex. 442:[2] Sept. 5, 2006 email from Gard to Stracke *et al.*). Among the documents he forwarded was a series of letters sent to the Department, including an October 13, 1989, letter, reflecting a diagnosis of narcolepsy by the Mayo Clinic in Rochester, Minnesota, *id.*, Ex. 1 (Pl.'s Ex. 436); a July 1992 letter confirming narcolepsy, neck and back pain, and hearing loss, Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s Mem. in Opp'n") [Dkt. # 59], Ex. 5 (Pl.'s Ex. 344-6); as well as a June 1997 request from Mr. Gard for a reasonable accommodation of working at home three days per week, accompanied by a doctor's prescription for the same. Am. Compl., Ex. 1 (Pl.'s Ex. 441). Two weeks later, Ms. Stracke replied that she was unable to locate a "record of any written approval for a reasonable accommodation request from [Mr. Gard]." *Id.*, Ex. 1 (Pl.'s Ex. 443-1) (Sept. 20, 2006 email from Stracke to Gard). She added that the Department would consider his request for a reasonable accommodation upon the receipt of updated, "i.e., last three months," medical documentation. *Id.* Mr. Gard responded that prior agency officials had determined he required a reasonable accommodation, that Ms. Stracke had

---

[2] These additional exhibit numbers refer to exhibit numbers used by Mr. Gard in prior complaints and occasionally referenced in the current Second Amended Complaint. The documents referenced in this opinion are all attached to the Second Amended Complaint as one exhibit, but the original numbers are often found in the bottom right hand corner of the specific documents in question.

no right to revoke that accommodation, and that he had previously responded to requests for medical records. *Id.*, Ex. 1 (Pl.'s Ex. 444-1) (Oct. 3, 2006 email from Gard to Stracke). He charged that the request for further documentation was proof that the Department had violated the Privacy Act and Rehabilitation Act by destroying or failing to maintain his records.[3] *Id.*

Ms. Stracke again stated that she had "no record of an agency determination that" Mr. Gard was "a qualified individual with a disability or of any decision to provide [him] with any reasonable accommodation of a disability." *Id.*, Ex. 1 (Pl.'s Ex. 445) (Nov. 24, 2006 email from Stracke to Gard). Without up-to-date medical information, Ms. Stracke refused to provide a reasonable accommodation to Mr. Gard. *Id.* Mr. Gard reads this email as a denial that he ever submitted medical records to the Department, ever requested a reasonable accommodation, or was ever provided with a reasonable accommodation. *Id.* ¶¶ 34-36. He never submitted current medical documentation as requested by Ms. Stracke, and as of the time briefs were filed, he had not submitted current medical documentation. Def's' Statement of Material Fact [Dkt. # 56] at 3 (Def's' Facts ¶ 8); Def.'s Mot. for Summ. J. [Dkt. # 56] Attach. 1 at 3 (Stracke Decl.¶ 7). During Ms. Stracke's tenure with the office from 2005 until 2010, no other employee under her supervision was granted a reasonable accommodation without medical documentation. Stracke Decl.¶ 9.

Despite Ms. Stracke's demands for current medical support, she "authorized requested adjustments to [Mr. Gard's] working conditions . . . as a matter of administrative discretion. Such approved adjustments included assignment to a private office and being allowed to work at home on an 'as needed' flex schedule." Def's' Facts ¶ 11. In September 2006, Ms.

---

[3] These claims were brought before the Court in the Amended Complaint, but were dismissed by the Court. *See* Memo. Op. [Dkt. # 45].

Stracke was "somewhat perplexed that accommodation remains an issue, since the Department has given you a private office and allows you to work at home most days on an 'as needed' flex schedule." Pl.'s Mem. in Opp'n, Ex. 8 (Pl.'s Ex. 443-1) (Stracke email to Gard of 9/20/06).

Before the Court is Mr. Gard's claim of retaliation under the Rehabilitation Act. *See* Am. Compl., Count VI.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Id.*, *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.* at 325. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675-76. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B. Retaliation Claim

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may "be subjected to discrimination" by any federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). The Act further provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990, (42 U.S.C. § 12111 *et seq.*). *Id.* § 794(d); *see Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (applying the ADA's anti-retaliation provision to the Rehabilitation Act). The ADA's anti-retaliation provision forbids "discrimina[tion] against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). The D.C. Circuit has held that the framework for analyzing anti-retaliation suits under the ADA/Rehabilitation Act mirrors that applied

for retaliation suits under Title VII of the Civil Rights Act. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) ("Although the [retaliation] framework was developed for Title VII cases, our sister circuits have all accepted its application to ADA retaliation suits under 12203(a), as we do now.") (cases cited).

However, *Gross v. FBL Financial Services Inc.*, 129 S. Ct. 2343 (2009), has altered the easy interplay between Title VII cases and cases arising under other federal anti-discrimination statutes. *Gross v. FBL Financial Services* was a case involving alleged age discrimination under the Age Discrimination in Employment Act of 1967 (ADEA), Pub. L. No. 90-202, 81 Stat. 602 (codified, as amended at 29 U.S.C. § 621 *et seq* (1996)). In addressing whether Mr. Gross had proved that his employer discriminated against him based on his age, the Supreme Court specifically noted the 1991 amendments to Title VII, by which Congress established a statutory basis for "mixed motive" cases.[4] Congress amended Title VII to "explicitly authoriz[e] discrimination claims in which an improper consideration was 'a motivating factor' for an adverse employment decision." *Gross*, 129 S. Ct. at 2349; *see also* 42 U.S.C. § 2000e-2(m) ("an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"). In a 5-4 opinion authored by Justice Thomas, the Supreme Court could not "ignore Congress' decision to amend Title VII's relevant provisions but not make similar changes to the

---

[4] A "mixed motive" case is one in which an employer has a legitimate reason for its action, such as weak job performance, and an illegitimate reason, such as race, creed, national origin, color, or gender. If a jury believes that the employer would have taken the same action because of the legitimate reason, without regard to the illegitimate reason, the employee's recovery is limited to a declaratory judgment that the employer violated the law and attorney's fees but not backpay, compensatory damages, reinstatement or other potential remedies. *See* 42 U.S.C. § 2000e-2(m), 42 U.S.C. § 2000e-5(g)(2)(B); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 240-41 (1989).

ADEA." *Id*. at 2349. Because of these new "textual differences between Title VII and the ADEA," the Court found itself prevented from remedying ADEA claims when an employee proves only that his age was a "motivating factor." *Id*. at 2349, n.2. "The ADEA provides, in relevant part, that '[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.'" *Id*. at 2350 (quoting 29 U.S.C. § 623(a)(1)) (emphasis in original). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Id*. Thus, the Supreme Court concluded that to "establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id*. In the end, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action. A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id*. at 2351.

The Rehabilitation Act itself says that "[n]o otherwise qualified individual . . . shall, solely by reason of her or his disability . . . be subjected to discrimination" in any federal program. 29 U.S.C. § 794(a). "[S]olely by reason of" is equivalent to the "but-for" analysis adopted in *Gross*. Prior to 2008, the ADA provided: "No covered entity shall discriminate against a qualified individual with a disability *because of* the disability of such individual," 42 U.S.C. § 12112(a) (emphasis added), which would also be covered by the *Gross* analysis. The ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008)), however, changed the relevant language and the statute now reads: "No covered entity shall discriminate against a qualified individual *on the basis of disability*

. . . ." 42 U.S.C. § 12112(a) (as amended by Pub. L. 110-325, § 5(a)(1) (2008)) (emphasis added). The ADA was amended to reject Supreme Court decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and to broaden the reach of the statute. Pub. L. 110-324 §§ 2(b)(2), (3), (4) and (5). The ADA now defines "disability" to mean:

> with respect to an individual
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102 (as amended by Pub. L. 110-325, § 3 (2008)). Avoiding prior language that a person covered by the ADA was "a qualified person with a disability," Congress changed the language in 42 U.S.C. § 12112(a) and modified the Rehabilitation Act to insert the same definition for "disability." *See* Pub. L. 110-325 § 7. Notably, Congress did not modify the provision in the Rehabilitation Act requiring a plaintiff to prove that s/he was subjected to discrimination "solely by reason of his or her disability."

*Gross* emphasized that words have meaning and that words in a statute should be given their customary meaning unless something specific is otherwise indicated. 129 S. Ct. 2343 (2009). While the language differences between the Rehabilitation Act and the ADA may (or may not) be significant in an ADA case, the language used in the former must control the outcome in this case. The Court concludes that a plaintiff seeking vindication under the Rehabilitation Act must prove that his disability was the "sole" or "but-for" reason for the employer's actions or inactions,

regardless of whether the plaintiff advances a claim of discrimination based on disparate treatment, mixed-motive, or retaliation.

### III. ANALYSIS

Mr. Gard alleges that because he filed an EEO discrimination complaint on March 14, 2005, "reasonable accommodation problems increased further." Am. Compl. [Dkt. # 29] ¶ 50. Ms. Stracke required current medical documentation as a precondition to processing his accommodation request, ultimately resulting in a denial of any accommodation when Mr. Gard did not produce the requested information. To avoid summary judgment in Defendants' favor, Mr. Gard must present facts from which a reasonable jury could conclude that "but for" his March 14, 2005 discrimination complaint, Defendants would not have made it more difficult to obtain a reasonable accommodation.

It is undisputed that Mr. Gard engaged in protected activity when he filed a formal complaint on March 14, 2005, alleging disability discrimination arising from the Department's refusal to continue existing accommodations for his disabilities. Am. Compl. ¶ 50; Def.'s Memo. at 4. It is also undisputed that during Ms. Stracke's tenure, from 2005 to 2010, Defendants:

> (a) did not provide accommodation alleged by [Mr. Gard] to have been authorized by a previous supervisor;
>
> (b) on September 20, 2006 and November 24, 2006, asked [Mr. Gard] to submit current medical documentation of his alleged disability and need for accommodation as a precondition to processing a new accommodation request; and
>
> (c) declined to process or approve [Mr. Gard's] accommodation request in absence of such information.

Def's' Mem. in Support of Mot. for Summ. J. ("Def's' Mem.") [Dkt. # 56] at 5. While Defendants

characterize the dispute as concerning the denial of a "new" request for an accommodation, *id.*, Mr. Gard challenges the Department's discontinuation of accommodations previously granted, Pl.'s Mem. in Opp'n at 27-28. Regardless, despite her demands for current medical support for his alleged disabilities before considering any accommodation, Ms. Stracke "authorized requested adjustments to [Mr. Gard's] working conditions . . . as a matter of administrative discretion. Such approved adjustments included assignment to a private office and being allowed to work at home on an 'as needed' flex schedule." Def's' Fact ¶ 11. In fact, in September 2006, Ms. Stracke was "somewhat perplexed that accommodation remains an issue, since the Department has given you a private office and allows you to work at home most days on an 'as needed' flex schedule." Pl.'s Mem. in Opp'n, Ex. 8 (Pl.'s Ex. 443-1) (Stracke email to Gard of 9/20/06).

In sum: Mr. Gard had informal approval for many years to work approximately three days a week from home; Ms. Stracke could find no written record of such approval and demanded current medical documentation to grant him a formal accommodation under the Rehabilitation Act; Mr. Gard resented the demand and refused to comply, but did submit medical records from the past; Ms. Stracke refused to countenance a formal accommodation based on decades-old doctors' letters; and, nonetheless, Ms. Stracke essentially allowed Mr. Gard to continue working at home, as needed, on a flex-work schedule, and provided him privacy in the office, thereby silently acknowledging his need for an accommodation.

The pending question is whether the Department made it more difficult for Mr. Gard to obtain a reasonable accommodation of his disability solely because he filed a discrimination charge in March 2005, before Ms. Stracke became his supervisor. The evidence is lacking from which a jury could conclude that his EEO charge, and not his refusal to submit current medical

information, caused Ms. Stracke to refuse to grant him a formal accommodation.

The "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Rw. Co. v. White*, 548 U.S. 53, 57 (2006). Such injury or harm must be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* at 68. The employer's action must be "materially" adverse because the statute protects an employee from significant harms and does not protect one from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Thus, an objective "reasonable person" standard applies and not an analysis of a plaintiff's subjective feelings. *Id.* at 68-69.

Under an objective reasonable person standard, it does not appear that the request for current medical information would be materially adverse. Providing an employer with updated medical documentation as a prerequisite for continued accommodation is a minor inconvenience. *See Dage v. Johnson*, 537 F. Supp. 2d 43, 63-64 (D.D.C. 2008). In *Dage*, Mr. Dage participated in an "alternative work space program" at the Environmental Protection Agency ("EPA"), which allowed EPA employees the ability "to perform work from either their home using telephone and computer equipment or from a specially equipped EPA office space designed to minimize potential exposure to chemicals, allergens, and indoor air pollution." *Id*. at 46. In that program, participants were required to submit a renewal application every two years, including updated medical documentation. *Id*. at 47. Mr. Dage challenged the re-certification requirement as an adverse employment action. Judge Bates, of this Court, disagreed, finding that "[t]he requirement that Dage submit a renewal application every two years d[id] not constitute an action that a reasonable employee would find materially adverse," even if a nuisance. *Id*. at 63. The Department explicitly

argues that there was no material harm or injury to Mr. Gard in providing updated medical information, and his opposition is silent on the point. The Court deems it conceded. *See Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997); *Stephenson v. Cox*, 223 F. Supp. 2d 119 (D.D.C. 2002)).

Mr. Gard acknowledges that his prior accommodation requests were approved orally and not in writing, Pl.'s Opp'n at 32; that he has not submitted medical documentation more current than 1990-1992, *id.* at 26; and that he has not complied with Ms. Stracke's requests for updated medical documentation because he believes the requests themselves violate his "reasonable accommodation rights." *Id.* at 22, 27. This Court has already dismissed his discrimination claim under the Rehabilitation Act, finding that the requests for current medical records did not violate the statute or Mr. Gard's rights.[5] The record is otherwise barren of evidence that would connect the March 2005 discrimination charge to Ms. Stracke's insistence on formality, not informality, in handling Mr. Gard's requests for an accommodation.

Mr. Gard argues:

The heart, meat and bones of the surviving reprisal claim is Defendants', i.e., Linda Stracke['s], continuous refusal to acknowledge that:

a) Plaintiff had submitted requests for reasonable accommodation to

---

[5] *See*, *e.g., Carroll v. England*, 321 F. Supp. 2d 58, 69-70 (D.D.C. 2004) (demanding up-to-date medical records, *i.e.*, within six months, reasonable). Because Mr. Gard did not submit the updated medical information as requested, the Court previously dismissed his discrimination claim. *See* Memo. Op. [Dkt. # 45] at 13.

> Plaintiff's former supervisors prior to March 14, 2005 (Accommodation Fact X);
>
> b) Plaintiff had submitted medical documentation to Plaintiff's former supervisors prior to March 14, 2005, pursuant to Plaintiff's requests for reasonable accommodation (Accommodation Fact Y); and
>
> c) Plaintiff's former supervisors had 1) made the required reasonable accommodation determination, 2) authorized, and 3) provided Plaintiff with the requested reasonable accommodation. (Accommodation Fact Z). . . .
>
> . . . The only reason Accommodation Facts X, Y and Z are in dispute is because Plaintiff dared to file a handicap discrimination refusal to continue reasonable accommodation complaint against Defendants [on] March 14, 2005.

Pl.'s Opp'n at 4-5. Accommodation Facts X, Y and Z are demonstrated by the record before the Court and are not contested by Defendants. (As to Accommodation Fact Z, all parties now agree that any prior accommodation was authorized orally and not in writing, which would appear to be inconsistent with Department policies.) These facts are relevant, however, only if Ms. Stracke denied a reasonable accommodation in retaliation for his March 2005 charge, and not because she sought current medical documentation of Mr. Gard's disability.

Instead of demonstrating a connection between Defendants' denial and his protected activity, Mr. Gard offers allegations without evidentiary support. Mr. Gard alleges the following in support of his retaliation claim — (1) that Ms. Stracke verbally accused Mr. Gard of being a liar, Pl.'s Opp'n at 23; (2) that Ms. Stracke's objective was to deny Mr. Gard reasonable accommodation as it was obvious from her conversations with him that the medical documents that he submitted to her (from 1989 to 1992) would never be adequate, *id*. at 27; (3) that former supervisor Chuck Miller told Mr. Gard that Ms. Stracke and senior agency officials would not allow him to authorize Mr. Gard's accommodations, *id*. at 31; (4) that Defendants want Mr. Gard out of the agency because of

Mr. Gard's success in certain whistleblower claims before the Merit Systems Protection Board, *id.* at 41;[6] and (5) that people in management wanted Mr. Gard to retire, *id.* at 43.

None of these subjective speculations suffices to connect the March 2005 discrimination charge to Ms. Stracke's request for current medical documentation. Ms. Stracke wanted to formalize Mr. Gard's situation: obtain up-to-date medical information, consider accommodations, and put it all in writing. As to points two and three, it is clear, as Mr. Gard argues, that Ms. Stracke did not think that the medical documents from 1989 to 1992 were sufficient and she did not want anyone granting an informal authorization of an accommodation. Points four and five are irrelevant: that Mr. Gard succeeded on whistleblower claims has no bearing on this retaliation claim and the same is true for the generic accusation that management wanted Mr. Gard to retire. Thus, the slim reed of evidence offered by Mr. Gard diminishes to a single alleged incident of Ms. Stracke calling him a liar. To defeat a summary judgment motion, however, a plaintiff may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial. *Greene*, 164 F.3d at 675. Mr. Gard offers no specific facts to support his burden of persuasion that his engagement in protected activity was the "but-for" reason that Defendants refused an official accommodation, rather than his own failure to provide current medical documentation as a precondition to a reasonable accommodation.

## IV. CONCLUSION

The Court will grant Defendants' Motion for Summary Judgment [Dkt. # 56]. The

---

[6] This Court has previously ruled that Mr. Gard's claims of whistleblower reprisal may not be considered as part of his Rehabilitation Act retaliation claim. *See* Memo. Op. [Dkt. # 45] at 13, n.4.

retaliation claim fails for lack of evidence.  A memorializing Order accompanies this Memorandum Opinion.

Date: November 23, 2010                             /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge